1           IN THE UNITED STATES DISTRICT COURT
          FOR THE EASTERN DISTRICT OF TEXAS
2                  MARSHALL DIVISION

3   U.S. SILICA COMPANY,          (   CAUSE NO. 2;20-CV-298-JRG
                                  )
4           Plaintiff,            (
                                  )
5   vs.                           (
                                  )
6   AMBERGER KAOLINWERKE EDUARD   (
    KICK GmbH & Co. KG.,          )   MARSHALL, TEXAS
7                                 (   MARCH 3, 2022
            Defendant.            )   9:00 a.m.
8   _____

9

10
    _____
11
                    PRETRIAL CONFERENCE
12
          BEFORE THE HONORABLE RODNEY GILSTRAP
13          UNITED STATES CHIEF DISTRICT JUDGE

14  _____

15

16

17

18

19

20

21

22           SHAWN McROBERTS, RMR, CRR
             100 E. HOUSTON STREET
23          MARSHALL, TEXAS  75670
                (903) 923-7464
24      shawn_mcroberts@txed.uscourts.gov

25

Shawn M. McRoberts, RMR, CRR
Federal Official Court Reporter

<pre>
 1                      A P P E A R A N C E S

 2      FOR THE PLAINTIFF:     BECK REDDEN LLP - HOUSTON
                               1221 McKINNEY, SUITE 4500
 3                             HOUSTON, TEXAS  77010-2010
                               (713) 951-3700
 4                             BY: MR. MATTHEW WHITLEY
                                   MS. BILMA CANALES
 5
                               THE WEBB LAW FIRM
 6                             ONE GATEWAY CENTER, STE. 1200
                               420 FT. DUQUESNE BOULEVARD
 7                             PITTSBURGH, PENNSYLVANIA 15222
                               (412) 471-8815
 8                             BY:  MR. ANTHONY BROOKS
                                    MS. CECILIA DICKSON
 9
                               SUSMAN GODFREY, LLP - HOUSTON
10                             1000 LOUISIANA ST., STE. 5100
                               HOUSTON, TEXAS  77002
11                             (713) 951-3700
                               BY:  MR. JAMES REDMON
12
        FOR THE DEFENDANTS:    PERKINS COIE LLP - SAN DIEGO
13                             11452 EL CAMINO REAL
                               SUITE 300
14                             SAN DIEGO, CALIFORNIA 92130
                               (858) 720-5721
15                             BY:  MR. MATTHEW BERNSTEIN
                                    MS. ABIGAIL GARDNER
16
                               PERKINS COIE LLP - WASHINGTON
17                             700 THIRTEENTH STREET, NW
                               SUITE 600
18                             WASHINGTON, D.C.  20005-3960
                               (202) 654-6201
19                             BY:  MR. TERRANCE WIKBERG
                                    MR. MICHAEL CHAJON
20
                               PERKINS COIE LLP - AUSTIN
21                             500 W. 2ND STREET, SUITE 1900
                               AUSTIN, TEXAS  78701
22                             (737) 256-6125
                               BY: MS. JANICE TA
23
                               PERKINS COIE LLP - WISCONSIN
24                             33 EAST MAIN STREET, SUITE 201
                               MADISON, WISCONSIN  53703
25                             (608)  663-7460
                               BY:  MS. EMILY GREB
</pre>

```
 1                                  WILSON ROBERTSON & CORNELIUS
                                    ONE AMERICAN CENTER
 2                                  909 ESE LOOP 323, SUITE 400
                                    P.O. BOX 7339
 3                                  TYLER, TEXAS  75711-7339
                                    (903) 509-5000
 4                                  BY:  MS. JENNIFER AINSWORTH

 5          OFFICIAL REPORTER:      SHAWN M. McROBERTS, RMR, CRR
                                    100 E. HOUSTON STREET
 6                                  MARSHALL, TEXAS  75670
                                    (903) 923-7464
 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          THE COURT:  Be seated, please.

2      This is the time set for pretrial matters before the

3  Court in the case of U.S. Silica versus AKW.  This is Civil

4  Case No. 2:20-CV-298.

5      The Court will ask for announcements on the record at

6  this time.

7      What says the Plaintiff U.S. Silica?

8          THE WITNESS:  Good morning, Your Honor.  Matthew

9  Whitley from Beck Redden in Houston ready to proceed.  With me

10  today from Beck Redden, my colleagues Patrick Redmon and Bilma

11  Canales, and my co-counsel from The Webb Firm in Pittsburgh,

12  Cecilia Dickson and Anthony Brooks.

13          THE COURT:  Thank you, counsel.

14      What's the announcement for the Defendant?

15          MS. AINSWORTH:  Good morning, Your Honor.  Jennifer

16  Ainsworth on behalf of Defendant Amberger Kaolinwerke or AKW.

17  We are ready to proceed.  And with me today going around the

18  table is Terrance Wikberg, Matthew Bernstein, Michael Chajon,

19  Janice Ta, Emily Greb, and Abigail Gardner sitting along the

20  wall.  And we are ready to proceed.

21          THE COURT:  All right.  Thank you.

22      Counsel, before we get into the pending motions, let me

23  go over some background housekeeping matters with you.

24      As you're aware, this case is set for jury selection and

25  trial on March the 21st.

1       I'm going to impanel a jury of eight jurors to hear this

2  case.  Each side will be afforded four peremptory challenges.

3  Each side will be afforded 30 minutes to examine the venire

4  panel.  As is the Court's practice, you are able, if you

5  choose, to use up to the first three minutes of your 30

6  minutes to give the panel a very high-level,

7  non-argumentative, thumbnail sketch of what is at issue so

8  that they can have a bare amount of context.  But I'll remind

9  you that's not to be more than three minutes, and it is not to

10  be argumentative.  And if I sense it's argumentative, I'll

11  insert myself in the process, and I suspect that's not what

12  you would like me to do, so keep it non-argumentative.

13       I want to note that apparently the Defendant has

14  indicated on its witness list that it intends to call some

15  witnesses live by Zoom.  That is a matter that's going to need

16  to be taken up with the Court.  It is not my practice to

17  permit that kind of testimony in most cases.  I don't know

18  what the rationale behind that indication is.  I'm not

19  prepared to discuss it at this moment, but I merely say the

20  Defendant should not presume they are entitled to call live

21  witnesses remotely.

22            MS. AINSWORTH:  Your Honor, we will not -- that must

23  have been an earlier version, but we do not intend any longer

24  to request that.

25            THE COURT:  Okay.  Then that solves that.  Thank

1   you.

2        I'm going to afford each side 11-and-a-half hours to put

3   on your evidence during the trial.  That does not include jury

4   selection, nor does it include opening statements or closing

5   arguments.  Each side will be afforded 30 minutes per side for

6   their opening statements and each side will be afforded 40

7   minutes per side for closing arguments.  Plaintiff can divide

8   their closing argument time into two separate closing

9   arguments, with the caveat that you must use at least 50

10  percent of your total time in your first closing argument.

11       I'm going to require, as is the typical practice in this

12  court, for the parties to meet and confer on an ongoing

13  constant basis throughout the trial.  If there are issues that

14  develop between the parties that require the Court's guidance

15  and that you cannot resolve by your meet and confer efforts,

16  then you're to notify my staff not later than 10:00 p.m. of

17  each evening before the next day's portion of the trial of any

18  such disputes.

19       That is not a point to stop trying.  You continue to meet

20  and confer after that 10:00 p.m. notification time, and if by

21  the next morning there are still disputes between the parties

22  that have not been resolved, then at 7:00 a.m. the next

23  morning you're directed to jointly prepare and deliver to

24  chambers a three-ring binder, including a hard copy of what is

25  at issue--for example, a demonstrative slide or something of

1    that nature--together with a one-paragraph narrative of the

2    position each party takes with regard to the substance of the

3    dispute.  And I'll be available by 7:30 to meet with you in

4    chambers to review those disputes and to give you guidance.

5    Obviously, between 7:00 and 7:30 I will be looking at your

6    notebook to see what the issues are.

7         By doing that, the Court intends and hopes to maximize

8    the efficiency and use of your designated trial time.  These

9    are matters that we can handle before the jury comes in and

10   that will save you the use of your time before the jury during

11   the trial, which I've designated and limited.

12        I'm going to handle any disputes regarding deposition

13   designations or counterdesignations on a rolling basis.  I

14   want any such designations raised with me not later than the

15   day before the day you intend to present that deposition

16   testimony.  I do not want to risk a delay in the trial because

17   of technical issues related to restructuring a video

18   deposition because we haven't had enough time in advance to do

19   that.  So make sure that those come to me not later than the

20   day before the day you intend to present them.

21        After all the evidence is presented, including both

22   Plaintiff's case in chief, Defendant's case in chief, and any

23   rebuttal case Plaintiff may put on, then at that time the

24   Court will take up and hear motions from both parties

25   regarding any matter they care to raise under Rule 50(a) of

1    the Federal Rules of Civil Procedure.

2        After I've heard and ruled on any motions raised under

3    Rule 50(a), then I'll conduct an informal charge conference,

4    probably in chambers, it will be off the record, it will be

5    informal and free-flowing, and we'll review at that time the

6    then existing most current iteration of the proposed final

7    jury instructions and verdict form.  I'll be able to hear

8    fully from each side as to any areas where there's a lack of

9    unanimity.  I'll also be able to inquire of any questions the

10   Court may have on its own.

11       And after that fulsome discussion off the record, then

12   the Court will take into account that input and will generate

13   what it believes to then be the correct final jury instruction

14   and verdict form.  I'll furnish that in hard copy form to each

15   side with an opportunity to review it.  And then after you've

16   had an opportunity to review those documents, the Court will

17   conduct a formal charge conference on the record where you may

18   lodge any objections you feel the interest of your clients

19   require.

20       For those of you that are not aware, it's this Court's

21   policy that no one is to refer before the jury and on the

22   record to any individual by first name only.  That goes for

23   counsel, that goes for the witnesses, that goes for everybody.

24   The Court is convinced that that type of reference to

25   individuals by first name only invites confusion in the

1    record.  The Court is likewise convinced that it fails to

2    maintain the minimum decorum necessary for a United States

3    District Court.  So don't talk about John or Jane; talk about

4    John Smith or Jane Jones.  If they have a terminal degree,

5    Dr. Jane Jones is perfectly fine.  And make sure your

6    witnesses are aware of the Court's policy and that they follow

7    it.  If your witnesses don't follow that policy, you will get

8    credit for them not following that policy.  So I remind you of

9    that in case any of you are not aware of my practice in that

10   regard.

11        Also regarding the Court's practice, I'll refer you to

12   the Court's standing order regarding sealing of the courtroom

13   as the means for protecting proprietary or confidential

14   information that's presented during the trial.  Sealing the

15   courtroom under my standing order also seals that portion of

16   the record.  And I will simply make it clear to you that I

17   intend to follow that procedure, and I will not consider

18   requests for post-trial redactions as a means by which to

19   protect confidential or proprietary information.

20        There will be a juror questionnaire available for counsel

21   in advance of voir dire.  I'll refer you to Ms. Clendening,

22   our Deputy Clerk-in-Charge for this division, as to access to

23   those completed jury questionnaires.  You're to follow her

24   instructions as though they come from me.  And I can tell you

25   that those instructions will include an admonition that you

1    are not to copy, retain, scan, or in any similar manner keep

2    the information that comes from those questionnaires.

3         We encourage the citizens in this division to be

4    forthright and candid in answering those questionnaires, and

5    we do that by telling them they won't have to worry about some

6    law firm keeping what they've said is answers to questionnaire

7    questions in a database that will pop up at some later time.

8    So that will certainly be part of that practice.

9         Typically the Deputy-in-Charge will tell you when you can

10   receive hard copies, which you can then review, that you can

11   take and use during jury selection, and then you'll need to

12   return those hard copies to her.  But without more, I simply

13   refer you to Ms. Clendening, and you're to follow her

14   instructions in regard to the use of the juror questionnaires

15   that will be available.

16        I've entered an order regarding exhibits in this case.

17   It's this Court's practice to take up and consider any issues

18   regarding the admissibility of exhibits in advance of the

19   trial.  That practice results in the creation and generation

20   of a list of pre-admitted exhibits.  Those are exhibits that

21   either party has tendered that have not drawn an objection,

22   together with exhibits that have drawn an objection and, after

23   hearing arguments on their admissibility, the Court has

24   overruled the objection and pre-admitted the document or the

25   exhibit.

1          Items from that list of pre-admitted exhibits are freely

2     usable by the parties before the jury during the trial without

3     a predicate or formal offer.  Once used before the jury during

4     the trial, they become admitted exhibits and are part of the

5     record evidence in the case.  Items on the list of

6     pre-admitted exhibits that are not used before the jury during

7     the trial remain pre-admitted and are not evidence in the case

8     and not part of the record.

9          In order to keep a clear delineation of what's an

10    admitted exhibit as opposed to an unused pre-admitted exhibit,

11    I'll expect each side beginning on the second morning of the

12    trial to have a representative available before I bring the

13    jury in who can from the podium read into the record the list

14    of pre-admitted exhibits that they have used during the

15    preceding day's portion of the trial, and we will keep a

16    running tally each morning so that we have a clear record of

17    what's an admitted exhibit that's been used and what's a

18    pre-admitted exhibit not part of the evidence that was not

19    used during the trial before the jury.  Have someone prepared

20    each morning beginning with the second morning to do that.

21         I'm going to direct that the parties jointly collaborate

22    and prepare juror notebooks for use by the jury in this case.

23    I'm directing that the parties prepare and generate 12 copies

24    of a juror notebook and that those are delivered to chambers

25    not later than noon on Wednesday March the 16th.  Those juror

1    notebooks should be typical three-ring binders that include a

2    complete single-sided printed copy of each patent-in-suit.

3        It should also -- or they should also contain a claim

4    construction chart consisting of two columns where entries on

5    the left are the language from the claims that the Court has

6    construed during the *Markman* process, and the column on the

7    right are the corresponding constructions the Court has

8    adopted.  So claim language, appropriate construction

9    side-by-side in two columns running throughout that entry into

10   the juror notebooks.  Nothing else from the claim construction

11   order; simply the claim language and the adopted construction

12   side-by-side in comparative columns.

13       In addition to that, you should include a section of

14   tabbed witness pages with a single page for each witness,

15   whether presented live or by deposition.  Each witness page

16   should have a head-and-shoulders photograph of the witness

17   superimposed at the top of the page with their complete name

18   underneath for identification.  You're not to characterize the

19   witnesses on those witness pages.  Below the photograph,

20   Dr. Jane Jones is fine, but Dr. Jane Jones, Defendant's expert

21   on damages is not fine.  So don't characterize them; just

22   identify them by complete name.  And, obviously, if they have

23   an earned degree, that's an appropriate part of their

24   identification.

25       The remainder of those pages, or each such page, are to

be ruled lines for note-taking purposes, and each of those
pages is to have a tab with the witness' name on it so the
jury doesn't have any great difficulty in finding that page as
the witnesses are called and presented.

Then behind those witness pages should be a legal pad
three-hole punched included in the notebook for additional
note-taking.  And in the front pocket of each notebook should
be a new pen, preferably one that does not click or make
noise.

And again, those 12 juror notebooks should be delivered
to chambers by noon on Wednesday the 16th.

Counsel, I would like to think that we can cover
everything today that's going to be necessary to cover during
pretrial.  Realistically, I'm not particularly convinced
that's going to be able to be done, although we will move as
expeditiously as we can through the various matters before us.
I do not have a follow-up date already identified on my
calendar between now and trial that I can give you to save for
an additional time to take up any unreached pretrial matters.
If we get to the end of the day and we're not finished, I will
continue looking and I'll let you know when I can get you back
here, but I try when possible to have such a date identified
on the first day of pretrial, and I try where possible to put
those days together so that there's not a break in the
process.  Unfortunately, the Court's schedule just is not

1    going to permit that in this case.  But if we don't finish

2    today, we will finish at a yet-to-be-identified future time

3    before we select the jury and go to trial.

4         Also, I'll take just a second to remind both sides that a

5    trial like this inevitably involves lengthy testimony from

6    competing expert witnesses.  I'll remind you that each expert

7    witness in the case is confined to and limited by the four

8    corners of their expert reports.  We're going to get to

9    *Daubert* motions in a little bit.  Expert reports that might be

10   limited or circumscribed by way of the *Daubert* practice are

11   what they are.  But whatever survives as to an expert's

12   written reports at trial define the universe of what they are

13   permitted to testify about.

14        Objections that an expert witness is attempting to

15   testify beyond the scope of their expert report are sometimes

16   legitimate objections, but they are always disruptive

17   objections.  I am not going to have every expert report

18   memorized by the time we go trial.  I hope to have looked at

19   them, but they are not going to be memorized, and if there's

20   an objection raised that an expert's attempting to go beyond

21   the scope of their report and their testimony, the only way I

22   can handle that is to send the jury out, get the expert report

23   before me, hear the argument from both sides as to where and

24   why and how the expert is being called upon to go beyond the

25   scope of the report, hear the response, consider it, rule on

1    it, then bring the jury back in.

2        I want to give you a couple of points to keep in mind in

3    this regard.  Number one, that takes time, and that time is

4    going to be charged to whoever loses on the objection.  If the

5    objection is sustained, then the party who attempted to bring

6    the expert -- or have the expert testify outside the report is

7    going to have all that time taken from their trial time or

8    charged against their designated trial time.  If it's

9    overruled then the objecting party is going to bear the cost

10   of that time.  So bear that in mind.

11       Secondly, and I don't presume any strategic, improper

12   conduct on the part of any of the counsel in this case, I will

13   simply tell you I have tried cases where opposing counsel was

14   making a lot of headway with a witness, an expert witness, and

15   for strategic purposes opposing counsel stood up, objected,

16   said the witness was being called upon to testify beyond the

17   scope of their report simply as a means to break that momentum

18   and rhythm; and once the jury got out of the room, it was

19   clear there was no real basis for that objection.

20       If I determine that objections of that nature are being

21   made for non-meritorious strategic purposes, I will consider

22   that sanctionable practice, and I have reduced trial time in

23   the face of that, I have reduced closing argument time in the

24   face of that.  I have lots of tools in the toolbox that let me

25   make you sorry you did that if you do that.  So don't do that.

1    I'll just put everybody on notice.  I'm not anticipating

2    that, but sometimes it's tempting in the heat of trial to do

3    whatever you can to get an advantage.  That kind of objection

4    misused for strategic purposes is not to be done in this

5    trial.  I'll just make that clear.

6    Let me touch briefly on the matter of public health

7    protocols given that we are still in the COVID-19 pandemic.

8    And this is obviously subject to change depending on what

9    might present itself in the real world between now and our

10    trial date, but at present my intention is to place the venire

11    panel in the entirety of the gallery for voir dire purposes,

12    to space them, and to require each member of the venire panel

13    to be masked.

14    I'll have two Court Security Officers with each holding a

15    separate handheld microphone in the gallery.  When a venire

16    member is called upon to give an answer or to respond directly

17    to a question, my direction to them will be to stand, remove

18    their mask, take a handheld microphone from the Court Security

19    Officer, use it to answer the question or to respond to

20    counsel, hand the microphone back to the Court Security

21    Officer, replace their mask, and have a seat, and that's the

22    process that we'll follow.  That handheld microphone will be

23    wiped down and sanitized by the Court Security Officer before

24    it's used by another member of the panel.  That's why there

25    will be two microphones in the gallery.  And they'll be

1    alternated and sanitized between each use.

2        You'll examine the panel from the podium.  And during the

3    jury selection process I'm going to limit you to not more than

4    four people at each counsel table.  And that can be any four

5    people you want.  It can be one lawyer, a jury consultant, a

6    corporate representative, in-house counsel; it can be four

7    lawyers who appear in the case and are going to participate in

8    the trial; it can be whoever you designate, but it needs to be

9    not more than four people.

10        Your remaining trial team members, any support staff, can

11    congregate and remain downstairs near the magistrate's

12    courtroom.  I don't have other space in this building.  I

13    don't have a jury assembly room.  There's not anywhere else

14    can put them.

15        Once the jury's selected and seated and I've dismissed

16    the remainder of the venire panel, then you are free to bring

17    anybody else that you have associated with you up and place

18    them in the gallery.

19        Once the jury is selected and sworn, I'm going to direct

20    the members of the jury to replace their mask with a clear

21    face shield; something like this.  It's my considered belief

22    you can't try this case and I can't try this case unless we

23    can see the entire face of each member of the jury.  And

24    that's why we will replace -- or I will direct the jury to

25    replace their mask with a clear face shield.

1          I'm going to order the jury sequestered during lunch each

2     day.  That means the court will provide their meals.  That

3     also means they will not be leaving the courthouse; so they do

4     not go out in the community, stand in line at a local

5     restaurant, get exposed to whatever may be there to be exposed

6     to, and bring it back to the courthouse with them.  That's

7     consideration regarding the current public health situation

8     that we're in.  That will also mean that we will probably be

9     able to have shorter lunch breaks and still get everything

10    accomplished, which means we may be able to get in more trial

11    time each day.

12          Speaking of trial time each day, those of you that have

13    appeared before me in trial before are pretty much aware of

14    this, but we're not going to start at 10:00 and quit at 4:00.

15    We're going to start at 8:30 each day and probably go until

16    somewhere in the neighborhood of 6:00.  It's been my

17    experience that jurors in this district, and particularly in

18    this division, and they tell me this repeatedly after trials

19    are over and verdicts have been received, they'd much rather

20    work longer days and be away from their homes and their

21    businesses a shorter number of days than have a shorter day

22    each day and consume a greater number of days away from their

23    homes and businesses.

24          So with that in mind, that's the general approach we'll

25    follow from a timing standpoint or a use of time each day

1    during this trial.

2        There are four separate air filtration units running in

3    this courtroom.  They'll be running throughout the trial.  I

4    will direct that the jury room and the jury box and the

5    restrooms that serve the jury room will be deep-cleaned each

6    evening.  I'm going to share these things with the jury.  I

7    want the jury to be as comfortable and at ease as it can be

8    about any public health issues during the course of the trial.

9    There may be some other things that did not come to mind right

10   now that relate to public health precautions, and if so, I'll

11   share them with you.

12       I do want you to communicate with the Court between now

13   and the trial date.  I want to know who's vaccinated and who's

14   not vaccinated on each trial team before we begin this trial.

15   If you're not fully vaccinated, you need to wear a mask at

16   counsel table or inside the bar, unless you're at the podium;

17   then, of course, at the podium you'll take the mask off and

18   put it back on when you leave the podium.  If you're fully

19   vaccinated, you're not required to wear a mask in the well of

20   the courtroom during the course of the trial at counsel table.

21   If for any reason you're vaccinated but you would prefer for

22   your own reasons and given your own personal circumstances to

23   be masked, you're entitled to do that.

24       I intend to conduct any necessary bench conferences here

25   at the bench.  I want an idea of who's talking to me six

1    inches away from my face outside of the hearing of the jury

2    during the trial.  I've been vaccinated, I've been boosted,

3    I'm not going to have a mask on during the trial.  That's for

4    your information.  I want to know your status before you come

5    up here to the bench during the trial and we whisper about an

6    issue outside of the jury's hearing that needs to be dealt

7    with.

8        So between now and the 21st, make sure my staff knows

9    who's on each trial team and who's -- the status of their

10   vaccination condition before we start the trial.  I think

11   that's only reasonable.

12       I have during earlier times in the last two-plus years

13   done bench conferences in the jury room, which means I have to

14   get up and leave the bench, I have to take the court reporter

15   with me, and I have to bring counsel into the jury room, and

16   then we have to have the bench conference outside of the

17   jury's hearing spread out and spaced.  That's a very

18   cumbersome process, it takes a lot of time, it breaks and

19   disrupts the trial.  It also makes the jury nervous about the

20   people that are using their jury room when they're not in

21   there.  So I'm going to try my best to avoid that.

22       But if you're not vaccinated, I want to know about it,

23   especially with regard to whether I'm going to be in close

24   physical proximity during bench conferences during the trial.

25   I'm not asking for that information today, but I want a

 1    complete review of it from each trial team shared with my

 2    staff before we get to the 21st of March.

 3        All right.  Are there any questions from either Plaintiff

 4    or Defendant about these background/housekeeping matters that

 5    I've gone over with you?

 6        Anything from Plaintiff?

 7            MR. WHITLEY:  Your Honor, may I speak from here or

 8    do you want me to go to the podium?

 9            THE COURT:  Typically I have everybody go to the

10    podium, but you have a nice strong voice.  If you'd rather

11    stay there, I'll be glad to let you speak from there.

12            MR. WHITLEY:  I only have two -- well, one question

13    and then just one thing to alert the Court.

14        As far as alerting the Court, I wanted to make sure you

15    knew in the pretrial that, while I don't think we're going to

16    talk about it today, we do have a request for injunctive

17    relief.  So that would be a post-trial matter depending on

18    what the verdict is.

19        My question relates to the Court's procedure for closing

20    the Plaintiff's case and dealing with adverse witnesses from

21    the Defendant.  Obviously, some of our evidence we plan to get

22    will be admissions from the Defendant's witnesses who will be

23    testifying live.  Does the Court want -- does the Court have a

24    procedure where it requires us to formally close our case such

25    that we need to call their witnesses, or is our evidence open

1    throughout the duration so we can just get what we need from

2    cross examination when those witnesses are called by the

3    Defendants?

4            THE COURT:  Well, let me answer you this way.  When

5    I ask Plaintiff to call their next witness and you tell me

6    you've called all your witnesses, then I'll tell the jury the

7    Plaintiff has closed the Plaintiff's case in chief, and we'll

8    proceed with the Defendant's case in chief.  However, because

9    I'm not going to take up 50(a) motions until after all the

10   evidence is in, anything that you elicit during the

11   Defendant's case in chief by way of an admission or other

12   evidence is before the Court at such time as I would hear

13   anything under Rule 50(a).  So I'm not sure that it's a big

14   substantive issue as much as it is a matter of form.

15       If you choose to, you have the right to call the

16   Defendant's witnesses adversely, and I will leave it to you as

17   to whether you believe in the management of your part of the

18   trial you're better off calling them adversely in your case in

19   chief or waiting until you cross examine them in the

20   Defendant's case in chief.  I guess you run the risk that they

21   don't call who you want to cross examine, but that's a

22   decision you get to make.  I don't make that decision.

23       But I'll ask -- I'll delineate when the Plaintiff's case

24   in chief has been completed as a part of making the jury aware

25   of where we are in the process.  But I don't know -- unless

1    you think of something I'm not thinking of, I don't know how

2    that's going to make any difference, because I will have heard

3    the Defendant's case in chief, and I'll have heard any

4    rebuttal case you've put on before I ask either side to move

5    for any relief under rule 50(a).

6            MR. WHITLEY:  I think you answered the question.  I

7    appreciate it.

8            THE COURT:  All right Do you have anything else?

9            MR. WHITLEY:  Nothing from the Plaintiff, Your

10   Honor.

11           THE COURT:  Is there anything from the Defendant?

12           MR. BERNSTEIN:  Your Honor, just one quick question

13   about vaccination status.

14           THE COURT:  Yes, sir.

15           MR. BERNSTEIN:  Do you want that from the witnesses

16   who are going to be testifying live as well or just the

17   attorneys?

18           THE COURT:  Well, I'm mainly concerned about the

19   attorneys because, as you can see, the witness stand is

20   encased in plexiglas, and it's encased on my side as well, so

21   I'm not particularly worried about the witnesses.  I am

22   primarily worried about close proximity to counsel during

23   bench conferences.  If you've got a witness -- I mean, let's

24   put it this way.  If one of your witnesses is your corporate

25   representative and they're going to sit with you at counsel

1    table inside the bar throughout the trial, then I need to know

2    what their status is; and if they're not vaccinated, they need

3    to be masked just like a member of your trial team.  If

4    they're going to be in the gallery -- or they're going to be

5    under the Rule outside the courtroom, then I'm not as

6    concerned about that.  They'll need to be -- if they're not

7    vaccinated they'll need to be masked.

8         And also that raises another point.  My practice is that

9    during the trial anybody in the gallery remains masked.  I

10   don't care if they've had 15 vaccinations.  I'm not going to

11   inquire about vaccination status of everybody in the gallery.

12   If they're part of your trial team that's in overflow and you

13   put them in the gallery, they'll need to wear a mask.  If

14   they're inside the bar, they're vaccinated, they don't have to

15   wear a mask.  But your support team, your shadow jury, if you

16   have one, anybody in the gallery is going to have to be masked

17   throughout the trial.

18             MR. BERNSTEIN:  Thank you, Your Honor.

19             THE COURT:  Anything else?

20             MR. BERNSTEIN:  Nothing further from Defendant.

21             THE COURT:  Okay.  Thank you.

22        All right.  Let's turn to the disputed dispositive

23   motions between the parties.  I'm going to attempt to follow

24   the order that you suggested to my staff when we reached out

25   and asked for your opinions on the priority of how these ought

1    to be structured and taken up.

2        With that in mind, we'll turn first to the Plaintiff's

3    motion to dismiss Count 9 of its amended complaint.  This is

4    Document 124.

5        Let me hear from the moving Plaintiff on this, please.

6            MS. DICKSON:  May I approach the podium, Your Honor?

7            THE COURT:  You may.  And there's no need to

8    separately ask to approach the podium during the trial.  If

9    you want to approach the bench or the witness, you need to ask

10    me, but just go to podium when it's your time.

11        All right.  Please proceed.

12            MS. DICKSON:  This motion seeks dismissal of Count

13    11 of Plaintiff's amended complaint which pertains to the

14    infringement allegations associated with U.S. patent

15    No. 10,253,493.

16            THE COURT:  And for the record, you are Ms. Dickson.

17            MS. DICKSON:  I am Ms. Dickson.

18            THE COURT:  I will ask everybody to identify

19    themselves whey they to go to the podium so we keep the record

20    straight.

21        Go ahead, Ms. Dickson.

22            MS. DICKSON:  Thank you, Your Honor.

23        It appears from the briefing that there is no dispute

24    with regard to dismissal of Plaintiff's allegations.  Where

25    the dispute now seems to reside is whether or not Defendant

1    can continue to maintain counterclaims seeking declaratory

2    judgment of non-infringement and invalidity.

3              THE COURT:  You're seeking to dismiss your

4    affirmative infringement claim with prejudice.  Is that

5    correct?

6              MS. DICKSON:  We are, and we are also seeking to

7    dismiss out prejudice the two declaratory judgment claims.

8    And it seems, based on the briefing, that the parties have

9    agreed to dismissal of our affirmative infringement count, but

10   where we are still in dispute is what happens to the two DJ

11   counts.

12             THE COURT:  Well, let me ask you this.  I can see an

13   argument that the dismissal of your affirmative claim with

14   prejudice might moot the Defendant's counterclaim of

15   non-infringement or declaratory judgment seeking a finding of

16   non-infringement.  I'm not sure I see how the dismissal of

17   your affirmative infringement claim with prejudice prevents

18   Defendants from going forward with their declaratory judgment

19   counterclaim for invalidity.

20             MS. DICKSON:  It would be Plaintiff's position there

21   is no actual immediate justiciable controversy on that point

22   for the following reason:  The only accused product that has

23   been timely disclosed in discovery, the only formulation that

24   has been identified is being addressed in this instance.

25   There has been no evidence presented that Plaintiff has

1    discussed the '493 Patent with any of Defendant's purported

2    customers, and so we don't see where this is an appropriate

3    time to be considering it.

4         Defendant points to the possibility that they may seek to

5    change the formulation, they may seek to do a lot of things in

6    the future, and at that point in time if that happens and it

7    now falls within the scope of the '493 claim, then we may be

8    back here.  But at this point in time, there doesn't seem to

9    be a basis where Plaintiff has ever alleged to customers or,

10   frankly, now that it's gone through the interaction of looking

11   at what has been timely disclosed in discovery, that it has

12   made any sort of claim with regard to the current

13   commercialized formulation that has been disclosed by

14   Defendant in this case.

15         THE COURT:  Well, I'm confident the Defendant is

16   going to tell me that if you hadn't sued them for infringement

17   under the '493, they would have never had an opportunity to

18   bring this counterclaim, and it's your fault that it's in the

19   case, and you don't get to manage their counterclaims anymore

20   than they get to manage your affirmative claims.  That's what

21   I would expect them to tell me.

22         MS. DICKSON:  I think they may.  But what's unique

23   about this case, when -- prior to filing the complaint,

24   Plaintiff had no intention of bringing a '493 Patent into this

25   case.  We didn't know one way or the other whether there was

1    any sort of basis for infringement.  Defendant approached

2    Plaintiff and asked for a broad covenant not to sue based on

3    that patent, claiming it was part of some discussion with

4    customers and that we had somehow put it at issue.  There's

5    been no evidence of that.  So from the get-go it was their

6    answer and counterclaim that injected the '493.

7         Where things sort of shifted, as we -- you know, the case

8    meandered through, we got a discovery response that gave broad

9    ranges of percentages of the formulation.  And we said, Well,

10   it could be.  So rather than have the motion to dismiss

11   continue to pend, because we had no basis to assert the '493

12   affirmatively, we brought it into the case, no objection was

13   raised by Defendant, and then as discovery proceeded through

14   expert discovery, the only time we disclosed formulation did

15   not meet those percentages.

16        And it was at that point in time we said, You have no

17   evidence that we've approached customers, you have not

18   provided us any commercialized product that falls within this

19   range, so at this stage we don't see a justiciable

20   controversy.

21        Now, I know Defendant is going to say, Well, we have all

22   of these different things that could happen in the future

23   where we may commercialize a different product with different

24   percentages of feldspar and quartz and clay.  That can happen.

25   But as in any patent case, if someone introduces a new product

1    with a new formulation, regardless under what marketing term

2    they call it, then that's something that we discuss, and if we

3    see something that is problematic at that point in time that

4    is commercialized, then I think it would be appropriate.

5    Otherwise, I don't see that this is a timely issue for this

6    case.

7                THE COURT:  All right.  Thank you.

8                MS. DICKSON:  Thank you.

9                THE COURT:  Let me hear response from Defendant.

10               MS. AINSWORTH:  Good morning, Your Honor.  May it

11   please the Court.

12         Your Honor, looking at Plaintiff's motion to dismiss, it

13   sounds like this is a situation where AKW just won't take yes

14   for an answer or won't take dismissal for an answer, but

15   that's not the case.  AKW would be more than willing to have

16   the '493 Patent out of this case, and, in fact, we don't ever

17   want to see this patent again, but that's the exact reason why

18   we can't agree to their current motion to dismiss our

19   counterclaims without prejudice, because we've seen throughout

20   their briefing and from counsel's statement right here on the

21   stand that we would see this patent again.  I mean, counsel

22   just now said, We may be back here again in the future if

23   there's a change in the formulation of the current accused

24   product.

25         If U.S. Silica would dismiss the '493 Patent and provide

1    a covenant not to sue AKW or its customers for future

2    products, then we would be glad to agree to the dismissal of

3    the counterclaims.  However, as it stands, there is still very

4    much a live controversy regarding both the invalidity and the

5    infringement of the '493 Patent, and it's black letter law

6    that a non-infringement finding does not moot a counterclaim

7    of invalidity, as the Court raised already in argument.

8         Procedurally this is a little bit of an unusual status in

9    that it's not the typical situation where a plaintiff filed an

10    infringement case and a defendant as a matter of course just

11    did a pro forma counterclaim of non-infringement and

12    invalidity.  These were actually our counterclaims to begin

13    with.

14         And the way that this all played out was U.S. Silica sent

15    letters to AKW's customers threatening with regard to their

16    patent portfolio.  The patent portfolio included the '493

17    Patent.  AKW provided samples of products pre-litigation.

18    When U.S. Silica filed suit, they filed suit on the other

19    patents but didn't include the '493.  So in our answer, AKW --

20         THE COURT:  Let me stop you, Ms. Ainsworth.  I

21    really am not concerned with this story line that the

22    Plaintiff got tricked into adding the '493 Patent, or the

23    Defendant was somehow at fault, or everybody didn't know

24    everything there is to know at the time the pleadings were

25    filed.  At some point the Plaintiff made a conscious

1   affirmative decision to add the '493 Patent to their suit.

2   The Defendant filed these two declaratory judgment

3   counterclaims, as they have a right to do.  The Plaintiff has

4   a right to dismiss that affirmative claim of infringement on

5   the '493.

6       I'm going to grant their motion to dismiss it with

7   prejudice.  I'm going to find that having granted that motion

8   to dismiss with prejudice, it makes your counterclaim for

9   non-infringement moot, and your counterclaim for

10  non-infringement declaratory judgment for non-infringement is

11  dismissed without prejudice.  But I don't see how that impacts

12  the counterclaim for declaratory judgment of invalidity for

13  the '493.  And I'm going to deny the motion of the Plaintiff

14  to dismiss the declaratory judgment counterclaim regarding

15  invalidity of the '493.

16      Now, if you two sides want to negotiate between now and

17  the trial about agreements not to do this or not to do that

18  and that results in an agreed motion to take the declaratory

19  judgment counterclaim regarding invalidity out of the case

20  before trial, you're free to do that, but you're not going to

21  negotiate in front of the Court from the podium, We'll do this

22  if you do that and if you do that we'll do this.  Procedurally

23  it seems very clear to me that the counterclaim for

24  declaratory judgment of invalidity is not impacted by the

25  dismissal that the Plaintiff is entitled to receive.

```
 1         And so that's going to be my ruling.  The counterclaim

 2    for declaratory judgment regarding invalidity of the '493, the

 3    motion by Plaintiff to dismiss that is denied; the Plaintiff's

 4    motion to dismiss their affirmative claims regarding

 5    infringement of the '493 are granted with prejudice; and the

 6    Plaintiff's motion to dismiss the Defendant's counterclaim of

 7    non-infringement regarding the '493 is granted but without

 8    prejudice.  That's going to be the Court's ruling.

 9         MS. AINSWORTH:  Yes, Your Honor.

10         There may be some evidentiary issues that arise later in

11    the day as we work through some motions in limine and exhibit

12    objections.  I just wanted to alert the Court that there are

13    some exhibits still on the list with regard to the '493 that

14    we are going to still need to offer and we believe are

15    relevant to infringement issues.

16         THE COURT:  If they don't relate to your surviving

17    invalidity claim, they are probably not relevant, but we'll

18    get to exhibits when we get to exhibits.

19         MS. AINSWORTH:  Thank you, Your Honor.

20         THE COURT:  All right.  Next up is Defendant's

21    motion for partial summary judgment, Document 133.

22         And I'll hear from the moving Defendant.

23         MR. WIKBERG:  Good morning, Your Honor.  Terry

24    Wikberg for Defendant AKW.  I'll be arguing this motion and

25    the corresponding Plaintiff's motion.
```

1          THE COURT:  Good morning.

2          MR. WIKBERG:  I've been tasked with presenting the

3    Court with our slide presentation for today.  May I approach?

4          THE COURT:  You may approach.  Give them to the

5    Courtroom Deputy.

6          MR. WIKBERG:  I also have a copy for the Plaintiffs.

7          THE COURT:  All right, sir.  Let's proceed with your

8    argument.

9          MR. WIKBERG:  My argument begins on page 7 of our

10   slide presentation.  Your Honor, up until recently there were

11   five patents in the case related -- all related.  They were

12   the Sexauer patents or the roofing system patents.  There now

13   only remains three, so the claim presentation on slide 8 of my

14   presentation is not quite accurate.  All that is currently

15   remaining are claim 9 from the '303 --

16         THE COURT:  I'm aware of your narrowing that you

17   filed on the docket.

18         MR. WIKBERG:  All right.  Thank you.

19      All of these related patents, the roofing system patents,

20   claim priority to the same priority provisional application,

21   the '285 application, which was filed in 2009.  They purport

22   to claim priority to that in an effort to predate some prior

23   art that Defendant has identified in this case.  But if we

24   look at the provisional disclosure, it does not expressly in

25   itself disclose certain claim limitations that are found in

1    the asserted claims.

2        In the five remaining asserted claims, we are dealing --

3    and for purposes of my discussion today, we'll only discuss

4    really two limitations.  They are the 'crushed' limitation and

5    they are the solar reflectance of the granules or particles

6    themselves.

7        Throughout discovery in this case, Plaintiffs have only

8    pointed to the disclosure of the '285 provisional application

9    and have never identified in any discovery response any

10   disclosure from any other reference to support their claim for

11   priority, even though Defendant proposed an interrogatory

12   asking for that specific information.

13       For the first time in the pleadings, frankly, did

14   Plaintiff acknowledge expressly that the '285 provisional on

15   its face and by itself did not disclose the limitations that

16   are in the claims, but then relied on incorporated patents.

17   The Plaintiff's argument fails as a matter of law because they

18   are simply resting on the incorporation by reference as if

19   that is the end all be all of the analysis, and that is not

20   the case.

21       As the cases cited both by Plaintiff and Defendant,

22   specifically the *Paice* case makes clear, as well as *Modine*,

23   incorporation by reference does not convert the invention of

24   the incorporated patent into the invention of the host patent.

25   The analysis is more than simply the incorporation by

 1   reference, but one must look at the applicability of what was

 2   in the incorporated patent and does it apply to the subject

 3   matter of the provisional application.

 4       And the logic behind that is fairly sound.  A person of

 5   ordinary skill in the art must know and understand that the

 6   inventors possessed the invention as currently claimed in the

 7   asserted claim, and so there must be some logical

 8   applicability between what is incorporated by reference into

 9   the provisional application to claim that priority.

10       Because Defendant AKW has identified intervening art, the

11   burden shifts now to the Plaintiff to show that they are

12   entitled to the priority date of the provisional application.

13           THE COURT:  Let me stop you, counsel.  Am I not

14   correct, this motion seeks a summary judgment at least on a

15   partial basis of non-infringement?  Why are we talking about

16   priority dates?

17           MR. WIKBERG:  I'm sorry.  I thought we were talking

18   about the priority motion.  The non-infringement motion has

19   been mooted by the dropping of claims by the Plaintiff.

20           THE COURT:  Okay.  Document 133, AKW's motion for

21   partial summary judgment of non-infringement, that's what I

22   thought we were on.

23           MR. WIKBERG:  I misheard you, Your Honor.  I

24   apologize.  I stepped right up.  But I believe that that

25   motion has been mooted because that summary judgment motion

1  was directed to claims that have since been dropped by

2  Plaintiff.

3          THE COURT:  Does Plaintiff concur with that?

4          MR. BROOKS:  Plaintiff concurs, Your Honor.  Thank

5  you.

6          THE COURT:  Okay.  Well --

7          MR. WIKBERG:  I misheard you, Your Honor, and I

8  stepped right up.  I was so anxious to get talking, and that's

9  on me.

10          THE COURT:  Well, Document 133, defendant's motion

11  for partial summary judgment of non-infringement, will be

12  denied as moot based on the agreement of the parties.

13      So that brings us to the priority issue.

14          MR. WIKBERG:  All right.  I apologize, Your Honor.

15  I certainly hope you don't want me to start over.

16          THE COURT:  No.  I heard what you were arguing, I

17  just didn't know how it related to non-infringement.

18          MR. WIKBERG:  No, it doesn't.

19          THE COURT:  And for the record, there are dueling

20  motions here.

21          MR. WIKBERG:  That is correct.

22          THE COURT:  And it's my intention to hear composite

23  argument from both of you on both motions.  So argue on both,

24  argue why yours is right and theirs is wrong, and they will do

25  the same.

 1           MR. WIKBERG:  Understand, Your Honor, and I

 2    apologize.

 3           THE COURT:  No problem.

 4           MR. WIKBERG:  I'm just so excited to get chatting

 5    this morning.  And the arguments are the same and, frankly,

 6    the limitations, the 'crushed' limitation and the 'solar

 7    reflectance' limitation span both motions and are dispositive

 8    of both motions, so my discussion here is equally applicable.

 9    And so for the reasons we believe our motion should be granted

10    is the same reasons their motion should be denied.

11        So as I was saying, the Plaintiff focuses only on the

12    incorporation by reference aspect of the analysis as set forth

13    in the *Modine* and *Paice* cases and believes that's dispositive

14    of the issue.  However, that is not for the reasons I stated

15    before.

16        So as a matter of law, by failing to apply the

17    appropriate standard, as identified by the Federal Circuit in

18    those cases, and not coming forward with any analysis in

19    opposition to Defendant's motion or in Plaintiff's affirmative

20    motion as a matter of law, the Defendant's motion should be

21    granted and Defendant's motion should be denied.

22        But even beyond that, if we look to the limitations

23    specifically referenced, the 'crushed' limitation and the

24    'solar reflectance of the granule' limitation, the 'crushed'

25    limitation is not discussed at all by their expert, and only

 1   -- Plaintiff's only come forward with attorney argument as to

 2   that limitation.  It's not discussed at all by their expert,

 3   Doctor Weinstein, in his report.  He skips it completely.

 4   And, again, therefore, there is no substantive discussion on

 5   the applicability of the 'crushed' disclosure that may exist

 6   in the incorporated patents and references to the disclosure

 7   of the provisional.

 8        Similarly, with respect to the 'solar reflectance of the

 9   granule', there is no discussion whatsoever of the

10   applicability of the Fensel reference, which is what

11   Plaintiffs rely on for the 'solar reflectance of the granule'

12   and the granule type in the provisional.  And, frankly, that

13   makes sense.  They are entirely different solutions to a solar

14   reflectance problem.  In fact, the only evidence put forth by

15   any party on the applicability was put forth by Defendant AKW

16   through expert, Doctor Klink, who made it very clear that the

17   Fensel disclosure is entirely different from the disclosure of

18   the '285 Patent; and because of those differences, a person of

19   ordinary skill would not have looked and believed that the

20   named inventors of the '285 provisional were in possession of

21   the disclosure in the Fensel application.

22        And that's -- one of the primary differences is that the

23   Fensel patent is related to a painted roofing system, where

24   the granules are different material and are then ultimately

25   painted to get the reflectance level that's disclosed in

1    the -- in that Fensel; whereas --

2           THE COURT:  Let me stop you, counsel.  But isn't the

3    issue of whether a person of ordinary skill would have

4    recognized these differences as either inadequate to be a

5    material difference or adequate to be a material difference,

6    and isn't the question of whether the written description

7    would have been adequate here, aren't these fact questions and

8    how do we dispose of fact questions in the context of a

9    summary judgment motion?

10          MR. WIKBERG:  Well, they may be, Your Honor, but in

11   both Plaintiff's opening brief for purposes of their motion

12   and the opposition to Defendant's motion, they don't address

13   it or rely on it or come forward with any of those facts, and

14   simply argue incorporation by reference, and then are critical

15   of Doctor Klink; but their expert, Doctor Weinstein, has

16   proffered no evidence or testimony of the applicability or

17   similarity or how a person of ordinary skill in the art would

18   see the reflectance of Fensel--we'll focus on reflectance for

19   purposes of this discussion--is applicable to the disclosure

20   of the '285 provisional.

21       So while -- I would agree with that statement, but those

22   facts are not in dispute here.  And by failing to address it

23   as -- failing to address applicability, as a matter of law

24   their motion should fail and Defendant's motion should win.

25          THE COURT:  All right.

1        MR. WIKBERG:  So as stated earlier as far as

2    'crushing' versus 'grinding', their expert provides no

3    testimony whatsoever.  His report skips it altogether.  There

4    cannot be a factual dispute.  As you stated earlier in your

5    presentation, an expert will be unable to opine outside of

6    their report, so they could come forward with no facts with

7    respect to the 'crushing' and 'grinding' limitation.

8        And, as stated, only Doctor Klink's, AKW's expert,

9    discusses the applicability issue, and he makes it very clear

10   they are apples and oranges; it's completely different

11   technology; and because of that, a person of ordinary skill in

12   the art would not see that the named inventors of the

13   provisional would be in possession of the reflectance found in

14   the Fensel document.

15       And then, finally, even if we were to give them credit,

16   even if Fensel was incorporated and there was some

17   applicability, some factual evidence of applicability, which

18   there is none in this case, the *Indivior* case, which goes

19   unresponded to by Plaintiffs, would control here.  In

20   *Indivior*, there was a disclosure in the provisional

21   application of a range of at least 25 percent.  The asserted

22   claims in that case had a more specific range of 40 to 60

23   percent, and then there was another claim with a narrower

24   range.  The Federal Circuit made it very clear, the priority

25   document did not have those bounds, and because there was no

1    bounds of 40 to 60 percent in the provisional, there was no

2    support for it.

3        And that's what we have here.  If we were to credit

4    everything, applicability and incorporation by reference,

5    Fensel at best discloses or its broadest range is, say, 35 or

6    45 percent to 99 percent.  There is no upper bound of 92

7    percent that we find in the asserted claims for 'solar

8    reflectance'.  All of the asserted claims for 'solar

9    reflectance of the granules' have a range of 80 to 92 percent.

10   The provisional application only discloses 80 to 87 percent;

11   and Fensel, given its most optimal read in Plaintiff's favor,

12   is 45 to 99 percent.  There is no disclosure of the claimed

13   range.

14       So taking everything else, if we ignore everything else,

15   their failure to address applicability, their failure in

16   discovery to identify anything from the incorporated patents

17   as supporting their claim limitations, we rest on *Indivior,*

18   it's controlling law, they fail as a matter of law in their

19   priority document and any of the incorporated art to disclose,

20   at the very least, the 'solar reflectance of the granule'.

21   And again, the 'crushed' limitation is not addressed at all by

22   their expert.

23           THE COURT:  All right.  What else?

24           MR. WIKBERG:  Your Honor, that's it.  Thank you.

25           THE COURT:  Let me hear a response from Plaintiff,

1    please, and an affirmative argument on Plaintiff's own motion

2    since we're taking them both up together.

3                MR. BROOKS:  Thank you, Your Honor.  May it please

4    the Court.  Anthony Brooks on behalf of Plaintiff.

5                THE COURT:  Please proceed.

6                MR. BROOKS:  Thank you, Your Honor.

7          The first question I'd like to address, Your Honor, is,

8    is this really a question of fact that we're dealing with

9    here.  I know Your Honor asked opposing counsel that while he

10   was up here.  And the answer is, Your Honor, it is not.

11   Incorporation by reference and the extent of incorporation by

12   reference has been held several times by the Fed Circuit to be

13   a question of law.  And the reason there is no question of

14   fact here in this case, even as to the applicability, which

15   I'll explain in a minute is not the standard for incorporation

16   by reference, is Doctor Klink does not -- Defendant's

17   invalidity expert, in his report at pages 48 to 52 does not

18   even address incorporation by reference as to the disputed

19   claim limitations in both Plaintiff's affirmative motion and

20   Defendant's affirmative motion.  Incorporation by reference

21   was only addressed by Doctor Klink when he was confronted by

22   the disclosures of the incorporated by reference references in

23   his deposition.  And so it's unclear to Plaintiffs, Your

24   Honor, how this issue of applicability is even going to be

25   presented to the jury by Defendants.

1    And so what we have here now is undisputed facts that

2  Fensel and Shiao are incorporated by reference in the '285

3  provisional.  We have undisputed facts that Fensel and Shiao

4  were both directed to reflective roofing granules.  We have

5  undisputed that Fensel discloses not 45 to 99; it has a closed

6  range of 65 to 99 percent for granule reflectivity.  It also

7  has a closed range from system reflectivity of 65 to 85

8  percent.  It has size of -- a granule size of 0.3 millimeters.

9  And it discloses crushed reflective roofing granules, as does

10  Shiao.  So the only dispute here is applicability, which

11  Defendants are unable to present to the jury.

12    And even apart from that, this applicability argument is

13  legally incorrect.  As I noted at the top of my argument,

14  incorporation by reference is a question of law, and here in

15  the '285 provisional we have a very, very broad incorporation

16  by reference.  It states that the incorporated references are

17  incorporated in their entireties for all purposes.

18    And actually the *Paice* case, which Defendant relies on,

19  actually confirms that very broad and unambiguous

20  incorporation by references mean just that; they mean that the

21  entirety of the disclosures are incorporated.  And --

22    THE COURT:  Let me ask you this, Mr. Brooks.  I

23  mean, if I accept your argument that incorporation by

24  reference is a question of law, that doesn't address what

25  flows from that, and that is whether or not whatever is

1    incorporated is applicable, and isn't applicability a fact

2    question, not a legal question?

3                MR. BROOKS:  Your Honor, it can be a fact question,

4    but here it is not a genuine question of material fact because

5    Defendants have no evidence that they can put in front of the

6    jury in that regard.

7         And applicability is not a separate step in the test for

8    written description.  The *Paice* case said that applicability

9    and disclosure are two different concepts, but it didn't say

10   that in the manner of creating a different test for whether an

11   incorporated by reference provides sufficient written

12   description support.  What it said was merely -- was -- the

13   Court was saying that merely to counter the board's conclusion

14   that a qualifying statement on incorporation by reference

15   limited the extent of the incorporation by reference.

16        But -- and, you know, substantively additionally, Your

17   Honor, how much applicability do we need to show here?  Again,

18   there is no dispute that there is reflective roofing granules

19   in these references, there is no dispute that they have a

20   range that encompasses the claimed ranges of reflectivity,

21   there's no dispute that they're crushed, and there's no

22   dispute that they're sized appropriately according to the

23   claim size, and there's no dispute that they're put on asphalt

24   sheets.

25        And so, again, how close do we have to come?  There's

1    always going to be differences between an incorporated

2    reference and the host document.  You know, otherwise you

3    would -- you know, an inventor would be required to go

4    essentially pre-invalidate his patent by finding something

5    that disclosed exactly what his invention was.

6        And then the point about the mechanisms being different

7    is actually inaccurate as well, because if we look at Fensel,

8    and in particular, Your Honor, column 12, line 35, the

9    granules may be coated.  Right?  So the paint is optional.

10   And there are other examples in Fensel where it discusses the

11   coating, which is what Doctor Klink says makes this so

12   different; although our position is it doesn't matter how the

13   Fensel granules, if they're reflectivity, it's still

14   reflectivity of a reflective roofing granule.  Column 29,

15   lines 27 through 30, if the desired reflectivity is not

16   obtained, a layer of paint can be positioned -- or can be put

17   onto the granules.

18       And so, again -- and when you look at the disclosures

19   relying on for the reflectivities in Fensel, there is nothing

20   stating that they need to be coated by paint.  And, indeed,

21   one of the embodiments in figure 9 doesn't have any paint, and

22   so it's entirely optional.  So this position that the

23   mechanisms are completely different is really inaccurate.

24       And then to the point, Your Honor, that our expert,

25   Doctor Weinstein, does not address the 'crushing' limitation,

1    you know, admittedly he did not address under a separate

2    heading Doctor Klink's 'crushing' position.  However, if we

3    turn to his report at page 22, he does cite the Shiao

4    reference as disclosing mineral particles which can be

5    produced by a series of pouring and crushing.  And so there is

6    evidence of that in the case.

7         So -- and again, it is Defendant's expert that does not

8    have any evidence that the incorporation by reference is

9    inapplicable in this case.  And as a matter of law, what we

10   termed the subject claims in our motion should be afforded the

11   priority date of the '285 provisional.

12             THE COURT:  All right.

13             MR. BROOKS:  With that I'll rest.  Thank you.

14             THE COURT:  Do you have something additional?

15             MR. WIKBERG:  I do, very briefly, Your Honor.

16             THE COURT:  All right.

17             MR. WIKBERG:  And thank you.

18        If we could pull up the -- I'd like to direct the Court

19   to slide 16.

20        Mr. Brooks started his argument and was critical of the

21   analysis in Doctor Klink's report.  Doctor Klink is our

22   invalidity expert and, therefore, his -- he issued an opening

23   report not a rebuttal report.  And this slide exhibits the

24   interrogatory response that Defendant AKW received from

25   Plaintiff regarding 'priority'.  At no point in this

1    interrogatory response is there a reference of any aspect of

2    the disclosure of Fensel or Shiao or any of their detailed

3    subject matter that was -- that Plaintiff was relying on to

4    support their claim for 'priority'.

5        Now, admittedly, a few of the paragraphs cited in this

6    interrogatory response are the paragraphs in the provisional

7    that incorporate, but there was no direction to anything for

8    our expert to look at to say, Wait, they're actually relying

9    on the disclosure of 'crushed' and Shiao, or they're relying

10   on the reflectance limitations of Fensel for the granule.  So

11   Doctor Klink analyzed what was presented, what their argument

12   were in discovery, and provided that.  But Doctor Klink did

13   provide very detailed testimony as to applicability in his

14   deposition when asked about his analysis.

15       Mr. Brooks talked about differences here in his argument,

16   but those were Mr. Brooks' views of the differences.  Their

17   expert, Doctor Weinstein, provided none of that analysis in

18   his expert report or in his deposition testimony.

19       Attorney argument can't create a question of fact.  And

20   we agree with Mr. Brooks that while -- and I agree with the

21   Court that there are factual issues here, but for purposes of

22   the arguments today, we're resting purely on legal -- that no

23   facts have been put in dispute that would defeat Defendant's

24   motion for summary judgment.  The applicability arguments that

25   Mr. Brooks made were his arguments.  At no point in the record

1    is there any argument from Doctor Weinstein related to what

2    Mr. Brooks just said.

3         And we have to keep in mind here whose burden this is.

4    It is Plaintiff's burden to establish priority because of the

5    presentation of intervening art, which Defendants have done.

6              THE COURT:  All right.

7              MR. WIKBERG:  Thank you, Your Honor.

8              THE COURT:  Mr. Brooks, I'll give you the final word

9    if you want it; if you don't, that's fine.

10             MR. BROOKS:  Thank you, Your Honor.

11        The first thing I'd like to note, Your Honor, again,

12   Doctor Weinstein does have -- you know, goes on for several

13   pages about incorporation by reference and support for the

14   written description, and so there is plenty of evidence that

15   the claims are entitled to the priority date of the '285

16   provisional.

17        And very quickly just to the point about our -- the

18   parties' interrogatory response, as Mr. Wikberg identified,

19   the paragraphs that we cited to in our interrogatory response

20   of the '285 provisional have the express incorporation by

21   reference language in them, they cite the patents that are

22   incorporated by reference, and it's black letter law that

23   incorporation by reference is part of the disclosure as if it

24   were expressly recited therein.  And so it wasn't incumbent

25   upon Plaintiff, in our view at least, to lay out in detail

1    that position for Defendants when it is their ultimate burden

2    to prove invalidity in the first place.

3        So -- and with that I'll rest, Your Honor.

4        THE COURT:  Thank you, counsel.

5        Well, with regard to these two companion motions, being

6    Defendant's motion for partial summary judgment of priority on

7    the roofing system patents, Document 134, and Plaintiff's

8    motion for summary judgment regarding priority of certain

9    asserted claims, Document 137, the Court is persuaded that

10   there are, despite argument from both sides, material

11   questions of fact remaining in this situation that the jury is

12   entitled to address.  And based on the presence of material

13   questions of fact, I'm going to deny both motions.

14       There was argument before me during this segment, Well,

15   we don't know what may or -- the other side may or may not

16   come forward with, but we will hear what each side will come

17   forward with on this issue at trial, and if the projections,

18   predictions that the other side won't come forward with

19   anything adequate are correct, I'll revisit this issue, if

20   it's necessary, under Rule 50(a), but I'm not going to grant

21   summary judgment for either party.  I'm persuaded that there

22   are issues here that the jury is entitled to consider and

23   address that would preclude a proper grant of either motion

24   under Rule 56.  So both motions are denied.

25       All right.  Let's go to the next disputed motion, which

1    is Document 130, Plaintiff's motion for summary judgment on

2    Defendant's tortuous interference counterclaim.

3        And let me hear from U.S. Silica on this, please.

4            MS. CANALES:  Good morning, Your Honor.

5            THE COURT:  Good morning.

6            MS. CANALES:  Good morning.  My name is Ms. Canales,

7    and I am here for Plaintiff's motion for summary judgment as

8    to AKW's counterclaim.

9            THE COURT:  Please proceed.

10           MS. CANALES:  This has been briefed extensively, so

11   unless the Court has any questions, I'll go straight into both

12   causes of action that are at issue.

13           THE COURT:  That's fine.

14           MS. CANALES:  The first one is tortuous interference

15   with an existing contract.  And here, Your Honor, there is,

16   you know, no actual evidence of any existing contract except

17   as to MBT Technology.  But even if you look at the alleged

18   contract with MBT, that contact was modified as there is

19   actually no evidence of any breach.  So there's no evidence

20   contract as to any customer except MBT Technology, and there's

21   no --

22           THE COURT:  What about such things in the briefing

23   as -- with regard to Garland, there's request for six metric

24   tons in January of 2020; with U.S. Ply, there is ultimate

25   purchasing of 95 metric tons of granules in 2020; Johns

1    Manville, they submitted a letter of intent to purchase 2,000

2    metric tons annually starting in 2021.  You're not telling me,

3    are you, counsel, that there's got to be a long document,

4    single-spaced, printed and signed by the parties in advance of

5    any transactions taking place for there to be an existing

6    contract, are you?

7                 MS. CANALES:  No, Your Honor.

8                 THE COURT:  And that -- there's a history of custom

9    and practice here where products get shipped and money gets

10   paid, and I don't know how that happens without there being an

11   underlying contractual relationship.

12                MS. CANALES:  Sure, Your Honor.  So under the --

13                THE COURT:  Now, there may be a better argument

14   about some of these other entities that showed up at a trade

15   show and got samples, but that's about all that happened.  So,

16   I mean, each one of these stands or their own, but I'm not

17   sure I can concur that the only one there is a legitimate

18   question about an existing contract is MBT.  It seems like

19   it's broader than that.

20                MS. CANALES:  Well, Your Honor, the contracts -- the

21   purchases you mentioned were sample purchase orders and they

22   weren't actually existing contracts, which I believe is what

23   is required for a tortuous interference claim with an existing

24   contract.

25                As far as the letters of intent and the other items that

1    you mentioned, under the CISG, they mention like purchase

2    orders can be considered offers, but then there has to be some

3    kind of acceptance, like either confirmation or subsequent

4    shipment of the goods.

5        So it's our position that there is no actual existing

6    contracts except for the one with MBT Technology.  And, as I

7    mentioned, there was other issues with MBT Technology.

8            THE COURT:  All right.  Do you want to address the

9    non-disclosure argument for me?

10           MS. CANALES:  Sure Your Honor.

11       There is six undisclosed customers that AKW failed to

12   disclose until the expert report of Mr. Brian Napper, and

13   under Rule 37 it's our belief that AKW should not be allowed

14   to bring these claims as to these six undisclosed customers.

15   AKW has failed to address the Rule 37 arguments, and we

16   believe that they should not be allowed to rely on these

17   customers for their claims.

18           THE COURT:  Well, isn't there at least assertions in

19   the briefing that there were attachments to the discovery that

20   disclosed these six, even if they weren't specifically named

21   in the written response; and isn't it an issue here that

22   Plaintiff asked Defendant's corporate representative,

23   Ms. Seitz, detailed questions about the spreadsheets regarding

24   all these customers?  I mean, is there an actual lack of

25   knowledge here, or is it a matter of these names weren't

1    spelled out in this answer, they were included in the

2    attachments, and, therefore, it's a matter of form?  Is this a

3    matter of form or is this a matter of substance?

4          MS. CANALES:  We believe it's a matter of substance,

5    Your Honor.  We believe that we were not able to ask every

6    single, you know, in the depositions that we took, questions

7    as to all of these customers, and I think that depositions

8    would look a lot differently had AKW identified all of the six

9    customers that were undisclosed until the expert report.

10          THE COURT:  All right.  I understand that's your

11    position.

12          What's your argument on whether or not there's evidence

13    that there was actual interference with existing contracts?

14          MS. CANALES:  Yes, Your Honor.

15          So AKW alleges that there were threats from U.S. Silica

16    as to these customers.  There's no actual evidence from any

17    customer, except maybe as to U.S. Ply, but there's actually

18    no, you know, testimony from any customers, there's no emails

19    from any customers, and even if you look at the email from

20    U.S. Ply, it's our position that that's not a threat.  If the

21    Court looks at Federal Circuit authority, like the *Mikohn*

22    *Gaming* case and *Concrete*, those cases say that a patent owner

23    has the right to enforce its patent, and that includes

24    threatening patent infringement.

25          So we believe as a matter of law that there was no actual

1  threat, interference, or tortuous conduct for that matter,

2  Your Honor.

3          THE COURT:  All right.  And what's your position on

4  the damages component of this motion?

5          MS. CANALES:  Yes, Your Honor.

6     So as far as the existing contract claim, AKW relies on

7  the expert report of Mr. Brian Napper, but that report makes

8  no mention of damages as to existing contracts; it only

9  mentions prospective customers.

10     As far as the prospective business claim, if the Court

11  grants the *Daubert* motion that we have as to Mr. Napper, then

12  there will be no evidence of damages as to that claim as well.

13          THE COURT:  All right.  What else do you have for

14  me?

15          MS. CANALES:  Just one final thing, Your Honor.

16  There's no causation as to both.  We believe that the evidence

17  shows that, for example, AKW stopped making sales of AK Cool

18  on their own, and we believe the evidence shows that the

19  customers had questions about what was going on in the patent

20  litigation, and that was a decision that they made on their

21  own, not because of U.S. Silica's conduct.

22          THE COURT:  All right.

23          MS. CANALES:  That's it.  Thank you, Your Honor.

24          THE COURT:  All right.  Let me hear a response from

25  the Defendant.

1          MR. BERNSTEIN:  Good morning, Your Honor.  Matt

2     Bernstein.  May it please the Court.

3          THE COURT:  Please proceed.

4          MR. BERNSTEIN:  So let me just try to expedite this.

5     There are factual issues everywhere.  I think Plaintiff really

6     thinks they have a strong defense to our interference with

7     contract case, but that's not the standard for summary

8     judgment.  There are factual disputes with respect to every

9     element of both tortuous interference with contract as well as

10    tortuous interference with potential contract.

11         Addressing the existence of contracts first, Your Honor,

12    Your Honor pointed out the reality of this market is that it

13    is done at most with purchase orders--purchase orders are

14    placed and then deliveries are made.  In fact, AKW actually

15    provided for 10 years both NCC, the predecessor owner of these

16    patents, and U.S. Silica supply of granules, again for 10

17    years through purchase orders, informal purchase orders.

18    That's how this market works.

19         So there's clearly -- and they admit with respect to MB

20    Technology that there was something constituting a contract,

21    but we would say that there's certainly a factual dispute, and

22    a reasonable jury could conclude that there were other

23    contractual agreements, as is used in this industry.

24         And then with respect to tortuous interference with

25    potential business, Your Honor, all the things that you were

1    talking about, the letters of intent and the shipments -- even

2    the shipments of samples, and the communications that AKW had

3    with it's potential customers, including at trade shows and

4    elsewise, that creates a factual dispute as to whether a

5    reasonable jury could conclude that there was a reasonable

6    likelihood of future business relationships.

7              THE COURT:  Well, let's take that circumstance and

8    talk about it from the perspective of tortuous interference

9    with an existing contract.  With regard to such entities as

10   Certainteed and Soprema, GFA, Malarkey, even Firestone and

11   Siplast, is there any real credible evidence here of sales,

12   purchases, product is exchanged for money?  Or is it, We met

13   at a trade show, we got a couple of samples, we talked about

14   what we might do or what might make sense for us in the

15   future?

16       It seems like to me we've got a wide spectrum of what

17   really existed with this long list of customers, or intended

18   customers, and some of it's pretty strong and some of it's

19   pretty weak.  And with these that showed up and met at a trade

20   show and got some samples and went on their merry way, I don't

21   know how that is material evidence of an existing contract.

22              MR. BERNSTEIN:  Your Honor, I think that's fair, and

23   I think our primary focus for those customers would be

24   actually the interference with potential contract as opposed

25   to interference with contract.  I think that is a fair point

1    that Your Honor makes.

2            THE COURT:  Okay.

3            MR. BERNSTEIN:  Your Honor, turning to the actual

4    evidence of interference, Plaintiff says that there's

5    virtually no evidence of that from the customers, but what we

6    actually have, Your Honor, we disagree with that; we think

7    there's a genuine dispute with respect to the customers

8    actually providing indication that they were being threatened.

9        But we certainly have evidence from J.P. Blanchard, who

10   is the -- you know, boss of U.S. Silica.  He actually told AKW

11   that he was communicating with our customers.  He actually

12   told AKW that he was -- that he specifically said the

13   customers should look at the fact that U.S. Silica had an

14   earlier patent than an AKW patent, and we believe that a

15   reasonable jury could certainly conclude that that is a

16   threat, that that is a threat based on, frankly, a

17   misrepresentation, a fraudulent misrepresentation that somehow

18   having an earlier patent causes you to infringe a patent.

19       There's also testimony from Mr. Blanchard -- his

20   testimony is inconsistent at his deposition.  Sometimes he

21   says that he didn't contact -- U.S. Silica didn't contact

22   customers to talk about patents and AK Cool, and then

23   sometimes he says that U.S. Silica did do that.

24       The testimony -- his testimony is also inconsistent with

25   evidence from the customers that say that they were being

1    threatened.  And so there's just -- and there's also, Your

2    Honor, the simple fact that U.S. Silica was actually

3    contacting these customers on the phone.  There's very little

4    record evidence -- or record -- or U.S. Silica didn't generate

5    any records of these communications, even though it's

6    undisputed that they were taking place.  And based on all of

7    this, a reasonable jury could conclude that the Plaintiff was

8    interfering with our contracts.

9        Your Honor, with respect to damages, Mr. Napper has a

10   very detailed expert report where he for each customer sets

11   forth the amount of damages.  He goes through his analysis.

12   There's actually a *Daubert* motion on that.

13       The dispute with respect to damages is actually the

14   amount.  Mr. Napper sets forth in detail how he came to his

15   numbers, and then Ms. Salters just says that Mr. Napper's

16   numbers were overstated.  Interestingly, Your Honor, the

17   amount of damages for tortuous interference is significantly

18   more than the $75,000 or so that Plaintiff is seeking in

19   damages in its patent case, just a data point there.

20       And as far as the issue of causation, what you have is a

21   record of AKW selling product to a whole host of companies,

22   they are doing really well, this product is taking off, and

23   then there's evidence of these communications from U.S.

24   Silica, and then those -- virtually all of that business

25   stops.  But for the communications With U.S. Silica that

1    U.S. Silica made with our customers, my client AKW would have

2    continued selling these products, but because of those

3    communications there was a cessation in sales.  And there

4    certainly is, based on the record, a disputed fact whether

5    that's the case.

6        By way of analogy, Your Honor, the Titanic hit an

7    iceberg, and after that happened, you know, the captain could

8    have put the row boats in the water earlier, the captain could

9    have told the people down in the engine room to do X or Y or

10   Z, but a reasonable jury could conclude that but for the

11   Titanic hitting that iceberg, nobody would have died.  It's

12   not the facts that, you know, took place afterwards.  A

13   reasonable jury could conclude that the but-for evidence is

14   what actually caused the damage.

15       And so unless Your Honor has any further questions, there

16   is just factual issues everywhere, Your Honor.

17           THE COURT:  All right.  Thank you, counsel.

18       Ms. Canales, do you have any follow-up?

19           MS. CANALES:  Yes, please.

20       Two brief points, Your Honor.  First, for the breach of

21   contract claim, there's still no evidence of an actual breach

22   that has been presented.  And for the prospective business

23   claim, there's still no evidence of an independent tort.  And

24   without evidence of these elements, then there can be

25   no -- none of these counterclaims.  And that's it.

1           THE COURT:  Thank you.

2           MS. CANALES:  Thank you.

3           THE COURT:   All right.  With regard to Plaintiff's

4    motion for summary judgment on the Defendant's tortuous

5    interference counterclaim, I'm going to address the embedded

6    issues in the motion separately.

7        I am not persuaded that there's been an absolute failure

8    of disclosure here.  There may have been sloppy lawyering,

9    there may have been an oversight of specifically listing

10   entities, these six entities in a written response, but the

11   accompanying production clearly indicated they were involved.

12   And that's really borne out by the deposition of Ms. Seitz and

13   the questions about the spreadsheet and, thus, identifying all

14   of these customers.  I don't find that the failures here are

15   overwhelmingly substantive, and I don't find that they warrant

16   a grant of the motion in regard to that one issue.

17       On the second issue regarding existing contracts with the

18   listed customers, I do find that there is no real question of

19   material fact that there were existing business contracts that

20   were potentially interfered with regarding certainty

21   Certainteed, Soprema, GFA, Malarkey, Firestone, and Siplast,

22   and for that reason I'm going to grant summary judgment that

23   there is no tortuous interference of an existing business

24   contract with regard to those identified customers.  The other

25   identified customers I find there's adequate evidence of

1    existing business contracts that could have been tortuously

2    interfered with and, at a minimum, there are fact questions

3    about those.  And that would relate to Garland, MBT, U.S. Ply,

4    and Johns Manville.

5        This ruling does not impact the motion with regard to the

6    separate issue of potential tortuous interference with a

7    prospective business relationship; but as to tortuous

8    interference with existing contractual relationships, I'm

9    going to grant the motion as to those six customers.

10       As to the issue of tortuous interference with prospective

11   or future business relationships, I agree with Defendant that

12   there are questions of fact that are unresolved that are

13   material and would prohibit entry of summary judgment under

14   Rule 56, so I'm going to deny the motion in that regard.

15       The upshot, as I see it, counsel, is that with regard to

16   these 10 customers, the allegations of tortuous interference

17   with a prospective or future business relationship, the motion

18   is denied and those are live issues for this case.  But with

19   regard to the motion that there is no tortuous interference of

20   existing business relationships and relating to these 10

21   customers, I'm going to grant that motion as to the six

22   identified customers--Certainteed, Firestone, Siplast,

23   Suprima, GFA, and Malarkey, and deny it as to the other

24   four--Garland, MBT, U.S. Ply, and Johns Manville.

25       So we have a live motion as relates to four of these

 1    customers relating to interference with an existing business

 2    relationship, tortuous interference, and we have a live issue

 3    post this motion on all 10 with regard to potential tortuous

 4    interference regarding a future or prospective business

 5    relationship.  And that will be the Court's ruling on Document

 6    130.

 7         Counsel, it appears that we're ready to move into the

 8    *Daubert* motion portion of the pretrial.  We've been in here

 9    almost two hours.  We're going to take a short recess.  When I

10    come back, we're going to turn our attention to outstanding

11    *Daubert* motions.

12         The Court stands in recess.

13                      (Brief recess.)

14         THE COURT:  Be seated, please.

15         All right, counsel, let's turn to U.S. Silica's motion to

16    exclude certain opinions of Dr. Richard Haber, AKW's

17    non-infringement expert.  This is Document 126.  There is some

18    overlap between this and the *Daubert* on Doctor Weinstein, but

19    I think we can take these separately.

20         MR. BROOKS:  Thank you, Your Honor.

21         Your Honor, that was our intention as well.  Anthony

22    Brooks on behalf of Plaintiff U.S. Silica.

23         Your Honor, here the only issue is whether Doctor Haber

24    is engaging in an improper claim construction exercise and

25    advancing a definition of calcined kaolin and kaolin chamotte

1    that was previously rejected at claim construction.  And here

2    I think he clearly is.  His positions are essentially a

3    rehashing of an -- of arguments that AKW made at the claim

4    construction phase of this case.  And while his particular

5    definitions of calcine kaolin and kaolin chamotte may not

6    mirror exactly the definitions that were advanced by Defendant

7    at the claim construction phase, they are exactly the

8    arguments that were made, in our view, that were rejected by

9    the claim construction order.

10    Doctor Haber's position is that calcined kaolin and

11    kaolin chamotte must be made with 100 percent kaolin clay

12    without any intentional additives.  And in particular here, he

13    focuses on his position that calcined kaolin and kaolin

14    chamotte exclude compositions made with calcined clay and

15    purposefully added feldspar and quartz; what he terms triaxial

16    ceramic.  And he notes that that cannot be calcine kaolin and

17    that cannot be a kaolin chamotte.

18    And, in fact, this is exactly what AKW argued at claim

19    construction.  If we look at their brief -- of their claim

20    construction brief at page 13--and I apologize, Your Honor; I

21    don't have the docket number in front of me--but AKW argued

22    specifically that AK Cool is a mixture of kaolin, feldspar,

23    and quartz, and is, therefore, not a calcined kaolin.

24    And further, this position was -- at page 11 of their

25    brief was argued -- AKW argued that Mr. Sexauer distinguished

1    his invention from the ceramic value of Shiao, which the claim

2    construction also -- which the claim construction order also

3    rejected.  And, indeed, Shiao is a triaxial ceramic.  If we

4    look at paragraph 38, it defines kaolin as used in that

5    reference as being kaolinite, quartz, and feldspar.

6         And so, again, Doctor Haber's opinions as to the calcined

7    kaolin and kaolin chamotte terms are essentially an attempt to

8    relitigate claim construction.

9         Now, on kaolin chamotte, he also includes a heating

10   temperature of 1300 degrees, which, you know, again, is not

11   exactly what AKW had in their definition at claim

12   construction, but theirs was 1380 and, you know, in our view,

13   a specific heating temperature, again, was rejected at claim

14   construction.

15        And further, if you look at Doctor Haber's report, he

16   actually is engaging in an interpretation and characterization

17   of the intrinsic record, which I think even the case law that

18   AKW cites in their brief makes clear it is inappropriate to go

19   in front of the jury.  That is an issue for claim construction

20   and claim construction only.

21        And so, for example, if we look at paragraph 155, he's

22   using an exemplary kaolin chamotte for Mr. Sexauer's

23   declaration to conclude that his temperature of kaolin

24   chamotte is correct.  Paragraph 185 of his report, he says

25   that the Sexauer's declaration demonstrates that Mr. Sexauer

1    indicated kaolin is not a ceramic body.  At paragraph 251, he

2    said that the patents, i.e., the Sexauer patents, teach away

3    from purposefully adding feldspar and quartz.  And in

4    paragraph 150, he even disparages the intrinsic record by

5    saying that parts of the specification are incorrect.

6         And so our position, Your Honor, is that he should not be

7    permitted to discuss these claim limitations when his

8    definitions are based on opinions that are inconsistent with

9    the claim construction order and a recharacterization of the

10   intrinsic record.  And that is really the gist of our motion.

11        And with that, Your Honor, I will turn it to the other

12   side.

13        THE COURT:  All right.  Thank you, counsel.  I think

14   I understand your argument.

15        Let me hear from the Defendant in response.

16        MR. BERNSTEIN:  Your Honor, Matthew Bernstein again

17   for AKW.

18        So we have a very different view of Your Honor's claim

19   construction order than the Plaintiffs, and that's where we

20   we're going to actually begin.

21        THE COURT:  My recollection is at claim construction

22   you-all said, Plain and ordinary meaning would be fine because

23   we don't disagree as to what the plain and ordinary meaning

24   is.

25        MR. BERNSTEIN:  Yeah, that's exactly what I was

1    going to say, Your Honor.

2            THE COURT:  How did we get from there to here?

3            MR. BERNSTEIN:  Well, so I -- because what they're

4    talking about is actually not claim construction or even plain

5    and ordinary meaning; they're raising infringement issues.

6    They don't like the way that Doctor Haber applied the plain

7    and ordinary meaning to conclude that there was no

8    infringement, and that's an issue for the jury, Your Honor.

9        Your Honor said in his claim construction order plain and

10   ordinary meaning, just like you said, because the parties

11   agree.  The parties do agree of what kaolin is.  It's a clay

12   that you dig up out of the ground.  The parties agree that the

13   ordinary mean of calcination is that you heat something.  The

14   parties agree that kaolin chamotte particles are calcined

15   kaolin particles that are heated a little bit more.  All this

16   thing -- all these things are agreed to.

17       And if you actually -- if you could pull up slide 57.

18       Here is the plain and ordinary meanings that the parties

19   in their expert reports actually apply.  And you see that

20   they're very similar.  They're not identical.  It talks about

21   heating hydrous kaolin.  That's the -- you know, the

22   ingredient.  And it talks about heating it to a certain

23   temperature.  So that's -- both parties say that you take

24   hydrous kaolin and you heat it.

25       The problem is, Your Honor, is that actually Plaintiff is

1    taking its plain and ordinary meaning, hydrous kaolin, it's

2    adding some other things to it to argue infringement because

3    that's what the accused products do, and they're basically

4    saying, Well, you add those two things, the chemical reactions

5    are the same, and the end product is the same, and our expert

6    says a hundred percent disagree; that's infringement analysis.

7    Our expert says if you add things to the hydrous kaolin, that

8    one thing that both parties agree is in the plain and ordinary

9    meaning, if you start adding stuff, other minerals that have

10   their own chemical properties, and you start heating those

11   things, the chemical reactions are going to be different and

12   the end products are going to be different.  And that's just

13   the pure -- it's a pure infringement analysis that both

14   experts do, and both experts agree -- disagree on kind of the

15   outcome and whether products infringe.  And that's really the

16   dispute, Your Honor.

17        They take issue -- they say that Your Honor held in its

18   claim construction order that you can't have composition in

19   your plain and ordinary meaning.  That's not what Your Honor

20   said, and that makes no sense.  The claim terms are calcined

21   kaolin.  And so you can see on the screen both parties are

22   saying hydrous kaolin is the ingredient that starts this

23   process for this claim term, and that's composition.

24        And their argument that you can't have any heating or

25   temperature, that's not what Your Honor said.  Your

1    Honor -- what Your Honor said was that there was specific

2    composition and temperature that was set forth in the

3    specification and in the prosecution history, and Your Honor

4    said there's no disavowal; I'm finding no disavowal; just use

5    the plain and ordinary meaning.

6        And if you look at our actual construction, Your Honor,

7    it -- from the -- that was rejected, it's particles having a

8    chemical composition of 54.5 percent to 55 percent silicon

9    dioxide and 41.5 percent to 42.4 aluminum oxide, which are an

10   anhydrous aluminum silicate produced by heating kaolinite to a

11   temperature in a range of 1100 to 1600 degrees, and that's

12   not -- we're not arguing that in any way, Your Honor.  We

13   followed Your Honor's guidance and we applied -- or Doctor

14   Haber applied the plain and ordinary meaning.

15       He -- both sides looked at both intrinsic -- the

16   intrinsic record as well as other things, scholarly articles

17   and theses and their own experience to explain to a

18   person -- explain how a person of ordinary skill in the art

19   would understand this plain and ordinary meaning.  Both

20   parties did that, and there's nothing wrong with that based on

21   the law cited on pages 5 and 6.

22       So fundamentally, Your Honor, this is an infringement

23   dispute, and it's actually the Plaintiff who is adding these

24   other minerals to hydrous kaolin, which hydrous kaolin is

25   their plain and ordinary meaning, they add other things.

1    They're saying that the end results and the chemical reactions

2    are the same or equivalent, and that's infringement analysis,

3    and our expert simply disagreed with their infringement

4    analysis.

5                THE COURT:  All right.  Thank you, Mr. Bernstein.

6                MR. BERNSTEIN:  Thank you, Your Honor.

7                THE COURT:  Anything further, Mr. Brooks?

8                MR. BROOKS:  Yes, a couple of things, Your Honor, if

9    you don't mind.

10               THE COURT:  Let's make it brief.

11               MR. BROOKS:  Very brief, Your Honor.

12        The first point I want to make is that the definition

13   that Mr. Bernstein put up there is actually not the definition

14   that Doctor Haber uses.  The definition that Doctor Haber uses

15   is actually--one moment; I apologize--cited in our brief as --

16   again, I apologize, Your Honor, but I will find that.

17        But the second point I wanted to make is that we never

18   argued that there is -- there was -- there can be no

19   composition in the plain and ordinary meaning.  Our position

20   is that Doctor Haber has taken a position that is inconsistent

21   with the claim construction order that said that the patent --

22   or that the claimed invention was not distinguished on the

23   basis of this triaxial ceramic composition that was in Shiao.

24        And again, Doctor Haber is engaging in interpretation of

25   the intrinsic record, as demonstrated by the paragraphs that I

1    pointed Your Honor to initially, and the extrinsic evidence

2    that he points to that the theses and technical articles and

3    journal articles and such are basically used to support his

4    contradictions to the intrinsic record rather than as an

5    independent example of what these definitions are.

6        And if we turn to Doctor Haber's report, I will find that

7    definition.

8        Well, Your Honor, I'm not going to waste Your Honor's

9    time anymore.  But I know it is cited in our briefing, and I

10   will rest on the papers there.

11       THE COURT:  All right.

12       Well, with regard to U.S. Silica's motion to exclude

13   certain opinions of Dr. Richard Haber, Document 126, I'm not

14   persuaded that the positions taken are so obviously contrary

15   to the Court's claim construction as to warrant exclusion.  I

16   think cross examination is the appropriate remedy, if there is

17   one here, but I'm going to deny the motion.

18       And let's next move to Document 136, which is Defendant's

19   motion, *Daubert* motion regarding Dr. Jerry Weinstein.

20       And let he hear from the moving Defendant on this.

21       MS. TA:  Good morning, Your Honor.  May it please

22   the Court.

23       THE COURT:  Good morning.

24       MS. TA:  Janice Ta on behalf of AKW to argue AKW's

25   *Daubert* motion.

1          THE COURT:  Please proceed.

2          MS. TA:  Before I begin, I wanted to clarify that

3    the surface coverage terms that were briefed in the *Daubert*

4    motion are no longer live because Plaintiffs withdrew the

5    claim terms including those surface coverage terms.  So we're

6    just going to focus now on the kaolin chamotte term and the

7    bright white term.

8          THE COURT:  All right.

9          MS. TA:  I'll get started with kaolin chamotte term.

10    Throughout his deposition testimony, Doctor Weinstein

11    stated the calcined kaolin is coextensive to kaolin chamotte.

12    It's contrary to the Court's claim construction, which said

13    that kaolin chamotte is actually a subclass of kaolin, a

14    calcined kaolin.  U.S. Silica even asserts in its sur reply

15    that the Court never found that kaolin chamotte is a subclass

16    of kaolin, but the Court's claim construction order expressly

17    recognized that kaolin chamotte is, quote, a special type of

18    calcined kaolin--that's at page 3; and also found that, quote,

19    most of the claims then further limit the calcined kaolin

20    particles to include kaolin chamotte--and that's at page 9 of

21    the claim construction order.  Yet, Doctor Weinstein

22    repeatedly testifies in his deposition testimony that calcined

23    kaolin and kaolin chamotte mean the same thing, have the same

24    plain and ordinary meaning, are synonymous, do not have a

25    subset relationship, and are coextensive.

1       Plaintiff says this isn't true, but they don't have a

2  plausible explanation for his conflicting deposition

3  testimony.  His testimony on this is not based on any

4  confusing questions or some one-off mistake.  Doctor Weinstein

5  says that calcined kaolin and kaolin chamotte are

6  co-extensive, and he says this definitively and repeatedly

7  over and over again in at least five different ways.

8       This is what he said on the record.  When asked, "Is it

9  your contention that the plain and ordinary meaning of

10  calcined kaolin is the same as the plain and ordinary meaning

11  of the word kaolin chamotte?"

12       He said, "Pretty much."

13       When asked, "Are they co-extensive of each other?"

14       He said, "That's right."

15       When asked, "Kaolin chamotte and calcined kaolin to a

16  person of skill in the art are indistinguishable?"

17       He says, "That's correct."

18       When I repeated this purported definition of these terms,

19  he clarified, "Well, that's a definition of calcined kaolin

20  and kaolin chamotte."

21       He also said that the '303 Patent notes that the calcined

22  kaolin is referred to as kaolin chamotte.  So yes, they are

23  equivalent.

24       Then he says, "No, I believe that kaolin chamotte and

25  calcined kaolin are equivalent, not a subset."

1       He also says that kaolin chamotte has a calcination

2   temperature of over a thousand degrees, while calcined kaolin

3   is fired from 1100 to 1600 degrees.

4       U.S. Silica is now trying to walk back Doctor Weinstein's

5   deposition testimony to allege that it was not the case that

6   Doctor Weinstein had testified that calcined kaolin and kaolin

7   chamotte are equivalent and not a subsequent.  That's

8   inconsistent with the deposition record.  U.S. Silica cannot

9   have it both ways.

10      Akw took Doctor Weinstein's deposition to better

11   understand the positions that were laid out in his expert

12   report.  If Doctor Weinstein's report stated that kaolin

13   chamotte is a subclass of kaolin, it's concerning that he

14   would take the opposite position in his deposition testimony

15   where he clearly states that kaolin chamotte is not a subclass

16   of calcined kaolin.

17      His deposition demonstrates to us that Doctor Weinstein

18   himself is either unreliable or confused about these two very

19   crucial terms in this case, and based on that deposition

20   testimony it remains unclear what plain and ordinary meaning

21   of kaolin chamotte he actually applied to his infringement

22   invalidity analysis.

23      So to the extent that that testimony is inconsistent with

24   the Court's claim construction finding that kaolin chamotte is

25   a special type of calcined kaolin, we believe -- we hope that

1    his testimony should be precluded.  He should not be allowed

2    to confuse the jury with testimony that kaolin chamotte means

3    the same thing as calcined kaolin.

4        And I'll move on to the bright white term now, unless you

5    want to -- do you want me to come back on that term?

6            THE COURT:  No, let's go on to bright white.

7            MS. TA:  With respect to the term bright white,

8    Doctor Weinstein's use of the TAPPI brightness scale to define

9    bright white is not consistent with at the Court's

10   construction of this term, which is 'white enough to have a

11   solar reflectance of at least 80 percent prior to any surface

12   treatment'.  This doesn't require a TAPPI measurement or any

13   particular way of measuring brightness.

14       More importantly, Doctor Weinstein didn't even know that

15   the Court had issued a construction on this term, and then he

16   provided a definition that was different from that

17   construction, making it seem unlikely that he would have

18   applied the Court's construction in his reports or his

19   deposition testimony.

20       All that is needed to meet the bright white limitation

21   according to the Court's construction is a show that a granule

22   is white enough to have a solar reflectance of at least 80

23   percent.

24       Doctor Weinstein should be precluded from relying on such

25   a narrow interpretation of bright white or any construction

1    that imposes any other requirements for whiteness beyond the

2    minimum claimed reflectance of white particulates.

3         THE COURT:  Thank you, counsel.

4      Let me hear from the Plaintiff, please.

5         MS. DICKSON:  Thank you, Your Honor.  Cecilia

6    Dickson for the Plaintiff.

7         THE COURT:  Please proceed.

8         MS. DICKSON:  If I may take these two terms in

9    reverse order to just address the most --

10         THE COURT:  That's perfectly fine.

11         MS. DICKSON:  So for bright white, after 14 hours of

12    -- more than that, of deposition testimony, and after Doctor

13    Weinstein was reminded what the Court's claim construction

14    was, he went through his TAPPI analysis.  He did not disclaim

15    or otherwise disagree with what the Court's construction was,

16    which is 'white enough to have a solar reflectance of at least

17    80 percent prior to any surface treatment'; rather --

18         THE COURT:  Slow down.

19         MS. DICKSON:  Sorry.  Rather, he identified a

20    measurement system which Defendant has not challenged in terms

21    of reliability, and he provided his calculation.

22      So at least in terms of the term for bright white, you

23    know, to Plaintiff these are all questions that can be

24    addressed on cross examination.  He is going through and

25    explaining how you determine something is white enough to have

1    a solar reflectance of at least 80 percent.

2        And the Court did not in its claim construction order

3    provide for what the testing mechanism needed to be to make

4    that determination; rather, Doctor Weinstein took the Court's

5    claim construction and then applied it to explain why he

6    believed that term was being met.

7        In terms of the kaolin chamotte questioning, Ms. Ta read

8    an excerpt which is in the briefing where -- you know, it's

9    clear as we go through each of these excerpts, he is

10   recognizing that chamotte is a subset of calcined kaolin.

11   Even the little snippet that she read, he says 'pretty much'.

12   There's been extensive use of the term 'coextensive'

13   throughout the deposition, even though 'coextensive' does not

14   appear anywhere in these patents, was never defined in these

15   terms, and Doctor Weinstein responded 'pretty much'.  And why

16   did he respond that way?  Because sometimes, because it is a

17   subset, they can be the same.

18       So, you know, again, I would come back to saying every

19   time Doctor Weinstein was asked questions on this, he would go

20   back and use the expert report as the touchstone for how he

21   was defining these terms.  And if there are inconsistencies

22   the Defendant wishes to raise, again, I would recommend that

23   this is a cross examination point, not something that should

24   be excluding, given the interrelationship and nature of kaolin

25   chamotte to calcined kaolin.

1          The one other point, which is more of a housekeeping

2     point and is noted in a footnote, but, you know, as the

3     argument was presented, during our meet and confer, the issue

4     was only addressed to be for invalidity purposes, not for

5     infringement, so I would, again, just suggest that this motion

6     should be considered only from that vantage and not from both.

7               THE COURT:  All right.  Thank you.

8               MS. DICKSON:  Thank you.

9               THE COURT:  Do you have something additional,

10    Ms. Ta?  You don't?  That's fine.

11         With regard to AKW's *Daubert* motion on Dr. Jerry

12    Weinstein, Document 136, and these remaining live issues that

13    have been argued to the Court regarding bright white and

14    kaolin chamotte particles, much like the preceding *Daubert*

15    motion from the other direction, I don't find that there is a

16    clear violation of the Court's claim construction order to the

17    level that would warrant exclusion; and, as in the earlier

18    *Daubert* motion, I am persuaded that vigorous cross examination

19    between these competing experts is the right solution.  And

20    I'm going to deny the *Daubert* motion on Doctor Weinstein.

21         All right.  That brings us to Defendant's *Daubert* motion

22    on Dr. Jerry Weinstein's report on alleged infringement.  This

23    is Document 135.

24         And let me hear from the moving Defendant here.

25               MS. TA:  AKW requests that the Court grant the

1  *Daubert* motion to exclude Doctor Weinstein's improper use of

2  product comparisons to support his infringement analysis.  The

3  only proper comparisons are between the accused product and

4  the asserted claim limitations.

5      In order for U.S. Silica to preserve the right to argue

6  that WA-11 and the Millen granule are commercial embodiments

7  of the asserted patents, U.S. Silica was required to have

8  disclosed this argument to AKW back in April 2021 in a claim

9  chart as part of its infringement contentions.

10     Local patent rule 3-1(f) states that, quote, "If a party

11  claiming patent infringement wishes to preserve the right to

12  rely for any purpose on the assertion that its own

13  instrumentality practices a claimed invention, the party must

14  identify separately for each asserted claim each such

15  instrumentality that incorporates or reflects that particular

16  claim."  U.S. Silica never did this.  They never identified

17  the instrumentalities they would be asserting, much less did

18  they identify how that instrumentality embodies each and every

19  limitation of each and every asserted claim, nor did they ever

20  supplement their infringement disclosures with this theory of

21  commercial embodiment.  In fact, U.S. Silica never indicated

22  they would rely on the assertion of WA-11 and Millen to

23  practice the claimed invention until Doctor Weinstein served

24  his opening expert report.

25     There's no wiggle room in local rule 3-1(f).  U.S. Silica

1    simply failed to preserve any argument that WA-11 and Millen

2    practice the asserted patent claims.

3        But even where were the Court to find U.S. Silica did not

4    waive this argument and had not run afoul of local patent rule

5    3-1(f), Doctor Weinstein has not met his own burden to show

6    that WA-11 and Millen practice the asserted claims.  Without

7    having established that WA-11 and Millen actually practice the

8    asserted patents, they cannot rely on cases like *TEK Global* or

9    *Adams Respiratory* which form narrow exceptions to the majority

10   rule in *Zenith* that product-to-product comparisons cannot be

11   used to show infringement.  It would be highly prejudicial to

12   AKW, as well as misleading to a jury, to allow U.S. Silica to

13   do that now.

14       Rather than providing a claim chart, Doctor Weinstein

15   provides a single conclusory paragraph in paragraph 116 of his

16   expert report that has no citations to any evidence or

17   documents.  It's less than a page long.  This is not

18   sufficient.

19       For example, in the *Volumetrics* case, *Volumetrics Medical

20   Imaging versus Toshiba* case, the Court actually sanctioned the

21   patentee for acting in bad faith to provide a proper claim

22   chart of each version of each commercial product and how and

23   where each patent claim limitation is found in that product.

24   That rule is very -- it's not that different from the local

25   patent rules here in 3-1(f).  The *Volumetrics* court said that

1    the patentee's claim chart was deficient because, one, it only

2    interests claim 1 of each patent.  At best, paragraph 116 of

3    Doctor Weinstein's declaration where he alleges that WA-11 and

4    Millen are commercial embodiments has made a showing for only

5    claim 1 of the '303 Patent, a patent claim that is no longer

6    asserted in this case because U.S. Silica dismissed that

7    particular claim earlier this week.

8        Doctor Weinstein provides no showing for any of the five

9    currently asserted claims.  In fact, he admits that WA-11 and

10   Millen are not commercial embodiments of the three asserted

11   claims of the '245 Patent.  The *Volumetrics* court also found

12   that the patentee had insufficiently identified how and where

13   each product embodied the claims, and the Court said the

14   patentee offered only, quote, cryptic references to parts to

15   the titles and Bates stamps of documents.  Here U.S. Silica's

16   -- or Doctor Weinstein's paragraph 116 doesn't even provide

17   references to Bates-stamped documents, only conclusory

18   statements, and it fails to make a showing for each product,

19   both WA-11 and Millen.

20       Like the patentee in *Volumetrics* who was sanctioned with

21   fees, the Court should preclude U.S. Silica from contending

22   that WA-11 and Millen embody its patents.

23       Akw's expert says that Millen cannot be a commercial

24   embodiment because the Millen granule cannot be considered a

25   kaolin chamotte.  This is represented in Doctor Haber's report

1    at paragraph 257.  And Doctor Haber never conceded that WA-11

2    practices any claims.  In fact, he has no opinion that either

3    product practices any of the claims.

4        It's also not true that AKW admitted that WA-11 and

5    Millen are commercial embodiments.  Part 6 of U.S. Silica's

6    opposition brief -- page 6 of U.S. Silica's opposition brief

7    highlights several statements made by non-legal and non-expert

8    laypeople.  All of these statements are directed to only the

9    white armor granules.  But the claims require more than that.

10   They also require a showing of certain limitations related to

11   the full cold roofing system, and none of the statements that

12   were cited relate to the cold roofing system.  Using these

13   alleged statements, U.S. Silica is attempting to compare a

14   broader claim to a narrower commercial embodiment in a

15   granule.

16       Finally, even were the Court to find that these

17   statements admitted to admissions on the part of AKW,

18   U.S. Silica was obligated to have disclosed or supplemented

19   its positions regarding these statements in its Rule 3-1(f)

20   infringement contentions well before the submission of Doctor

21   Weinstein's report in late November.  Because U.S. Silica did

22   not preserve the right to rely on these statements in its

23   infringement contentions, it's too late for U.S. Silica to

24   rely on them for the first time in Doctor Weinstein's expert

25   report.

1          AKW does not seek to exclude the entirety of Doctor

2     Weinstein's report; only the portions where he relies on a

3     product-by-product comparison between AK Cool and those

4     commercial embodiments.  And so we ask for relief here, and

5     that these portions of his improper -- portions of his expert

6     report where he does make improper product-to-product

7     comparisons should be excluded.

8               THE COURT:  Thank you, counsel.

9          Let he hear from the Plaintiff.

10              MS. DICKSON:  Thank you, Your Honor.

11         Ms. Dickson back again on Doctor Weinstein.

12              THE COURT:  That's fine.  Let's proceed.

13              MS. DICKSON:  Okay.  So Ms. Ta read the local rule

14    to the Court, but nowhere in the text of that local rule does

15    it indicate that a claim chart is required.  And in looking at

16    the briefing that is attached, you will see attached as an

17    exhibit to our opposition --

18              THE COURT:  Why don't we do this.  Why don't we

19    bypass the local rule issue at this time and just simply give

20    me your justification for any comparison between the accused

21    product and the Plaintiff's products.

22              MS. DICKSON:  In the cited *TEK* case, it similarly

23    involved admissions of a party.  And it is the position of

24    Plaintiff that it is AKW who has invited this comparison

25    through all of the various ways in which they have compared

1    these granules.  So Doctor Weinstein -- you know, this motion

2    has somewhat evolved a bit over time.  Initially it was

3    presented that Doctor Weinstein engaged in a

4    product-by-product comparison and didn't apply the right

5    standard.  Now it is just, We want to keep out the admissions

6    and any other ancillary comments which are detailed in the

7    briefing where Doctor Weinstein points out his testing shows

8    similarities between these granules.

9        So I think it's similar to the *TEK* case in that we're not

10   talking about just Doctor Weinstein comparing these items and

11   trying to throw that out to confuse the jury; rather, we're

12   taking the statements, which are binding admissions of AKW,

13   that does talk about these products meeting the patents, and

14   that should be fair game for something for Doctor Weinstein to

15   opine upon and say that it's something he noted.

16       In terms of making sure that he had sufficient

17   information that's being provided, in addition to the

18   paragraph that is referenced by Ms. Ta, going through all of

19   the claim terms -- claim charts, rather, that are attached to

20   Doctor Weinstein's report, it's clear that there are citations

21   applied to provided to each of those items.

22       So it would be the position of Plaintiff that because

23   Doctor Weinstein is engaging in a proper analysis and

24   providing the proper standard for an infringement

25   determination under the guidance of the *TEK* case, and because

1    it evolved in the same way, although in some sense earlier

2    here, because in *TEK* the admissions came out during trial; it

3    was comparisons that were made during direct examination.

4    Here we have the listing that is provided in briefing of all

5    the various admissions from a variety of sources during

6    deposition, in documentation, and all of those items that were

7    put out there as information by AKW should be something that

8    Doctor Weinstein can opine upon.

9         THE COURT:  So tell me, where is it that you believe

10   the Defendant is seeking to compare the accused product with

11   the Plaintiff's products?

12        MS. DICKSON:  Sure.  So, for example, you will see

13   instances where when marketing the AK Cool product and talking

14   about what is -- how it compares, for example, to the prior

15   WA-11 product, you will see WA-11, for example, saying that

16   was a hundred percent, you know, covered by the patent.  And

17   so going through and looking at the comparisons and that

18   language, he should be permitted to say these are statements

19   that are made by AKW throughout the quotes and the attachments

20   in our briefing.

21        THE COURT:  Anything further?

22        MS. DICKSON:  No, Your Honor.

23        THE COURT:  Thank you.

24   Ms. Ta, I don't need any additional argument.  Thank you,

25   though.

1    I've looked at Doctor Weinstein's report, and I am -- and

2    I'll leave aside for the time being the arguments about

3    compliance or non-compliance with the local patent rules, and

4    that's not to indicate that the Court doesn't give its local

5    patent rules significant standing and weight; but over and

6    above that issue, this report is replete with charts, graphs,

7    text seeking to invite the jury to compare the accused AK Cool

8    product with the Plaintiff's products.  And as I think

9    everybody in the room understands at a bedrock level in the

10   area of patent litigation, the only correct comparison is

11   between the accused products and the elements of the asserted

12   claims, and these improper comparisons called out in Doctor

13   Weinstein's report run afoul of that bedrock principle in a

14   way that the Court really cannot ignore.

15       I've also become persuaded in looking at his report that

16   there are not really discreet sections that seek this kind of

17   improper comparison, but he weaves it in and out throughout

18   numerous portions of the report such that it's not simply

19   available TO the Court to make some kind of surgical this

20   paragraph from this paragraph to this paragraph is excluded

21   but the rest of the report is not.  I don't really think I

22   have that luxury here because of the way the material's

23   presented and how it permeates the report.  But it certainly

24   is not all of the report, and Doctor Weinstein does in a very

25   proper fashion compare the accused product with the elements

1    of the asserted claims, and that's entirely proper.

2        So, as a result, I'm going grant the motion in the

3    following fashion:  Rather than attempting to go through this

4    lengthy report and with a red pen line out the sections where

5    he seeks an improper comparison and leave in the sections

6    where he presents a proper comparison, I'm simply going to say

7    that Doctor Weinstein is precluded from offering any testimony

8    during the course of this trial comparing or inviting the jury

9    to compare the accused products with anything other than the

10   limitations of the asserted claims, including the Plaintiff's

11   products.  His testimony is going to be confined to a

12   comparison of the accused product with the asserted claims and

13   their various limitations or elements.  I don't know any other

14   way to do it other than a global exclusion, given the way the

15   report is structured and put together.

16       But I want to make it clear, I expect Doctor Weinstein to

17   give important and robust testimony, but it is going to be

18   confined to the proper -- the only proper comparison of the

19   accused products to the limitations of the asserted claims.

20   And he is not -- and if he attempts to, it will be deemed by

21   the Court an effort to offer improper testimony, going to

22   invite the jury to compare the accused products to the

23   Plaintiff's products, or anything other than the asserted

24   claims and their elements.  That will be the Court's order in

25   regard to this motion.

1        All right.  Next is Document 125, U.S. Silica's motion to

2   exclude the testimony of Dr. Frank Klink regarding

3   inventorship and materiality of alleged misrepresentations to

4   the USPTO.

5        I'm happy to hear argument on whether he applied the

6   appropriate or inappropriate inventorship standard.  With

7   regard to misrepresentations to the PTO, that seems to be

8   solely limited to the bench trial issue of inequitable conduct

9   that's not going to be presented to this jury.  I don't know

10  any reason to take that up today.

11       If somebody thinks there's a reason why evidence

12  regarding misrepresentations to the PTO relate to any of the

13  live issues to be tried to the jury, you can try to convince

14  me, but these appear to solely be cabined to the bench trial

15  issues that have been alleged in this case.

16       Nonetheless, we -- in any case, we've got the issue of

17  appropriate inventorship, which is an appropriate jury trial

18  issue.

19       And with that, let me hear argument beginning with the

20  moving Plaintiff on this motion.

21            MS. DICKSON:  Thank you, Your Honor.

22            THE COURT:  Go ahead, Ms. Dickson.

23            MS. DICKSON:  We are not challenging Doctor Klink's

24  technical background.  We are not challenging that he can

25  testify and talk about his experience.  We were not suggesting

1    that in order to testify on inventorship, Doctor Klink needs

2    to be a lawyer.  That is not the position of Plaintiff; that

3    is the position of Doctor Klink.  In taking his deposition, we

4    elicited, as we all understand for testimony of inventorship

5    when someone is not a lawyer, they can be provided with

6    information from counsel, Doctor Klink indicated that was what

7    happened, and he laid out his understanding of the law.

8        He then proceeds to go through a summary list of the

9    facts and documents he reviewed.  Again, that is perfectly

10   fine.

11       In his expert report in the sections that are cited, you

12   will see he indicates that he believes that Doctor Mirke's

13   contribution consists of conception and reduction to practice

14   such that it supports their claim that Doctor Mirke should be

15   an inventor.  However, during deposition, in repeated attempts

16   to understand how you take that link of -- how do you link all

17   of those facts and documents that you've reviewed to come to

18   the conclusion that he has been -- you should be determined to

19   have conceive or -- and/or reduce to practice the invention,

20   it is Doctor Klink who said, I do not feel comfortable

21   offering that testimony.  When asked why, he said it's because

22   he is not a lawyer.  And there are repeated excerpts in the

23   motion that go through this.

24       So this is not an attempt to say Doctor Klink does not

25   have technical capability but, rather, he did not go far

1    enough because of his lack of comfort in reaching that

2    decision.

3            THE COURT:  I've read the sections of the deposition

4    cited in the briefing.

5            MS. DICKSON:  So in response, the argument is

6    offered that this is asking him to opine on the ultimate

7    issue, and that's not what we're saying.  We're not saying he

8    has to suddenly say, Therefore Doctor Mirke is an inventor;

9    but his report makes certain assertions about conception and

10   reduction to practice and he doesn't link them.  So that's our

11   issue there.

12       On materiality, I agree with the Court--we can hold that

13   in abeyance; but, again, it's just a similar issue.  He says

14   -- he uses the word 'materiality', but nowhere in the report

15   does it explain what he thinks that means.  There's no legal

16   definition of how he understands 'materiality'.  And because

17   he's not a lawyer, it's not sort of insert -- innate, rather,

18   innate that he doesn't have it.  He's -- if he doesn't have it

19   from AKW, it's not in his report.  Him saying the magic word

20   'materiality' doesn't make it so.  And he couldn't express

21   what standard he was applying.

22       So that's why we've grouped it with this issue, because

23   it similar concern even though relating to different aspects

24   of the proceeding.

25           THE COURT:  All right.  I understand.  Thank you.

1          MS. DICKSON:  Thank you.

2          THE COURT:  Let me hear from the Defendant.

3          MR. WIKBERG:  Your Honor, Terry Wikberg on behalf of

4    Defendant AKW, and may it please the Court.

5      We certainly agree with the Court's assessment regarding

6    materiality, and I'll discuss it no further.

7      Inventorship, as the Court is well aware, is a

8    combination of question of law and fact, much like virtually

9    many of the issues that will be tried to this Court.  And I

10   think for a first time expert, Doctor Klink, he understood his

11   role and what -- and what were legal concepts and could not

12   ultimately opine on what is a legal concept.  But what he did

13   opine on is the factual underpinnings that bolsters his view

14   that the asserted patents are invalid because they do not name

15   the proper inventorship.

16     One of the key factual questions for inventorship is how

17   important the omitted -- or the limitations were that were

18   contributed by the non-named inventor.  They can't be

19   insignificant contributions.  And so his analysis on the cited

20   pages of the report deal directly with the significance of

21   these limitations, why he understood these limitations not to

22   come from Mr. Sexauer and Mr. Kolb, which were the named

23   inventors on the asserted patents, but actually came from

24   Doctor Mirke, in his view, looking at the documents he

25   reviewed and the testimony of the people in play.  And I think

1    that's perfectly within the purview of an expert.

2         He understood that he cannot ultimately decide conception

3    and reduction to practice, as he is not a lawyer; and to the

4    extent there's any issue with his report in that regard, it

5    certainly is -- can be addressed in any cross examination.  I

6    certainly can't see any justification for the preventing of

7    Doctor Klink from talking about the factual -- underlying

8    factual issues that lead to his conclusion that the asserted

9    patents are invalid for improper inventorship.

10              THE COURT:  All right.  Thank you, Mr. Wikberg.

11              MR. WIKBERG:  Thank you, Your Honor.

12              THE COURT:  Do you have anything additional on this,

13   Ms. Dickson?

14              MS. DICKSON:  No, Your Honor.

15              THE COURT:  All right.  With regard to Plaintiff's

16   motion to exclude testimony of Dr. Frank Klink, Document 125,

17   with regard to the issue of inventorship, thankfully for all

18   of us we don't live in a world where perfection is the

19   standard.  This is not perfect testimony by any means, but I

20   don't find that it is so erroneous or improper as to warrant

21   outright exclusion.  I think it can fairly and justly be dealt

22   with through vigorous cross examination.  And to the extent it

23   contains some statements that he might wish he had said

24   differently, I suspect the Plaintiff to make good use of them

25   at trial, but in the context of cross examination.

```
1          I'm going to deny the motion as to the inventorship

2    issue.  Anything related to the asserted equitable issue to be

3    tried to the bench post the verdict related to equitable

4    conduct I'm going to carry until that time.  But for purposes

5    of the jury trial, this motion is denied.

6          And that brings us, then, to the what appears to be the

7    last Daubert motion, and that is Document 127, Plaintiff's

8    motion to exclude certain opinions of Defendant's damages

9    expert Brian Napper.

10          Let me hear from the moving Plaintiff, please.

11          MR. REDMON:  Your Honor, may it please the Court.

12    Patrick Redmon for U.S. Silica.

13          THE COURT:  Good morning.  Please proceed.

14          MR. REDMON:  Thank you, Your Honor.

15          I'd like to start with -- there are a number of issues to

16    talk about with regards to Mr. Napper.  The first issue that I

17    think we do need to talk about in light of the Court's ruling

18    on the motion for summary judgment is the Rule 37 issue.

19    And --

20          THE COURT:  Let me ask you this, counsel.

21          MR. REDMON:  Yes, Your Honor.

22          THE COURT:  In light of my prior ruling today on the

23    tortuous interference issue, what do you think that does to

24    this motion?

25          MR. REDMON:  Correct.  That is the exact question I
```

1    wanted to address, Your Honor.  And the answer is that with

2    regards to the motion for summary judgment, the issue was that

3    AKW had disclosed their sales figures.  They produced those in

4    discovery.  We were able to depose their witnesses about those

5    sales figures.  I deposed Ms. Seitz with regards to the

6    spreadsheet.  That deposition was largely about sort of going

7    through a document that was in German and had been handed

8    across the table to us two days earlier.

9        The issue with respect to Mr. Napper's testimony is

10   different, and that is this.  It is not an issue of when AKW

11   disclosed evidence; it is an issue of when AKW disclosed their

12   contention that they sought damages as to these six customers.

13   In their complaint and amended complaint, they never state

14   that their claim is for damages as to those six customers.

15       We asked them a contention interrogatory very directly,

16   "For each customer for whom you contend AKW tortuously

17   interfered with either current or prospective business,

18   identify that customer by name."  That's interrogatory No. 6,

19   Your Honor.  By the close of discovery, the last supplemental

20   answer that AKW gives is only four customers, it's not the

21   other six that we challenge in our motion.  We don't hear

22   about those six customers as customers for whom AKW is

23   actively seeking damages until Mr. Napper's report.

24       That lack of disclosure shaped the way that we conducted

25   our depositions, it shaped the way we conducted discovery,

1    because, frankly, given the paucity of documents, lack of any

2    contracts, lack of any actual sales, we certainly did not

3    imagine that there would be claims for millions of dollars of

4    damages from those six customers.  So that's the Rule 37

5    issue, Your Honor, and how it is distinguished for the motion

6    for summary judgment.

7              THE COURT:  And you think that's still a live issue

8    given the briefing and the argument and the ruling of the

9    Court on the tortious interference issue?

10             MR. REDMON:  Yes, Your Honor.  We would contend it

11   is; that we were prejudiced by AKW's lack of disclosure of its

12   contentions as to which customers it sought damages, and that

13   the appropriate sanction in this case for that prejudice is to

14   exclude Mr. Napper's opinions as to those customers.

15             THE COURT:  All right.  Let's go on to the remainder

16   of the motion.

17             MR. REDMON:  Will do, Your Honor.

18       AKW in its reply--and I'm going to start with tortuous

19   interference because we're there--states, as it must, that

20   this is basically all for cross; U.S. Silica does not raise

21   anything that really rises to the level of exclusion.

22       Now, in its legal standard, AKW cites *GREE versus*

23   *Supercell*.  It's a 2020 decision from the Eastern District.

24   And that case stands for the proposition that an expert, in

25   determining his starting points, the bases for his testimony,

1    and what evidence is to receive weight and what evidence does

2    not receive weight must apply reliable principles and methods.

3    And the basis for U.S. Silica's motion as to the tortuous

4    interference opinions of Mr. Napper is that there is no

5    methodology; there are no principles.

6        We certainly don't challenge once he has his base here

7    the sort of rote arithmetic that he does.  We obviously have

8    challenges to his growth rate as well as to the discount rate

9    I think we have some quibbles with.  But the real issue here

10   is that there are a lot of forecasts in this case, Your Honor,

11   and Mr. Napper picks AKW's most optimistic, he makes no

12   attempt to square it with AKW's other forecasts, nor does he

13   really, I think, cope with the issue that AKW's forecasts are

14   for potential volumes from potential customers and, as he put

15   in his deposition, from the fall of 2019 before they were even

16   really on the market.  As in *Fail-Safe versus A.O. Smith*

17   *Corp.*, expert opinion cannot be based merely on the parties'

18   own hopes and aspirations for their own product.

19       Now, I think the second issue, and I think the

20   instructive case on this point is *Advent Systems versus*

21   *Unisys*, and that's a Third Circuit decision, and I'd submit to

22   the Court that that case stands for the proposition that an

23   expert cannot rely on past forecasts that have not survived

24   contact with reality.  And that's exactly the case here.

25       The 2019 forecast Mr. Napper relies on were produced

1     pre-COVID.  AKW apparently felt comfortable readopting them

2     two years later post-litigation, for whatever reason.  We

3     don't know why they felt comfortable readopting them.  But we

4     do know that the market for cool roofing granules suffered

5     seriously in 2020 as a result of the COVID-19 pandemic.

6          AKW's projections for 2020 are over 4,000 tons.

7     U.S. Silica from 2019 to 2020 went from about 10,000 tons to

8     about 4500 tons.  We lost about 50 percent of our sales.

9     Mr. Napper cannot rely on these projections that do not

10    survive contact with reality as it was lived and which we all

11    sitting here today know in hindsight is the case.

12         Now, I think -- the other response that AKW offers is

13    that Mr. Napper makes an attempt to be conservative in his

14    estimates--he has a conservative growth rate, he doesn't take

15    the most extreme positions he could on the starting year.  But

16    I think the issue with a conservative estimate is that

17    conservative says nothing about whether an estimate is, in

18    fact, reasonable.

19         And that's essentially the case with the 18 percent

20    growth rate.  He simply sets out three growth rates.  The

21    lowest is a 2018 or 2019 growth rate by U.S. Silica, and he

22    adopts it because it's the most conservative.  He makes no

23    analysis of whether that growth rate is appropriate in 2020

24    given what we know happened in 2020.

25              THE COURT:  Counsel, listening to your arguments,

1    they all sound like very good points to ask on cross

2    examination, but tell me why they rise to the level of

3    outright exclusion so that the jury never hears this.

4            MR. REDMON:  And, Your Honor, what I would say again

5    is as in the *Advent Systems versus Unisys* --

6            THE COURT:  The presumptive remedy is cross

7    examination, not exclusion.  Exclusion is the exception to the

8    rule.

9            MR. REDMON:  Understood, Your Honor.  And I -- we

10   agree that generally cross is the remedy.  In this case,

11   however, Mr. Napper really abdicates his judgment to AKW.  He

12   does not corroborate their figures, he does not validate their

13   figures and, frankly, him just presenting AKW's 2019 forecasts

14   without doing any work on his own, that is not the role of an

15   expert, is our position, Your Honor.

16           THE COURT:  All right.  Let's see if we can move

17   this along a little bit.  What else do you have for me?

18           MR. REDMON:  Absolutely.  I'll discuss briefly the

19   BASF and the Houlihan Lokey issues as to his reasonable

20   royalty positions.

21       As Your Honor knows, courts and experts have to treat

22   licenses obtained in settlement of litigation with caution,

23   with care, and that was not done in this case, Your Honor.

24   AKW relies on *Elbit Systems Land versus Hughes Network*

25   *Systems*, Federal Circuit decision from 2019, for the

1    proposition that settlement agreements are admissible when

2    differences are accounted for.  But the Federal Circuit

3    emphasized in that case that you have to carefully account for

4    all the differences.

5         In this case, Mr. Napper does not evening acknowledge the

6    fact that this license was obtained in settlement of

7    litigation or that part of the consideration given by AKW to

8    BASF was to drop its efforts to invalidate BASF's patent.

9    Taking those two things together, that rises to the level of

10   exclusion for the BASF patent, particularly when you consider

11   that Mr. Napper does not cope with, nor does Mr. Klink, whose

12   opinion he relies on for technological comparability, neither

13   of them come to grips with AKW's own testimony about how these

14   patents have nothing to do with each other.  And that's why

15   the BASF license agreement should be excluded, Your Honor.

16        THE COURT:  What else do you have for me?

17        MR. REDMON:  Houlihan Lokey, if Your Honor has any

18   questions, I'm happy to answer them.  I think, just very

19   briefly, Houlihan Lokey doesn't have anything to do with

20   apportionment.  Mr. Napper tries to use it for apportionment

21   purposes.  It is not an apportionment analysis.

22        AKW's two cases are completely inapplicable.  *Parthenon*

23   *Unified Memory Architecture*, the argument presented there was

24   that a damages expert could never rely on a similar accounting

25   document for purposes of a damages opinion.  That's not our

 1    argument, Your Honor.

 2         As to *Oracle v. Google*, in that case you have a proper

 3    apportionment.  There's a document that values all of Sun's

 4    patent portfolio, and then that value is apportioned to the

 5    patents at issue in that case.  If Mr. Napper had done that in

 6    this case, if he had taken the top line fair value that

 7    Houlihan Lokey reached and used it as a sanity check for the

 8    parties' reasonable royalty opinions, that would be absolutely

 9    appropriate, but that's not what he's done, Your Honor.

10         If you have no further questions, I'll cede my time.

11              THE COURT:  Thank you, counsel.

12              MR. REDMON:  Thank you, Your Honor.

13              THE COURT:  Let me hear a response, please, from the

14    Defendant.

15              MS. GREB:  Counsel, I think you may have left some

16    things.

17         Good afternoon, Your Honor.  Emily Greb.

18              THE COURT:  It is afternoon now.  Good afternoon.

19              MS. GREB:  Emily Greb for Defendants AKW.

20         I'll start with tortuous interference where Mr. Redmon

21    began.

22         First just on the Rule 37 argument he made, I'm, frankly,

23    a little surprised that they're still arguing that.  Certainly

24    in light of Your Honor's ruling, it would be our position that

25    the damages as to each of the customers would be part of the

100

1    case, as they were in Mr. Napper's report and as Your Honor

2    already found fully disclosed to Plaintiffs.

3        Turning to tortuous interference generally, USS has put

4    in a laundry list of complaints about Mr. Napper's opinions.

5    They have concerns about the forecast themselves; but as Your

6    Honor questioned Mr. Redmon, those are not grounds for

7    exclusion.  They posited that the forecasts are unsupported

8    hopes of a nascent product, but the fundamental problem with

9    that is their argument ignores that the same forecast that

10   Mr. Napper relies on were used by AKW to present to their

11   board of directors in an over $30 million infrastructure

12   investment.  That presentation was in August of 2021.  So that

13   also goes to the issue of the pandemic.

14       USS wants to say that Mr. Napper has relied on 2019

15   forecasts, which is true, but what they ignore and have yet to

16   square with their argument is that those same forecasts were

17   used in 2021 to support an infrastructure investment for the

18   company.  Those are not business decisions that a company

19   would make lightly, and do not suggest that these are some

20   sort of unsupported hopes of a new product that AKW is

21   throwing out there for litigation purposes or something

22   similar like that.  It's also not some sort of risky

23   unpredictable venture.

24       USS also argues that Mr. Napper didn't do enough to

25   confirm the accuracy of the forecasts.  Again, Mr. Napper did

1    many things, as set out in the briefing.  Mr. Napper talked to

2    the employees at AKW, as he testified in a deposition.  He

3    looked at whether AKW had supplied CRGs to these customers

4    before.  He looked at the volumes of CRGs purchased by

5    customers from USS.  He knew that the forecasts were used to

6    support this infrastructure investment.  He looked at products

7    that AK Cool had already shipped.  And he also confirmed that

8    the AKW forecast included any time needed to qualify

9    customers.  So the suggestion that he did nothing and is just

10    a mouthpiece for AKW employees is simply counterfactual.

11        And setting aside the complaints about the forecasts on

12    the growth rate issue that Mr. Redmon raised, that is also not

13    a ground for exclusion.  They're welcome to cross examine

14    Mr. Napper on his growth rate.  Mr. Napper wrote in his report

15    what he looked at and what he chose for growth rate.  He used

16    his years of experience to do that.  As I'm sure Your Honor is

17    aware from the briefing, the expert report, this is an area

18    that Mr. Napper is well-versed in.

19        And so in light of all that, and in light of the analysis

20    and the corroboration Mr. Napper did, and the use of these

21    forecasts to support an infrastructure investment, we would

22    posit that the appropriate remedy, if any, is cross

23    examination.

24        Turning briefly to the arguments Mr. Redmon has made on

25    patent damages, on the BASF license first, USS's primary

1    argument appears to be that the BASF license should be

2    excluded because of what Doctor Hieber and Doctor Hullin said

3    in depositions.  Well, Mr. Napper reviewed those depositions,

4    and so the suggestion that he somehow didn't know about them

5    or doesn't grapple with them just is not a reason for

6    exclusion.

7         But I think the important thing here is what USS has not

8    said on the BASF license.  They haven't really argued that

9    Mr. Napper's methodology was unsound.  They sort of suggest

10   something about settlement agreements and say that he didn't

11   consider enough about settlement agreements.  But in reality

12   Mr. Napper did a lengthy comparability of economic and

13   technological factors and accounted for the differences in his

14   years of experience that he thought were important.

15        Interestingly, USS raises Doctor Klink's declaration that

16   Mr. Napper relied on to technical technological comparability,

17   but they haven't moved to exclude that either.  And they

18   haven't really suggested that his economic comparability

19   analysis is grounds for exclusion.  They also haven't argued

20   that Mr. Napper failed to consider all the differences.

21        And so without some sort of actual challenge to the

22   methodology, there would be no reason to exclude Mr. Napper's

23   analysis related to BASF.

24        And looking at Houlihan Lokey, I think USS's arguments

25   here are really red herrings.  They assert that they're

1    improper apportionment, but Mr. Napper doesn't actually

2    apportion anything.  Houlihan Lokey does the apportionment.

3    The Houlihan Lokey analysis is a third-party valuation that

4    was done when USS acquired White Armor Assets from NCC.

5    Houlihan Lokey puts a value on the patents.  It was Houlihan

6    Lokey that said the portion of the profits that the White

7    Armor product line was bringing in what was accounted to for

8    the patents and what was other things like trademarks or

9    business relationships.  And Mr. Napper took that and used it

10   in considering *Georgia-Pacific* factor 13.  There's nothing

11   improper about using the Houlihan Lokey analysis to inform a

12   reasonable royalty rate here.  But *Georgia-Pacific* and

13   *Georgia-Pacific* factor 13 is not so limited that somehow the

14   Houlihan Lokey valuation is properly excluded.

15        And, in fact, he noted at his deposition that the

16   Houlihan Lokey valuation could simply go anywhere.  It just

17   puts a value on the patents at issue in this case, and using

18   that value as a data point in arriving at a reasonable royalty

19   number is a completely reasonable thing for him to do.

20             THE COURT:  All right.  Anything further, counsel?

21             MS. GREB:  No, Your Honor.  Thank you.

22             THE COURT:  Mr. Redmon, do you have anything new and

23   unargued that you want to raise?  I don't have time for

24   repetition.

25             MR. REDMON:  Understood, Your Honor.  I'll make one

1    point.

2        As to tortuous interference, AKW puts a great deal of

3    weight on the fact that AKW's business decided to in 2021

4    readopt the late 2019 figures in recommending an investment

5    decision to its board.  That's the transformation strategy

6    document to which the forecasts that Mr. Napper relies on were

7    an appendix.

8        I believe it should be pointed out that AKW notes in a

9    that transformation strategy document recommending this

10   purchase of a new kiln that their business case for a new kiln

11   is not contingent on their winning this lawsuit.  They

12   recognize the possibility they may not be able to sell AK Cool

13   into the United States, and they're able to use this kiln for

14   other products and their business decision is not contingent

15   at all on being able to use it for CRG.  So there's no reason

16   why that should be a great stamp of why those figures are, in

17   fact, reliable.

18       That's all I have, Your Honor.

19           THE COURT:  All right.  Thank you, counsel.

20       With regard to this motion, Document 127, Plaintiff's

21   motion to exclude certain opinions from Brian W. Napper, the

22   Court's persuaded across the various issues that have been

23   raised and argued that exclusion is an excessive remedy and an

24   appropriate remedy is active and robust cross examination, and

25   with that, the Court is going to deny the motion in all

1    respects.

2        All right.  That appears to be the last of the

3    *Daubert*-type or motion to strike-type motions, and that

4    appears to bring us to disputed motions in limine.

5        It's 12:32 by the clock here on the bench.  We're going

6    to take an hour for lunch.  I'd like you to use about 15

7    minutes of it to eat and 45 minutes of it to discuss how you

8    narrow these limine disputes, so when we come back from lunch

9    we can narrow them significantly over where they are now.  You

10   have the benefit of the guidance the Court's given you through

11   the pretrial process this morning and my rulings on these

12   various motions.  That should afford you an ample means by

13   which to narrow these disputes.

14       So I will see you back here at approximately 1:30, and

15   we'll take up motions in limine and hopefully a narrowed

16   format at that point.

17       And with that, counsel, you are excused for lunch.

18       The Court stands in recess.

19                     (Lunch recess.)

20       THE COURT:  Be seated, please.

21       Counsel, let me hear from you regarding remaining and

22   hopefully narrowed disputes concerning motions in limine.

23   Where are we?

24       MR. WHITLEY:  So, Your Honor, Matthew Whitley for

25   U.S. Silica.  We have reached a number of agreements based on

1    the Court's rulings today that one or both sides can confirm

2    for the record, and otherwise the parties are ready to proceed

3    with the few that remain that still are going to require a

4    ruling.

5              THE COURT:  Am I correct there's a total of eight

6    remaining disputed motions in limine?

7              MR. WHITLEY:  I believe that is correct, Your Honor.

8    I believe it is four and four.

9              THE COURT:  All right.  Let's begin by noting for

10   the record that there appear to be 15 motions in limine that

11   are mutually agreed to by the parties, as reflected in the

12   joint pretrial order, Document 216 and in Document 233.  I

13   gather counsel are familiar with each of these, and I gather

14   the consensus on both sides is that these should each be

15   granted by agreement of the parties.  Is that correct?

16             MR. WHITLEY:  Yes, Your Honor.

17             MR. BERNSTEIN:  Yes, Your Honor.

18             THE COURT:  All right.  Then those 15 agreed motions

19   in limine as noted are granted by agreement.

20        All right.  I'm going to try to work through these

21   numerically, and we'll take up Plaintiff's motions in limine

22   first.  And my understanding is that Plaintiff's motion in

23   limine No. 1 remains at least partially in dispute.  Is that

24   correct?

25             MR. WHITLEY:  That is correct, Your Honor.

1          THE COURT:  All right.  Let me hear from Plaintiff

2     first, and then I'll follow that with argument from Defendant

3     on Plaintiff's MIL No. 1.

4          MR. WHITLEY:  Good afternoon, Your Honor.  Matthew

5     Whitley on behalf of U.S. Silica.

6       I regret to inform you that while you didn't have to

7     listen to me this morning, you're going get a lot of me this

8     afternoon on the motions in limine.

9          THE COURT:  I'll reserve judgment on that.

10          MR. WHITLEY:  And I will not make a self-deprecating

11     remark.

12       This motion had three components.  The first was the

13     undisclosed customer, which is obviously moot in light of Your

14     Honor's prior rulings.

15       The second component dealt with expert opinions that were

16     not part of their reports.  In lieu of the Court's admonition

17     this morning and reminder about what will happen if parties go

18     outside the report, I don't think this motion in limine is

19     needed, so we can withdraw that component.

20       What does remain is the third part on late-produced

21     documents, and this is a fairly serious lack of disclosure

22     problem.

23       As the Court has seen in the briefing, you know, this is

24     a case where the infringement analysis relates, in some part,

25     to the composition of AK Cool's granules and whether those

1    fall within the asserted claims.  As early as -- and, of

2    course, Your Honor's procedures, which are well-known to both

3    sides, we are required to produce relevant documents without

4    document requests, and that happened in this case; both

5    parties produced documents in the late spring/early summer of

6    2020.  And by June of 2020, we had noticed that we had not

7    received any documents showing the composition of the AK Cool

8    granules.  We asked for those specifically by email, did not

9    receive any, went, took our depositions in Europe, asked again

10   afterwards, still did not receive anything, and then after

11   discovery had closed and after Doctor Weinstein had put in his

12   opening report, AKW suddenly produces compositional documents.

13   And to make matters worse from our perspective, Doctor Haber,

14   their expert, relies on them.

15       To give the Court an example --

16       THE COURT:  Let me stop you there, counsel.  Why --

17   we've had a *Daubert* motion on Doctor Haber.  Were these

18   late-produced documents not covered as a part of that?  Did

19   you not move to strike any reliance on them there?

20       MR. WHITLEY:  We presented it as a motion in limine

21   as opposed to a -- as a *Daubert* motion.

22       THE COURT:  And what's your rationale for that?  I

23   typically do not favor motions in limine that are a back-door

24   *Daubert* motion or motion to strike or any other type of

25   substantive motion that the parties don't step forward and

109

1    raise as a substantive motion.

2            MR. WHITLEY:  I understand.  I can't tell Your Honor

3    that there was any -- there was no conscious decision as to --

4    in what form to put the argument in.  As we noted in some of

5    our briefing, some of these issues we weren't sure exactly how

6    they should be raised, and so they were presented multiple

7    ways.

8        But that is the fundamental issue--that there are

9    documents that were -- regardless of whether Doctor Haber

10   relied on them or not, they are documents that were

11   late-produced, and particularly egregious since they were

12   produced after our expert had tendered his report, and so the

13   motion in limine is for them to not come in, obviously,

14   without approaching Your Honor.

15           THE COURT:  Well, if this is a dispute about the

16   admissibility of documents because those documents were

17   late-produced, then I don't -- again, I don't know why I'm

18   hearing about it at the motion in limine stage instead of the

19   remaining stage of taking up and considering the admissibility

20   and the propriety of exhibits in the case.  If this is to keep

21   documents from being admitted as exhibits, then let's deal

22   with it as an exhibit issue instead of a MIL issue.  If it's

23   to keep an expert who has relied on these late-produced

24   documents from relying on them, then it should have been a

25   *Daubert* motion.  But it seems like out of the three possible

110

1    ways this could have been approached by the Plaintiff, you

2    picked the one that doesn't really apply.  I'm confused about

3    the rationale here.

4         MR. WHITLEY:  Well, to be clear, Your Honor, this is

5    also raised as an evidentiary objection.  And both sides have

6    done this.  AKW has motions in limine that are evidentiary

7    objections as MILs.  I don't fault them for that.  I don't

8    think either side was -- I think both sides were just trying

9    to get the issues in front of Your Honor and may not have

10   always chosen the clearest path.

11        But that is the issue, and if we need to address it at a

12   different stage as opposed to -- if we need to address it as

13   an evidentiary objection as opposed to a motion in limine, we

14   certainly understand.

15        THE COURT:  Well, I mean, as you well know and as

16   your opposing counsel well know, limine practice is to avoid

17   not so much specific documents, not so much specific improper

18   opinion testimony, but broader prejudicial items that are

19   typically outweighed -- the probative value is outweighed by

20   the prejudicial effect.

21        I mean, the vast majority of my arguments on MILs center

22   around 402, 403.  But they're not limited to that; it's just

23   that -- I mean, it seems like this is the wrong vehicle for

24   this, and the fact that you want to urge the Garden of Eden

25   defense that they did it, too, doesn't really change the fact

1    that it's not really appropriate as a limine.

2              MR. WHITLEY:  Understood.

3              THE COURT:  To the extent you want to use the

4    asserted late production as a basis that these not be admitted

5    as exhibits, let's take them up under the exhibits.

6              MR. WHITLEY:  Understood.

7              THE COURT:  All right.  Then I'll deny this as a

8    limine motion, but to the extent it's still appropriate, I'll

9    hear arguments about their late production as a reason if

10   there is opposition to their admission as exhibits.  All

11   right?

12        Plaintiff's motion in limine No. 2 I show to be unopposed

13   at this juncture.  Is there an agreement here?

14             MR. BERNSTEIN:  Yes, Your Honor.

15             THE COURT:  And state the agreement, please,

16   somebody.

17             MR. WHITLEY:  I believe the parties agree that

18   Plaintiff's motion in limine No. 2 is agreed.

19             THE COURT:  All right.  It will be granted as

20   agreed.

21        You concur with that, Mr. Bernstein?

22             MR. BERNSTEIN:  I do, Your Honor.

23             THE COURT:  Okay.  Thank you.

24        Plaintiff's MIL No. 3 seems to fall in the unopposed

25   category at present.

1    MR. WHITLEY:  It is, Your Honor.  The parties -- in

2    light of the Court's rulings this morning, the parties agree

3    that the -- if I am looking at this correctly, that's the '974

4    Patent.  Obviously that will be coming into evidence in light

5    of the invalidity case on the '493 Patent.  And -- am I

6    reading the wrong one?

7    THE COURT:  This is regarding the BNP --

8    MR. WHITLEY:  You're right.  I apologize, Your

9    Honor.  I looked at the right one.  Yes, I believe that motion

10    in limine No. 3 is agreed.

11    MR. BERNSTEIN:  It is, Your Honor.

12    THE COURT:  Then it will be granted by agreement of

13    the parties.

14    Plaintiff's motion in limine No. 4, this has to do with

15    the withdrawing claims of the '493.  We've already taken that

16    up, have we not?

17    MR. WHITLEY:  I have, and I believe we have an

18    agreement that while the '493 is obviously coming into

19    evidence, the parties have agreed that there will be no

20    mention of the fact that Plaintiffs asserted claims on the

21    '493, withdrew claims, your Court's ruling on that motion to

22    dismiss, and so on.

23    THE COURT:  Okay.  The surviving counterclaim as to

24    invalidity that I left in tact this morning would be properly

25    addressed, but otherwise, anything as to the after affirmative

1    count for infringement or the counterclaim for declaratory

2    judgment of non-infringement that have been dismissed or

3    denied, those would not come in under this limine.  Correct?

4            MR. WHITLEY:  That is correct, Your Honor.

5            THE COURT:  Defendant agrees with that?

6            MR. BERNSTEIN:  We do, Your Honor.

7            THE COURT:  Okay.  Then that motion in limine --

8    Plaintiff's No. 4 will be granted to the extent it confirms

9    and conforms to the Court's substantive ruling on the '493

10   Patent and as agreed to by the parties.

11       All right.  Plaintiff's MIL No. 5.  This has to do also

12   with withdrawing claims based on the Sexauer patents.

13           MR. WHITLEY:  That is correct.  And I believe that

14   motion in limine has already been agreed to by the parties.

15           MR. BERNSTEIN:  We agree, Your Honor.

16           THE COURT:  All right.  It will be granted by

17   agreement.

18       Plaintiff's No. 6, this regards the '974 Patent.

19           MR. WHITLEY:  And for this motion in limine, Your

20   Honor, it was obviously mooted in large extent based on the

21   Court's ruling as to the '493.  Plaintiff agreed that the '974

22   Patent is admissible with regards to the invalidity

23   counterclaim that AKW will present on the '493 Patent, and I

24   believe we have an agreement that AKW will not argue that the

25   '974 Patent is evidence of non-infringement with regard to the

1    Sexauer patents.

2              THE COURT:  Mr. Bernstein?

3              MR. BERNSTEIN:  We agree with that as well, Your

4    Honor.

5              THE COURT:  All right.  Then to the extent the

6    parties have an enforceable agreement here, I'll grant the

7    motion in limine to the extent this is -- any issues here have

8    been mooted by the Court's prior ruling, they will not be

9    covered by the grant of this limine.

10        All right.  That brings us to Plaintiff's MIL No. 7, and

11   this one remains in dispute.

12             MR. WHITLEY:  It does, Your Honor.

13        It's a fairly simple issue.  We understand, of course,

14   that AKW is going to challenge the accuracy of Doctor

15   Weinstein's findings, and that's, of course, within -- that's

16   the whole purpose of a trial.  What this limine specifically

17   speaks to is to prevent an argument to the effect that Doctor

18   Weinstein was rushed, procrastinated, or, you know, otherwise,

19   you know, did something improper based on the fact that he was

20   doing his testing in the month of November just before expert

21   reports were due.

22        I mean, this is obviously an argument that all lawyers

23   like to use, when they can, to criticize the timing of when

24   people did their work.  In this case there's two reasons why

25   that would be inappropriate and far more prejudicial than

1    probative.

2        The first is the fact, as Your Honor knows, that Doctor

3    Weinstein came into the case late because of the illness of

4    our first expert.  Doctor Ginn had been retained by us at the

5    same time we filed this lawsuit in 2020, and unfortunately

6    took gravely ill and had to be replaced at the last minute.

7    We asked for a continuance, it was opposed.  The Court denied

8    that request.  But as a corollary to that, we believe it would

9    be inappropriate for anyone to be arguing to the jury that

10   Doctor Weinstein was rushing or procrastinating in some

11   measure.  To rebut that would require us to potentially to go

12   into Doctor Ginn's situation, asking for a continuance, and

13   that obviously doesn't seem appropriate.

14       And the other factor affecting this, Your Honor, is that

15   we did not even receive the post-litigation sample to test

16   until October 27th of 2021.  So we had been asking for samples

17   from AKW since much earlier in the year.  This is all

18   documented in our briefing.  We received them at the end of

19   October, and so obviously the testing had to be done in

20   November.  Now, it doesn't seem like we should have to be

21   explaining how discovery works or anything like that to the

22   jury.

23       So that's really the only thing we're seeking to exclude

24   is just any kind of argument that, you know, he was rushing to

25   meet a deadline or anything along those lines.

1          THE COURT:  Is there a line that can be drawn here

2     between pre-litigation testing and post-litigation testing?

3     Your briefing seems to focus on pre-litigation.

4          MR. WHITLEY:  Well, it's really just for the sake of

5     clarity.  There were samples that were exchanged before the

6     lawsuit was filed.  Those were -- of course they were tested,

7     but we did not receive a stipulation from the other side that

8     those samples were representative of their existing products

9     until sometime in November of 2020 just before the expert

10    deadline was coming up.

11         We then also asked for a fresh set of samples and AKW

12    asked for samples of our product.  Those were exchanged.

13    Those -- just those exchanges happened towards the end of

14    discovery, so necessarily Doctor Weinstein, in addition to the

15    fact he had just been hired because of Doctor Ginn's illness,

16    that's when the post-litigation samples came in, which also

17    then had to be tested.

18         And this would obviously -- I would hope this would go

19    without saying.  This would be a reciprocal motion in limine.

20    We obviously could not turn around and criticize any of their

21    experts for doing testing in November either.

22         THE COURT:  All right.  Let me hear from the

23    Defendant in response.

24         MR. CHAJON:  Good afternoon, Your Honor.  Mike

25    Chajon on behalf of AKW.

1          THE COURT:  Good afternoon.

2     What's your position?

3          MR. CHAJON:  We don't intend to argue that Doctor

4  Weinstein's testing was rushed or that he was procrastinating.

5  Now, we do intend to challenge the sufficiency of his testing

6  and his choice for what testing he did and he didn't do.  If

7  USS uses timing or the date of his retention as an excuse for

8  the sufficiency of his testing, then that would open the door

9  for us to address the timing issue.

10         THE COURT:  That's your position?

11         MR. CHAJON:  Yes.

12         THE COURT:  All right.  Well, the MIL as drafted is

13  very broad, so let me see if I can tell you where the Court

14  comes down on this.

15     I'm going to grant the MIL with regard to any direct

16  reference to the discovery process or to the illness of the

17  prior witness.  Beyond that, an important part of the trial is

18  challenging the opinions of the experts and how they arrived

19  at the conclusions and the analysis that they put forward.

20     I'm going the deny the MIL beyond prohibiting any

21  reference to alleged delays or insufficiency in the discovery

22  process.  We're not going to get into discovery fights before

23  this jury or the handing off, if you will, between the former

24  expert who was taken ill and the current expert.  But beyond

25  that narrow subject matter, I think that this and any other

118

1    expert's conclusions, analysis, and how they got to where they

2    got to is fair game for being probed thoroughly before the

3    jury.

4        If in the course of the trial either side believes a door

5    is open here, I will hear about it at the bench and either

6    give you leave or I won't.  But I'm going to grant this to the

7    extent it covers discovery disputes, the alleged insufficiency

8    of discovery, the 'We didn't get this until late in the

9    process'.  Anything related to the discovery process I'm going

10   to cover by the grant of this MIL, and anything related to the

11   substitution of the current expert for the previously retained

12   expert who became ill I'm going to cover by the MIL.

13   Otherwise, except for those targeted areas, the MIL is denied,

14   and probing the sufficiency of the testing and the analysis

15   undertaken by the expert is an expected part of the trial.

16   All right?

17       It looks like Plaintiff's MIL No. 8 is still in dispute.

18       Mr. Whitley, what's your position on this?

19           MR. WHITLEY:  Your Honor, so this is another one

20   where the principal may be a bit simple than the briefing

21   would lead one to believe.

22       Based on arguments that AKW has made in its summary

23   judgment motion on non-infringement, which was not heard this

24   morning, but in large part, based on the kind of arguments

25   they were making there, we were concerned that they will argue

1    to the jury that the only way we as the Plaintiff can prove

2    that there has been infringement, either direct infringement

3    by customers or contributory or induced infringement by AKW,

4    is to present testing results of the granules on an actual

5    asphalt sheet.

6         And this was all thoroughly briefed in the summary

7    judgment motion you didn't have to hear this morning, but we

8    have been pointed out, you know, a legion of case law from the

9    Federal Circuit pointing out that direct evidence is not

10   necessary, that facts can be proven by circumstantial

11   evidence.  We suspect the Court is going to give the jury

12   instructions as to how they consider the evidence.

13        And the sole purpose of this MIL was to preclude, you

14   know, any argument that would assert to the jury or seek to

15   confuse the jury into believing that the only evidence that is

16   permissible for establishing infringement is testing of

17   granules on an asphalt sheet.

18             THE COURT:  All right.  Let me hear Defendant's

19   response.

20             MR. CHAJON:  Mike Chajon for AKW.

21        As written, this MIL is broader than what opposing

22   counsel just said.  It's an attempt to prevent us from doing

23   standard cross examination of an expert witness.  The claims

24   in this case cover roofing systems, fully made sheets, and

25   those have to have certain properties.  Doctor Weinstein,

1   USS's expert, he didn't test any finished product made with

2   the accused product AK Cool.  He didn't test any sheets to

3   which AK Cool had been applied.  We can use his choice to not

4   do that testing as a means to test the reliability of his

5   opinions.  And that's what they seek to -- that's what this

6   MIL seeks to prevent us from doing, and it's standard cross

7   material, Your Honor.

8           THE COURT:  All right.  Well, let me say this.  The

9   Court is going to instruct the jury on direct evidence and

10  indirect or circumstantial evidence.  The Court is going to

11  instruct the jury that they're entitled to find the facts in

12  this case from both direct and indirect evidence, or any

13  combination thereof, as long as, considering all of the

14  evidence, they conclude under the proper standard and burden

15  of proof that those facts have been established.

16      That being the case, it would be improper for anybody,

17  either in argument or attempted testimony, to tell the jury

18  what they can and cannot properly consider.  I will consider

19  an effort to do that an infringement on the purview of the

20  Court.  The Court will instruct the jury as to the law and

21  what is legally permissible, and I don't expect anybody to

22  tell this jury, either in argument or through their witnesses,

23  what the law allows them to do.

24      That being said, the fact that testing may have occurred

25  one way as opposed to another way, testing occurred on

121

1    granules that weren't embedded in asphalt sheets, they were

2    embedded in asphalt sheets, those kind of factual inquiries

3    are a traditional part of the cross examination process, and

4    I'm not going to tie the Defendant's hands.

5        So as to appropriate cross examination, I'm going to deny

6    this MIL.  As to anybody instructing the jury on what is

7    legally permissible and what the law is, I'm going to grant

8    the MIL and make it clear that the Court is the sole source of

9    the instructions on the law to the jury, not counsel and not

10   witnesses.  But given what's before me, I would expect this

11   ruling not to substantially interfere with the Defendant's

12   right to traditionally cross examine the witnesses about the

13   testing that they did and how it was done and would it have

14   been better to do it this way as opposed to that way.  That's

15   all clearly within the fair purview of robust cross

16   examination.

17       But if anybody strays into the arena of telling the jury

18   what they cannot consider and what they are legally prohibited

19   from considering or they legally must consider, then they'll

20   hear from me, because I consider that an encroachment on the

21   purview of the Court.  Is that clear?

22       Okay.  Plaintiff's MIL No. 9 appears to be the last

23   disputed MIL from the Plaintiffs.  Let's take that up.

24           MR. WHITLEY:  So, Your Honor, MIL No. 9 is certainly

25   the most unusual of the MILs, and it really -- it touches on

 1    conduct that happened in discovery and also how the evidence

 2    is going to be presented in this courtroom.

 3         When we took the depositions of the AKW witnesses in

 4    Europe, we knew that they, you know, were all German citizens

 5    and we didn't know their language proficiency, so we asked, Do

 6    we need an interpreter; do these people speak English.  And

 7    the response we received from opposing counsel, which is

 8    attached to our briefing, you know, said that all witnesses

 9    require interpreters; they're all native German speakers who

10    live and work in Germany with no command of English that would

11    enable them to be deposed without an interpreter.

12         You know, and I'm not criticizing opposing counsel here,

13    but that turned out to not be accurate.  Without question,

14    some witnesses spoke English better than others.  I think

15    there were a couple who legitimately could not testify without

16    a translator, but definitely some could.  There are numerous

17    instances, we cited to some of them, where witnesses had

18    been --

19              THE COURT:  I assume we are talking about live

20    witnesses, not deposition witnesses.

21              MR. WHITLEY:  Correct.  If witnesses testify by

22    deposition only, there's only one -- it will be translated.

23              THE COURT:  There's no need -- if we're going to

24    have deposition witnesses, there's no need to play the German

25    to then wait and hear the English.  We can hear the question

1    and the answer and save considerable time on the deposition

2    testimony.  But I assume you're not concerned about that.  I

3    assume you're concerned about live witnesses who were deposed

4    with an interpreter and show up without an interpreter to

5    testify live in front of the jury.

6              MR. WHITLEY:  Correct.  I mean, that is the primary

7    concern, although the depositions raise a second issue which

8    I'll touch on, if you'll permit me, in just a second.

9         There's an obvious concern of fairness here.  You know,

10   witnesses who could clearly understand English, Doctor Hieber,

11   for example, who will be coming live is my understanding,

12   clearly does business in English, knew English, and often

13   responded in English, only to be admonished that he needed to

14   speak in German.

15        A bigger issue was Doctor Mirke, who is obviously an

16   important witness for their inventorship claim.  His

17   deposition went the full seven hours, and it's remarkably

18   short if you look at the transcript.  It's shorter than some

19   of the witnesses who are only deposed for four or five hours

20   because of the translation time.

21        Now, all that's well and good.  We don't have an issue

22   with that.  If they need a translator they need a translator.

23   What concerns us is now being told--and it's in the

24   briefing--that Doctor Mirke, for example, now suddenly feels

25   comfortable and wants to testify in English.  It raises

 1    concerns because, you know, there was an obvious strategy to

 2    use translators as a way of disrupting our ability to take

 3    depositions.

 4        I don't have a problem with that as long as the rules

 5    apply both ways.  If they testified with a translator in their

 6    deposition, well, then, as a matter of fair play they ought to

 7    be using a translator when they testify here.

 8        This is not an issue about them being foreign.  It's

 9    obvious they're foreign.  That's not an issue.  And no one's

10    going to comment on, you know, where witnesses are from or

11    anything like that.  No lawyer here would do that.  But when I

12    have to rely on deposition excerpts that have translators

13    which are going to impede my ability to use them -- to use

14    video clips for impeachment or, you know, opens the door to

15    the fact that we had fewer questions with some witnesses,

16    quibbles with how things are translated, the rules ought to be

17    applied both ways.

18        And I think, particularly when there's a representation

19    -- and I'm sure counsel, you know, was told that and honestly

20    believed, and I don't have any issue with opposing counsel

21    whatsoever, but if that's the representation that is made to

22    us and that's the way they behave in their depositions, it

23    ought to be the same in the courtroom.  And, you know, there's

24    no case law on this, there's no rule on this; this is truly an

25    issue of equity and fair play.

1        With respect to the deposition issue, I, frankly, hadn't

2    even considered the fact that, you know, to the extent we use

3    deposition clips, particularly for impeachment, we're going to

4    have to show the German, because they spoke in German, and so

5    for the jury to see their facial expression, which is part of

6    the credibility evaluation, they've got to see the witness is

7    talking in German and then they'll hear the interpreter giving

8    the English version.  But there's no way --

9        THE COURT:  I'm not sure how facial expression goes

10   to impeachment.  Impeachment is based on a prior inconsistent

11   statement.

12       MR. WHITLEY:  Fair enough.  If -- but to the extent

13   we are also showing clips of witnesses by deposition, you

14   know, their facial expressions are part of it.  It's part of

15   how witnesses evaluate the credibility of witnesses.  And the

16   time is going to cut against both sides, no question about it,

17   when it comes to depositions or interpreters in the courtroom.

18       But we did not set this precedent.  You know, we were

19   told that interpreters were needed, we had to take depositions

20   with interpreters even when the witnesses clearly knew

21   English, and the rules ought to be the same for both sides.

22   That's our position.

23       THE COURT:  All right.  Let me hear from the

24   Defendant.

25       MR. BERNSTEIN:  Good afternoon, Your Honor.  Matt

1    Bernstein for AKW.

2        So the first point, depositions from the German witnesses

3    just played in English we think is a much more efficient way

4    to handle trial.

5        Our take away from this motion is that the Plaintiff

6    really wants to hear German spoken in your courtroom, Your

7    Honor.  These witnesses want to try speaking in English, and

8    the Plaintiff cited no authority whatsoever that someone who

9    wants to try to speak in English in your courtroom should be

10   prohibited from doing it.  We're not aware of any such law

11   either.

12       Their stated ground, Your Honor, is that they were

13   prejudiced at the depositions because they didn't get to ask

14   all the questions they wanted to.  That's simply is not true.

15   So for four of the five witnesses they didn't even take the

16   full seven hours.  So Karin Seitz, it was a little under three

17   hours; for Hans-Jurgen Hofmann, it was 4 hours 49 minutes;

18   Doctor Hieber, it was a little less than six hours.

19       So Michael Mirke, he was and he is, he's a third party,

20   and he was deposed for a little over six hours by

21   U.S. Silica's counsel, at which point she passed the witness,

22   so she didn't even take the full six hours.  Then we went for

23   about 30 minutes, and then there was another 17 minutes of

24   testimony.  That's how you get to, you know, a little bit over

25   seven hours.

1       And then the last witness was Angela Hullin, who

2   testified for just under 7 hours.  And when that deposition

3   was over, the response from Plaintiff was, Okay, we get to go

4   home now.  They never asked for more time.  And, in fact,

5   before these depositions we said we'd be reasonable if they

6   needed more time.

7       And they haven't identified a single thing that they

8   actually -- you know, they say that they needed more time to

9   ask questions.  What questions?  They haven't identified a

10  single thing that they could have asked that they didn't have

11  an opportunity to ask because of the timing.  They certainly

12  didn't come to Your Honor and ask Your Honor for more time or

13  anything along those lines.

14      So again, these witnesses are -- four of the five

15  witnesses are coming.  Everyone other than Ms. Seitz plans on

16  coming to Marshall to testify.  And again, they want to

17  testify in English.  At the depositions they had just been

18  sued a few months ago.  None of them had any experience with

19  patent litigation, U.S. litigation, depositions.

20      These witnesses voluntarily -- they live in Germany, Your

21  Honor, in a small town in Bavaria, and they voluntarily went

22  to the Czech Republic.  They didn't have to do that.  The

23  consulate in Frankfort, the only place in Germany you can take

24  depositions, was closed because of COVID.

25      These witnesses voluntarily got in their car and drove

 1    several hours to the Czech Republic to give this deposition.

 2    They got there, this is new to them, they were tired, and they

 3    simply did not want to testify in English given that they are

 4    German nationals.  Now they're coming and they went to tell

 5    their story in English, and we think that the jury should hear

 6    the testimony in English, if the witnesses are willing to do

 7    so.

 8        And to the extent that Plaintiff wants to take issue with

 9    the fact that these witnesses used an interpreter at their

10    deposition, raise it on cross examination, Your Honor.  I

11    don't think it's a very effective cross examination point, but

12    that's fine with us if they want to point that out to the

13    jury.

14        And again, I really think what this is about is they want

15    to -- the Plaintiff wants to hear my clients speaking in

16    German as opposed to their client speaking in English.

17        Thank you, Your Honor.

18            THE COURT:  All right.  Well, with regard to

19    Plaintiff's motion in limine No. 9 as to live witnesses that

20    will testify in open court, I'm going to grant the MIL.

21    Defendants made a strategic decision when they had them

22    testify with interpreters when they were deposed, and they

23    need to present their testimony in the same way.  If they were

24    capable of speaking in English without the aid of an

25    interpreter at the time they were deposed, then they should

1    have presented themselves for deposition that way.  It needs

2    to be the same way.

3        The ability to present portions of their deposition

4    testimony for impeachment purposes would be hindered if they

5    testified solely in English and then their depositions

6    presented with the native language and the interpretation.

7        I intend to instruct the jury that some of the witnesses

8    will testify with the aid of an interpreter; that does not

9    mean they don't have a knowledge of English; they may simply

10   for making sure they don't misunderstand anything, they're

11   not -- that English is not their first language, and so an

12   interpreter is being used.  But if they were deposed with an

13   interpreter testifying in German, they will testify live in

14   the same way.

15       With regard to witnesses that are presented by

16   deposition, I don't necessarily agree that it is imperative

17   that we hear the German and then the English interpretation.

18   Often deposition witnesses are presented and you see the

19   deposition in the video and you see the person not answering.

20   As a matter of fact, I've often instructed juries that you

21   will not hear -- you'll not see their mouth move when they

22   answer the question audibly because there is an interpreter

23   that is being used, and that's part of the delay.  But to

24   avoid having the jury listen to the native language and then

25   the interpretation of it in a deposition, I think it makes a

1    lot more sense to present only the translated English both as

2    to questions and answers.

3         Now, that said, if the Plaintiff, as it's argued today,

4    believes there is some deposition testimony where a particular

5    question and answer needs to be presented as originally asked

6    and answered for facial expression purposes or credibility,

7    I'm open to that being raised on a case-by-case basis.  But I

8    don't expect that to mean, Your Honor, we think it should all

9    be in German because it goes to credibility.  I'm not going to

10   sanction that.  If there is a short exchange that you can show

11   me and I can be persuaded that there's an unusual facial

12   expression or unusual reaction that wouldn't be captured in

13   just presenting the English translation, I will consider it,

14   but deposition testimony will be presented in English without

15   the native spoken first language, but live testimony will be

16   presented in the same way the deposition was originally

17   undertaken.  That will be the Court's ruling.

18        And just for the record, that's not based on case law;

19   it's based on the trial court's appreciation of what is

20   fundamentally fair in the circumstances.

21        All right.  That's Plaintiff's MIL No. 9, and that

22   appears to be the last disputed Plaintiff's motion in limine.

23        That brings us to the Defendant's motions in limine.  And

24   it appears that we may have an agreement as to Defendant's

25   motion in limine No. 1.  And is that covered by agreed MIL 15,

1    or what is the agreement here, counsel?

2            MS. GARDNER:  Yes, Your Honor.  AKW's motion in

3    limine No. 1 was agreed.

4            THE COURT:  And the agreement of the parties is it

5    will be granted by agreement.

6            MS. GARDNER:  Yes.

7            THE COURT:  And Plaintiff agree with that?

8            MR. WHITLEY:  I'm struggling to remember which one

9    was MIL No. 1.

10           THE COURT:  Let me help you with your struggle.

11   Take a minute and make sure.  And if the parties need to

12   quietly consult with each other, that's fine, too.  I want to

13   get this right.

14           MR. WHITLEY:  Yes, Your Honor, MIL No. 1 is agreed.

15           THE COURT:  Okay.  Then Defendant's MIL No. 1 is

16   granted by agreement.

17           MR. WHITLEY:  And although to be clear, I think we

18   should specify what the agreement is.  The Defendant is not --

19   excuse me.  The Plaintiff is not going to argue that AKW's

20   cessation sales is evidence of infringement, but I believe the

21   corollary to that was that it would be -- certainly be a

22   relevant fact with respect to the tortuous interference

23   claims.

24           THE COURT:  All right.  Defendant, do you agree with

25   that clarification?

1    MS. GARDNER:  There was nothing stated to tortuous

2 interference specifically, but it was agreed as to

3 infringement and otherwise dropped, withdrawn.

4    THE COURT:  Well, it appears we have a disagreement

5 as to what the agreement was.  I mean, is the MIL as agreed

6 going to go only to the infringement issue and is it going to

7 be granted that the cessation of sales during the pendency

8 will not be raised as an infringement issue and it stops

9 there; or is it going to be that that will be a part of the

10 agreement but the MIL will not preclude evidence of the

11 cessation with regard to the tortuous interference claim?  We

12 need to be clear.

13    MR. WHITLEY:  I think we just said the same thing

14 except I used the word 'agreed' and you used the word 'drop'

15 with regard to tortuous interference.

16    MS. GARDNER:  Your Honor, I think we spoke past each

17 other there.  We are in agreement that the MIL will probably

18 include using this evidence with respect to infringement, and

19 beyond that AKW has withdrawn the MIL.

20    THE COURT:  All right.  So there's no prohibition of

21 testimony or evidence concerning the cessation of sales in

22 relation to the tortuous interference claim.

23    MS. GARDNER:  That's correct.

24    THE COURT:  Okay.  I understand.  And based on that

25 clarification in the record, Defendant's MIL No. 1 is granted

1    as agreed and as stated.

2         All right.  Defendant's MIL No. 2 appears to be disputed.

3    Let me hear from Defendants on this.

4         MS. AINSWORTH:  Thank you, Your Honor.

5         Defendant's MIL No. 2 is regard to evidence or testimony

6    or argument about AKW's trademark filing application or

7    issuance or AKW's identification of a tariff trade schedule.

8         Your Honor, this is a straight 403, 402 issue having to

9    do with prejudice.  This is a trademark -- this is not a

10   trademark case; this is a patent case.  This is not a case

11   dealing with trade tariff law that's going to get into the

12   issues about what categories are chosen by people, by

13   companies when they're dealing with the EU to U.S. tariff

14   harmonization schedules.

15        What we believe that U.S. Silica wants to do is a

16   traditional skunk in the jury box statement.  They want to use

17   just as a sound bite, the fact that AKW's trademark

18   registration includes the word 'calcined kaolin', and that

19   AKW's tariff classification uses the phrase -- or the

20   classification falls into the category entitled 'kaolin and

21   other kaolin clay whether calcined or not'.

22             THE COURT:  Let me stop you, Ms. Ainsworth.

23             MS. AINSWORTH:  Yes, Your Honor.

24             THE COURT:  Tell me why this wasn't raised during

25   motion to strike or *Daubert* practice.  Why are you asking me

 1      to circumscribe an expert's opinions under a motion in limine?

 2              MS. AINSWORTH:  Your Honor, we did file motions --

 3      *Daubert* motions with regard to the infringement expert.  We

 4      viewed this strictly as a prejudicial 403, 402 issue.  There's

 5      not going to be any expert testimony as to what the

 6      descriptions of trademark registrations mean by the

 7      Plaintiff's expert or what tariff schedule classifications

 8      mean.  They are offering no evidence whatsoever on that.

 9      There's going to be no evidence or testimony about what a

10      person of skill in the art would view as relevant in this

11      testimony or why they have any bearing at all on the case.  We

12      view this as just a prejudicial sound bite that they want to

13      throw out there, and not something going to the methodology of

14      the expert.  And so, rightly or wrongly, we saw this as a

15      classic skunk in the jury box limine issue.

16          This information or this characterization is not

17      probative at all as to whether these claims were infringed.

18      There's going to be -- it's not probative on the meaning of

19      calcined kaolin.  And if they are able to just throw out this

20      evidence, we are going to have to use an unjustified amount of

21      time to try to explain why a company would use a broad

22      trademark registration category or why a company may have

23      chosen one particular classification in the tariff schedules,

24      or whether the tariff schedule classification is even chosen

25      by the company.

1          What they want to point out there is that we didn't use

2    the category 'ceramics' versus the category 'kaolin and other

3    kaolinic clay'.  Those questions similarly are not relevant.

4    If they have any relevance, it's minuscule, but they are far

5    outweighed by the prejudicial effect, which is the only reason

6    that anyone wants to throw this out there is simply for

7    prejudice.  We don't think it's relevant, and under 403

8    shouldn't be permitted.

9          THE COURT:  Well, the conundrum that I find is

10   substantially I think you make a good 403 argument.  I just

11   don't know why, if you're trying to keep an expert witness

12   from testifying to something that's included in their expert

13   report, you didn't either move under *Daubert* if you thought it

14   involved flawed methodology or improper analysis or you didn't

15   move under a traditional motion to strike if there was some

16   other non-analysis or non-methodology basis that you believed

17   should have been used to limit or curtail the expert's

18   testimony.

19        I mean, to not do that and to wait until limine and just

20   say -- because you're targeting a specific witness and

21   specific testimony.  It's not, This topic shouldn't be raised

22   in front of the jury during the trial; it's not the kind of

23   broad, almost often global kind of thing that we see in limine

24   practice.  I often get the motion to strike and then the

25   corresponding limine so you get the second bite at the same

1    apple.  We just don't -- I just don't see the first bite here

2    and I don't understand why.

3              MS. AINSWORTH:  Well, rightly or wrongly, Your

4    Honor, we thought this was the right way to go about it, and

5    if we made the wrong procedural choice, I offer my apologies

6    to the Court.  I would say, however, that this does go beyond

7    just the expert's -- what's mentioned in the expert's report,

8    because there are exhibits on their exhibit list that they

9    plan to offer into evidence of these trademark registrations

10   and the tariff classification.  So we saw it as a bigger issue

11   that they could be planning to scatter throughout the trial.

12   But still if they plan to use it throughout the trial, it's

13   going to be at this high sound bite level with zero

14   explanation of what this means, and nothing to back it up, and

15   we're going to have to explain the irrelevant evidence that's

16   very prejudicial that they put in front of the jury.

17             THE COURT:  All right.  Let me hear from the

18   Plaintiff.

19             MR. WHITLEY:  So, Your Honor, calling something that

20   hurts you 'prejudicial' doesn't make it prejudicial.  What

21   you're going see in the case is, and what we have seen in the

22   depositions is witness after witness, fact witness and expert

23   witness, say that AK Cool granules are not calcined kaolin,

24   they are a triaxial ceramic, whatever that word, phrase is

25   supposed to mean.  This is the position that all of their

1   witnesses have taken.

2       Well, when it came time to sell the accused product in

3   the United States, they had choices about what tariffs to use

4   and they went and got out a trademark.  And when they made

5   their representation, they could have described their product

6   any way they wanted to, and they chose to describe it in great

7   detail.

8       This isn't a sound bite.  In the briefing, Your Honor has

9   seen it's a full paragraph in the trademark filing.  They

10  describe AK Cool as reflective granules of calcined kaolin or

11  calcined kaolin, feldspar, quartz mixtures.  That's just one

12  sentence.  It goes on and on from there.  It goes on to say

13  they're intended to be used on roofing sheets.

14      They made admissions, they made admissions and they get

15  to be cross examined with them.  They can explain it, they're

16  welcome on direct or redirect to do what they want with this,

17  but this is classic cross examination.  When your opponent

18  makes an admission, we are entitled to cross examine on it,

19  and they can give the jury whatever explanation they want to

20  as to why they did what they did.

21          THE COURT:  All right.  Thank you.

22          MS. AINSWORTH:  Your Honor, may I briefly respond?

23          THE COURT:  You may.

24          MS. AINSWORTH:  Your Honor, I think what we just

25  heard is that it's clear that this is not going to be

 1    something that's just limited to their expert, Mr. Weinstein,

 2    mentioning it once in his report.  They plan to offer this

 3    apparently throughout the trial with no expert testimony to

 4    explain on their part what the trademark registrations mean or

 5    what the EU categorizations mean.

 6        And they are prejudicial.  It's not just that we don't

 7    like the evidence.  If the evidence is not relevant or

 8    probative to the burden that the Plaintiff bears and they want

 9    to just use it because it sounds good and requires us to spend

10    an inordinate amount of time explaining something that's not

11    relevant, then it is a skunk in the jury box, and we ask that

12    the Court not allow them to present this evidence.

13        THE COURT:  All right.  Well, with regard to

14    Defendant's MIL No. 2, to the extent there's surviving expert

15    opinion in Doctor Weinstein's report that hasn't been

16    circumscribed through *Daubert* or motion to strike practice,

17    I'm not going to use a motion in limine to circumscribe his

18    expert report.

19        That said, outside of the context of this particular

20    expert and his report, I am persuaded that there may be more

21    prejudicial effect than probative value, and with other

22    witnesses besides Doctor Weinstein who's going to be confined

23    to the paragraph that's in his report, I'm going to grant the

24    motion in limine and require counsel to show me and ask for

25    and receive leave before they go into this topic with other

1    witnesses.

2        Also, I'll remind both sides that it is not this Court's

3    practice to admit into evidence as exhibits every document or

4    reference relied upon by an expert in their report.  The

5    expert's going to testify and the expert's going to testify

6    within the full scope of their report; but because they're

7    going to testify about whatever is in there, we don't need as

8    exhibits every document that they may have referred to or

9    discussed in their expert report.

10        So to the extent Plaintiff is intending to move into

11    admission as exhibits documents that relate to this trademark

12    issue that are referenced or included in Doctor Weinstein's

13    report, I would suggest that they reconsider that.  Perhaps it

14    can be used as a demonstrative with him when he testifies

15    within the four corners of his report, but I don't see a

16    compelling reason to admit it as an exhibit.

17        So with regard to the expert, I'm going to leave his

18    report in tact, I'm going to allow whatever he relied upon to

19    form that portion of his opinions to be used with his

20    testimony as a demonstrative.  I'm not going to pre-admit as

21    exhibits those documents.

22        And with regard to other witnesses who might

23    substantively be asked the same questions regarding the

24    trademark issue, I'm going to require that you get leave from

25    the Court before you go into that.  I think that's fair given

1    these circumstances.

2        That will be the ruling on Defendant's MIL No. 2.

3        That brings us to Defendant's MIL No. 3.

4        MR. WIKBERG:  Good afternoon, Your Honor.  Terry

5    Wikberg on behalf of Defendant AKW.

6        I fear I'm about to walk into a similar admonishment.

7        THE COURT:  Looks like it.

8        MR. WIKBERG:  But -- so I guess I'm a glutton for

9    punishment.  Let's go.

10       As evidenced in our MIL, it's very clear now through

11   various argument, whether it's summary judgment and in the

12   expert report that we received, there is a fairly voluminous

13   amount of unauthenticated third-party information that the

14   Plaintiff intends to use in an effort to prove infringement.

15   We've just referenced a few examples in our MIL, but there are

16   many others related to testing of granules.  And while there

17   are a whole host of evidentiary reasons, including hearsay and

18   lack of foundation, there is also a prejudicial aspect of

19   these documents because there is no --

20       THE COURT:  Let me stop you.

21       MR. WIKBERG:  Sure.

22       THE COURT:  I'll really not intending to cover the

23   admissibility or inadmissibility of documents at this

24   juncture.

25       MR. WIKBERG:  Sure.  Understood.

1          THE COURT:  If you're talking about an expert

2    witness who may have relied upon them, testifying about them,

3    or using in their testimony; if you're talking about some

4    other context please clarify it for me; but whether some

5    document is going to be pre-admitted under the rules of

6    evidence is not what's before me right now.

7          MR. WIKBERG:  Sure.  Understood.

8        Their expert absolutely cites many of these documents to

9    -- and relies on what is purported to be testing in these

10   third-party documents and communications for purposes of the

11   expert's infringement analysis, including a number of the

12   exhibits that were identified in our MIL.  None of these third

13   parties were subpoenaed, deposed, there's no foundation, there

14   has been no understanding of what testing was done, who did

15   it, what was tested.  In fact, some of the documents don't

16   even reference an appropriate product number.  For example,

17   one of the documents represents a product called AK Cool 17

18   which doesn't exist.

19          THE COURT:  Can you explain to me under *Daubert*

20   *versus Merrell Dow* why this would not be raised as a *Daubert*

21   motion where you could challenge the reliability and the

22   analysis that went into these experts' opinions?  That's what

23   *Daubert*'s all about.

24          MR. WIKBERG:  It sure is, your Honor.  And like my

25   colleague indicated, we viewed this more as a MIL issue to

1    bring this to the Court's attention because of the prejudicial

2    aspect of these documents.  Certainly we'll also be raising

3    them in the evidentiary objections when we get to exhibits.

4    But we also did raise the admissibility of some of these

5    documents when it came to our motion for summary judgment on

6    non-infringement that was mooted.  And so not all of them were

7    discussed in that motion, but at least some were because their

8    expert was relying on inadmissible evidence at the time in

9    that motion, so it wasn't discussed today.

10             THE COURT:  Well, let me just say this.  I am not

11   comfortable using motion in limine practice as the sole

12   vehicle by which to circumscribe the reliability of testing

13   that was undertaken by an expert and set forth in the expert's

14   report.  That's what the *Daubert* practice is all about.

15   That's the context in which *Daubert* was created, as you

16   probably well know.  And a motion for summary judgment is not

17   a *Daubert* motion, and I'm not going to circumscribe the

18   expert's report based on this motion in limine.

19        Now, I'll say the same thing.  Experts are not a simple

20   conduit by which to parrot hearsay testimony to the jury, and

21   they're entitled to rely on hearsay.  They're entitled to rely

22   on all number of things.  That's why they're subject to being

23   challenged and tested under *Daubert*, and whatever survives

24   that challenge is proper testimony before the jury.  But don't

25   expect me to admit as exhibits hearsay documents just because

1    an expert relied upon them or referenced them in their report.

2    That's not a basis to ignore the hearsay rule.  That's not a

3    basis to admit improper evidence.

4        So we seem to be -- as much as I am trying to target

5    dispositive motions, motions in limine, and admissibility

6    questions under exhibits, we are apparently blurring the lines

7    here, or it appears to me that the parties are blurring the

8    lines here, and I'm trying to keep the lines distinct.

9             MR. WIKBERG:  We have, based on your guidance, Your

10   Honor, for sure.

11       Just to be clear--and I understand what you are

12   saying--there was no testing of this particular claim feature

13   by the expert, so the expert's reliance is on these

14   third-party documents.  So it's -- I understand the point and

15   I think the point remains, but just for point of clarity,

16   that's what we're dealing with.

17            THE COURT:  Let me make it clear.  If it's in the

18   expert's report, he's able -- he or she are able to testify

19   about it and it can be challenged with robust cross

20   examination.  And, Doctor X, you relied on this and you didn't

21   do it and you didn't know how it got done and somebody just

22   handed it to you and you accepted it, all of that is part of

23   what the trial process is about.  But I'm not going to exclude

24   it under limine practice.

25       And by the same token, those -- in this particular

1    instance, those tests that -- the documents that relate to

2    that third-party test that the expert may have discussed in

3    his report are not -- they're not given a pass to be admitted

4    as exhibits in the case, and your ability to object to those

5    as exhibits, you still have the entirety of the rules of

6    evidence to rely upon.  And if there's not a good exception or

7    reason why hearsay shouldn't come in, it's not going to come

8    in.  That doesn't mean I'm going to keep an expert from

9    properly relying on hearsay.

10          MR. WIKBERG:  Understood, Your Honor.

11          THE COURT:  So again, I'm not getting into exhibits,

12   but don't think, Plaintiff, because I'm going to deny this MIL

13   that that means you have an open gate to bring in every

14   document that this expert's talked about and tender it as an

15   exhibit.  That's not what you should anticipate happening.

16   But I am not at this late date, after we've been through half

17   a day or longer of dispositive motions, going to come in at

18   the 11th hour and, Oh, by the way, this expert can't say that

19   because it's unreliable, because he didn't know the basis for

20   it.  I mean, that is pure *Daubert* practice, and I'm not going

21   to substitute limine practice for *Daubert* practice because,

22   quite honestly, if I do, counsel, every trial I have will be

23   doing this.  And I'm not talking to just you out there; I'm

24   talking to everybody that will be reading the transcript of

25   this hearing that I know will be circulated, and I'm trying to

1    make the Court's policies clear and distinct and reliable.

2    And those that know me know I am a big believer in certainty

3    and consistency, and I'm not going to sacrifice that because

4    perhaps shoulda-coulda-woulda.  This should have been a

5    *Daubert* motion and it was not.

6            MR. WIKBERG:  Understood, Your Honor.

7            THE COURT:  Defendant's MIL No. 3 as a motion in

8    limine is denied.

9        That brings us to Defendant's motion in limine No. 4

10   which is also still in dispute.  This has to do apparently

11   with § 102(f) inventorship.

12       Let me hear from the Defendant on this.

13           MS. TA:  Your Honor, U.S. Silica should not be

14   allowed to confuse the jury by suggesting that AKW's

15   inventorship defense is time barred when it is not.

16       U.S. Silica does nothing in its response to distinguish

17   the cases cited by AKW, and, in fact, it continues to confuse

18   an action for correct inventorship under § 256, which can be

19   subject to laches, from affirmative defense of invalidity

20   based on improper inventorship under § 102(f), which is not

21   subject to laches.

22       For example, U.S. Silica continues to cite cases like

23   *Serdarevic* and *Cummins*, both cases where plaintiff brought

24   suit seeking a correction of inventorship under § 256.  The

25   *Medichem* case that they cite, *Internet Machines* case, *Barry,*

146

and *Sandt* cases are all § 102(g)(2) cases dealing with prior

invention or priority of invention cases.  None of these are

§ 102(f) cases that are subject to laches or any time bar or

equitable estoppel argument.

          The cases that U.S. Silica does cite are more about the

sufficiency of corroboration and not whether inventorship

claim is time barred.  Counsel has not identified any cases

where rebuttable presumption of laches applies in the § 102(f)

context; and because any laches or time bar argument would be

legally erroneous, it would be confusing to even suggest to

the jury that any delay somewhat impacts legitimacy of this

claim.

          And because AKW did not wait too long to raise this

§ 102(f) inventorship defense, in fact, it waited -- it filed

its § 102(f) defense -- or asserted its § 102(f) defense at

its earliest possible time when a case in controversy did

arrive.  So silence during that time has no bearing on the

credibility of any witness or legitimacy of AKW's defense, and

it would be very confusing and misleading to a jury to hear

testimony or argument about the amount of time between the

alleged invention and the defense.

          U.S. Silica would have to first I think lay a foundation

that AKW waited too long to raise this § 102(f) defense before

making any assertion that the timing impacts credibility, but

they can't lay that foundation and they can't lay that

1    foundation because it would be contrary to the law.

2          THE COURT:  All right.  Thank you.

3       What's the Plaintiff's response?

4          MR. WHITLEY:  So, Your Honor, this is one of the

5    biggest weaknesses in AKW's inventorship position.  The facts

6    are clear that they knew about the earliest of these patents,

7    the '303 Patent, by at least 2011.  There are emails in the

8    case where Doctor Mirke, their new alleged co-inventor, read

9    the patent in 2011, congratulated the named inventors,

10   Mr. Sexauer and Mr. Kolb in 2011, and didn't say a word about

11   this new claim that he is a co-inventor on the patent.

12       I, frankly, still don't understand what AKW's position is

13   here.  No one is arguing that their inventorship claim is time

14   barred.  We don't have any jury instructions to that -- on

15   that proposed to the Court.  Our issue is simply credibility.

16       We cited the Court -- I couldn't believe we actually

17   found a case from 1883, the *Atlantic Works* case, that was

18   cited in our briefing where the Supreme Court said that an

19   alleged inventor's whole conduct for months, as well as his

20   total silence on the subject of any prior invention, et

21   cetera, et cetera, is the strongest possible proof that he did

22   not actually invent the invention.

23       It's just cross examination--basic credibility, basic

24   evidence.  They've known about these patents for 10 years;

25   they didn't say anything until they got sued.  That goes to

1    the credibility of this new inventorship position they've

2    asserted that really all along one of their employees should

3    have been named as an inventor.

4        There are a plethora of documents in this case where AKW

5    talks to U.S. Silica about these patents, always acknowledging

6    that they are owned either by NCC, the predecessor company, or

7    U.S. Silica with no challenge what over or even a hint that

8    there is an inventorship issue.

9        So to the extent this motion in limine is saying we can't

10   argue it is time barred, no one's arguing that their

11   inventorship claim is time barred.  Is time relevant?  Is

12   their silence for the last decade relevant?  Absolutely.

13   That's what trials are for.  And the jury's entitled to see

14   that evidence and then give it whatever weight they so desire.

15       But, I mean, the pure purpose of this MIL is to try to

16   eliminate one of the biggest holes in their case, and they're

17   trying to do it through a pretrial procedure because they

18   don't want the jury to hear what actually happened.

19           THE COURT:  All right.  Well, it's clear that the

20   inventorship issue is a valid issue for the jury.  It's clear

21   that the equitable defenses that have been raised in this case

22   are improper to be presented to the jury and are reserved to

23   the Court.  That being the case, I'm going to be an active

24   gatekeeper in this situation, and if there is evidence that is

25   questionable as to whether it relates to an equitable issue,

1    which is stay out of the jury trial, or it relates to the

2    inventorship issue, which is proper in the jury trial, then

3    you come see me and tell me what it is and why it's relevant

4    to the jury issue and get leave before you go into it.

5        I do not want equitable defenses inserted into this

6    trial.  It's improper and it creates unremediable confusion.

7    But I don't intend to tie either side's hands on appropriate

8    probative evidence regarding the inventorship issue.  But I

9    wish I could be comfortable and say, Just do the right thing

10   here and don't bring up equitable stuff before the jury and

11   take your best shot at each other on the inventorship issue.

12   I don't have any great confidence that that's going to work

13   when we get to trial.

14       So for purposes of the Court being an active gatekeeper,

15   I'm going to grant this motion in limine, but I want the

16   Defendants to understand that does not mean I intend to tie

17   the Plaintiff's hands on factual issues that relate to the

18   inventorship story.  As a matter of fact, I'm telling you it

19   won't.  But I want anything that potentially is close to the

20   line here to be previewed by me before it's presented to the

21   jury so that I can prevent, hopefully, confusion that may not

22   be able to be easily remedied.  So that's the Court's ruling

23   on Defendant's MIL No. 4.

24       All right.  Defendant's MIL No. 5 appears to be next and

25   it also appears to be disputed.

1        MR. CHAJON:  Mike Chajon on behalf of AKW.

2     In light of Your Honor's rulings on our motion in limine

3  No. 2 and 3, we withdraw this motion.

4        THE COURT:  That's a wise choice, counsel.

5        MR. CHAJON:  Thank you, Your Honor.

6        THE COURT:  Defendant's MIL No. 5 is withdrawn.

7     Now, my notes, counsel, say that any remaining

8  Defendant's MILs, which would be I guess Defendant's MIL No.

9  6, have some agreement to them and are not disputed.  Is that

10  correct?

11        MS. GARDNER:  The parties agree the MIL is now moot.

12        THE COURT:  All right.  Then Defendant's MIL 6 is

13  denied as moot.

14     Are there any other outstanding limine issues that the

15  Court's not heard or taken up that either side's aware of?

16        MR. WHITLEY:  Not for the Plaintiff, Your Honor.

17        MR. BERNSTEIN:  Nothing from Defendant, Your Honor.

18        THE COURT:  All right.  Well, counsel, it's 3:15.

19  Can you take the guidance that I've given you so far today up

20  to and through this point and get us to a point where we can

21  finish the exhibits, or am I going to have to bring you back

22  on a later date?

23        MR. BERNSTEIN:  Your Honor, I think we should be

24  able to finish today.

25        THE COURT:  Here's what I'm going to do.  I'm going

1    to take about a 20-or-so-minute recess.  I want you to put

2    your heads together and see what you can do as far as

3    streamlining, if not completely resolving, any exhibit issues,

4    and then I'll check with you and see where we are and we'll

5    find out.

6        Court stands in recess.

7                        (Brief recess.)

8            THE COURT:  Be seated, please.

9        All right, counsel.  I understand that you have narrowed

10   the outstanding exhibit disputes to a discreet group of five

11   categories or buckets, and we'll proceed to take up any

12   surviving disputes regarding the pre-admission of exhibits for

13   the upcoming trial.

14       The list that I've been furnished indicates that there

15   are three groups for Defendant and two groups of Plaintiff's

16   proposed exhibits.  Let's take up category what's been marked

17   as 'untimely produced documents' as urged by Defendant.  This

18   would begin with DTX 533 through 537 and following.

19       Let me -- let's do it this way.  I think it's more

20   efficient.  Let me hear Plaintiff's basis to object to these

21   exhibits, and then I'll hear response from Defendants.

22           MR. WHITLEY:  Your Honor, this category of documents

23   are the documents that I was beginning to discuss earlier

24   today with respect to one of the MILs.  These are the

25   documents that were -- the compositional documents that were

1    produced late, after the close of discovery and after our

2    expert had tendered his report.

3         We obviously object to them being admitted.  You know, I

4    understand from the Court's prior rulings on the fact that we

5    had filed a MIL instead of a *Daubert* motion that this might

6    not preclude Doctor Haber from looking at these documents, but

7    we still think they should certainly not be admitted for all

8    purposes in the trial given their late production.

9         The only thing -- I said most of this before, so I'm not

10   going to repeat it.  The only thing new to add with respect to

11   these documents, Your Honor, and I will attempt to show --

12        May I use the elmo?

13             THE COURT:  You may.

14             MR. WHITLEY:  I will attempt to show the Court, just

15   by way of example -- this is just one sample.  And what I want

16   to point out, there's never been an explanation for why these

17   were late-produced.  You see the date in the top right-hand

18   corner.  These are documents from April of 2020.  The

19   highlighted individuals here, HJH is Mr. Hofmann, who is one

20   of the witnesses who was deposed who I believe is coming to

21   trial; Christian Kohl CK, is another individual who was in

22   their disclosures.  So they had the document.

23        And this file path down in the bottom, other documents

24   were produced to us from this file path in a timely manner, in

25   a timely manner.  So it's not that there was -- these

1    documents were missing or hiding; they just weren't produced

2    for whatever reason.

3              THE COURT:  Remind me again when you got them in

4    relation to the close of discovery.

5              MR. WHITLEY:  They were produced after the close of

6    discovery, after our expert report was due.  So discovery

7    closed November 18th.  Expert reports were due November 30th.

8    It's in the briefing.  We received them between the date our

9    expert tendered his report and the date that Doctor Haber

10   tendered his rebuttal report.

11             THE COURT:  Am I correct, counsel, that there is a

12   reference in some of the applicable briefing where the

13   Defendant says you had these documents but they were, to some

14   extent, redacted and it was only unredacted copies that were

15   produced late?

16             MR. WHITLEY:  No, Your Honor.

17             THE COURT:  This is not that situation.

18             MR. WHITLEY:  This is not this situation.  That

19   situation is not in controversy today.

20             THE COURT:  Okay.  You clarified that, then.

21        Let me hear from Defendant.

22             MS. GARDNER:  Good afternoon, Your Honor.  Abigail

23   Gardner for AKW.

24             THE COURT:  Good afternoon, Ms. Gardner.  Please

25   proceed.

1          MS. GARDNER:  So U.S. Silica has not been prejudiced

2     by these documents, I think is the first point, because that

3     seems to be their main objection.  They did not move to strike

4     these documents from Doctor Haber's report.  They did not

5     *Daubert* Doctor Haber on these documents.  They had ample

6     opportunity to depose him on these documents, which they did.

7     And they never requested further depositions from any fact

8     witnesses regarding these documents.

9          THE COURT:  Let me ask you this.  Do you anticipate

10    these would be presented at trial if pre-admitted through

11    anybody other than Doctor Haber?

12         MS. GARDNER:  The primary witness who uses these

13    documents is Doctor Haber because they relate to

14    non-infringement.  However, they also relate to the story of

15    the development of the AK Cool accused product by AKW.

16         THE COURT:  All right.  What else do you have?

17         MS. GARDNER:  I was going to show you the timeline,

18    but I don't know if that's necessary.  I'll just say --

19         THE COURT:  Do you factually dispute that they were

20    produced after the close of fact discovery?

21         MS. GARDNER:  No, that is not in dispute, Your

22    Honor.

23         THE COURT:  And your explanation or reason is just

24    they were missed or what?

25         MS. GARDNER:  As Mr. Whitley pointed out, the

1    documents were requested earlier, and we asked our client for

2    the documents.  We received some and they were produced before

3    the close of fact discovery.  The paragraphs in Doctor Haber's

4    report that U.S. Silica cites for this issue demonstrates that

5    those documents have also been used by Doctor Haber and so

6    those were produced.

7         U.S. Silica came back, asked us again for more documents,

8    and we returned to our client; and when we did receive more

9    documents, they were promptly produced and we were giving them

10   to the other side when we received them.

11             THE COURT:  So, in other words, the lawyers aren't

12   the reason it's late; the client's the reason it's late.

13             MS. GARDNER:  Well, Your Honor, we discovered these

14   exhibits when we did.  I don't necessarily want to blame the

15   client for that.

16             THE COURT:  All right.  You didn't sit on them once

17   you got them from the client, though; you produced them

18   promptly.

19             MS. GARDNER:  Yes.

20             THE COURT:  That's my point.  Thank you, counsel.

21        I'm going to sustain the objection to category 22, these,

22   quote, untimely produced documents.  I want to make it clear,

23   to the extent Doctor Haber testifies about these, he's

24   certainly free to use them as demonstratives in support of his

25   testimony, but they're not pre-admitted exhibits.

1          Next category, 'AKW communications with customers'.

2          What's the basis of your objection here, Mr. Whitley?

3                MR. WHITLEY:  You'll be pleased to know, Your Honor,

4     that we are withdrawing our objections to this category.

5                THE COURT:  All right.  Then this category of

6     exhibits will be pre-admitted.  That includes DTX 17, 31, 358,

7     364, 671, and 831.

8                MR. WHITLEY:  And, Your Honor, not that I want to

9     step on your ruling--just as a matter of clarity for the

10    Court, we have made a number of agreements today.  We have

11    pulled some exhibits down, we've pulled objections down,

12    reached all sorts of arrangements.

13                THE COURT:  That's the way it works.

14                MR. WHITLEY:  We're going to go back now and clean

15    all this up.  Some of the -- and I don't know this to be true.

16    Some of the documents you just recited may have been pulled

17    down as part of negotiation.  I don't know if they are or

18    weren't.  But regardless, the ones that were still live in

19    that category we've withdrawn or objection to.  And the

20    parties will work together to get you the accurate listing.

21                THE COURT:  Well, to the extent that leaves the door

22    open for either party to come back to me later and say, Oops,

23    the list we gave you at pretrial was not accurate and there

24    was something left off that should have been included or

25    something included that should have been left off, that's not

a real satisfying prospect.  I mean, today is the day, and the list I have was generated by the parties after they met and conferred at length once we finished resolving motions in limine.  I have to be able to rely on them.

Now, if after today as a part of generating the composite list of pre-admitted exhibits both sides agree that something shouldn't be there or should be there, then I'm not going to question that, but I don't want to leave the door open to a dispute that could be and should be resolved today.

MR. WHITLEY:  Agreed.  And I was suggesting the latter scenario that the parties would -- there will not be more disputes is my point.

THE COURT:  Well, if in making Ms. Brunson happy the parties produce a composite list of all the pre-admitted exhibits subsequent to pretrial and there are no disputes or disagreements, I doubt we will go back and compare that list to this list.  All right?

What about this third category of documents relating to settlement talks where you're urging 408?

MR. WHITLEY:  So these are two slightly different issues.  The first document, which is Defendant's 241, that is a document that are settlement negotiations between U.S. Silica and another entity that was an accused infringer of one of the Sexauer patents.  That email was produced because there was some back and forth about royalty terms.

 1    And we appreciate that Defendant's expert wants to talk about

 2    that, and we don't have an objection -- the expert relies on

 3    his report he's going to talk about.  Our only objection is to

 4    the document being admitted for all purposes since it is a

 5    Rule 408 settlement negotiation between parties.  But that's

 6    the only limited objection to that.  We understand it's going

 7    to be talked about by the expert.

 8            THE COURT:  Which expert is this?

 9            MR. WHITLEY:  This would be -- it may be both, but

10    it will be the damages experts on the reasonable royalty

11    issue.

12            THE COURT:  What about DTX 308?  You only mentioned

13    241.

14            MR. WHITLEY:  So 308 is a little bit of a different

15    issue.  If we could request control, I think we can pull it up

16    on the computer because this one I think we need to show you.

17        So just starting here, this document is an email between

18    U.S. Silica and AKW executives.

19        And if we could just stop for one second.

20        This is from July of 2020.  This is a pre-litigation

21    filing settlement discussion that is occurring between

22    executives at the two companies.  So, as you can imagine,

23    there is -- this goes on for several pages.  And, you know,

24    both sides, as you would expect in these kind of letters,

25    pound their chest about how they're right and the other side

1    is wrong.

2         What I believe Defendants want to do with this

3    document --

4         If we can scroll through just a little bit.  I think it's

5    on the third page.  My mistake.  Fourth page.

6         So this bottom paragraph, Your Honor, this has been cited

7    in a number of AKW's filings on this tortuous interference

8    theory.  This is an email from Mr. Blanchard, who is a senior

9    executive at U.S. Silica, to Doctor Hieber, who is, likewise,

10   a senior executive at AKW.

11        And on this issue of alleged threats, as you can see in

12   this second paragraph, Mr. Blanchard denies that anyone at

13   U.S. Silica has communicated with customers about a legal

14   action, but he says, We have informed customers about the

15   patents, they predate the AKW patent by in years--a true

16   statement--we've encouraged customers to read both sets of

17   patents, and we've reminded them what the patents cover--the

18   application.  We believe these statements are a hundred

19   percent accurate.

20        The Defendants want to use this email as, you know, some

21   kind of evidence to the jury that U.S. Silica has threatened

22   customers.  Now, setting aside that clearly is not what the

23   paragraph says, it raises an obvious Rule 408 issue because

24   this paragraph is surrounded by settlement discussions,

25   including, you know, statements by the parties about how they

1    want to come to a business resolution and proposing some

2    fairly vague but, nonetheless, settlement proposals back and

3    forth.

4        So given the very limited -- I mean, given the very

5    limited probative value of the document and then the

6    surrounding settlement discussions and so forth, we have an

7    obvious, you know, 403 objection as well as a 408 objection.

8        At a minimum, if, for some reason, the document were to

9    come in, you know, we would request, you know, either

10   redaction of the irrelevant settlement discussions, at the

11   very least a limiting instruction of some kind.  But I'm sure

12   Your Honor can appreciate the conundrum this particular

13   document imposes.

14           THE COURT:  I'm seeing it for the first time,

15   counsel, and I'm sure you've studied it at length, but show me

16   in specifics where it talks about settlement of pending or

17   threatened litigation.  I see the part about the killer

18   hornets and the 500-year flood; I haven't seen anything about

19   threatened litigation.

20           MR. WHITLEY:  It will be probably easier if we have

21   a hard copy.  Do we have a hard copy?  Or I'll temporarily

22   take control.

23       You will see a discussion with companies lawfully work

24   together --

25           THE COURT:  You have to speak up, counsel.

1          MR. WHITLEY:  I apologize.  I apologize.  I forgot

2     where I was standing.

3          In this paragraph that is now on the screen, you will see

4     that U.S. Silica -- that there's a reference to U.S. Silica

5     being open to scenarios where the companies can work together;

6     you know, meeting to have further discussions.

7          You see here the parties.  That's U.S. Silica setting for

8     its position.  You see in this paragraph this is AKW talking.

9     You know, what actually matters is whether AKW's granules

10    practice U.S. Silica's patents, and he refers to counsel --

11    opinion from counsel, which is something that at AKW's request

12    has been limined out of the case.  So that's a problem.

13         You can see in this paragraph there might be smarter and

14    more beneficial solutions for U.S. Silica where there's a

15    proposal from AKW that they further supply WA-11 to

16    U.S. Silica and U.S. Silica distributing AK Cool in the U.S.

17    But that's conditional upon, you know, essentially no

18    litigation being filed and no customers being threatened.  So

19    that's a distinct offer.

20         So, Your Honor, that's the snapshot of the document.

21         THE COURT:  All right.  Let me hear from the

22    Defendant about both of these and then we'll see where we are.

23         MR. BERNSTEIN:  So, Your Honor, Matt Bernstein

24    addressing the second exhibit, 308, first.

25         I mean, it's just a series of emails to companies talking

1    about business issues, talking about the market, discussing a

2    potential partnership.  I mean, it's -- there's no threat of

3    litigation, there's no discussion of kind of settling a patent

4    case or anything else along those lines.  This document isn't

5    marked in any way as being a 408 communication or anything

6    along those lines.  U.S. Silica is a very sophisticated

7    company.  This is just not -- as a threshold matter, this is

8    not a settlement communication between the parties.

9             THE COURT:  Let me ask you this, Mr. Bernstein.  How

10   do you plan to use this if I should pre-admit it, and who are

11   you going to use it through?  What's the purpose here?  You

12   say it's just companies talking back and forth with each

13   other.

14             MR. BERNSTEIN:  One of the things that the parties

15   talked about was what was going on in the market, and this is

16   the document for our tortuous interference case where

17   Mr. Blanchard admits that he told customers about the earlier

18   date on the U.S. Silica patents, and this goes directly to our

19   tortuous interference case.

20             THE COURT:  And that was the paragraph we started

21   out with toward the end of the document?

22             MR. BERNSTEIN:  I think it's -- can we find that?

23             MR. WHITLEY:  Oh, we can.

24             THE COURT:  Why don't you pull that particular

25   paragraph up again.  That's it.  "I will circle back with my

1    sales team."  That's the paragraph.

2            MR. BERNSTEIN:  Yeah.  There's another -- isn't

3    there another?

4            MS. GARDNER:  Higher up there is another statement.

5            MR. BERNSTEIN:  There is two statements along these

6    lines, Your Honor.

7            THE COURT:  I've seen that one.  Show me the one

8    that's higher up.

9            MR. BERNSTEIN:  Bullet 1, Your Honor.

10           THE COURT:  Just a second.

11           MR. BERNSTEIN:  This is just further explanation --

12           THE COURT:  Let me read it before you tell me what

13   it says.

14       Okay.  So we have this paragraph and we have the one you

15   showed earlier.  Correct?

16           MR. BERNSTEIN:  Correct.

17           THE COURT:  Those are the sections of this lengthy

18   email chain that you would want to use.

19           MR. BERNSTEIN:  Yes, Your Honor.

20           THE COURT:  All right.

21           MR. BERNSTEIN:  And again, Your Honor, there is --

22   when we argued the tortuous interference claim, one of the

23   issues that we talked about was the actual acts of intentional

24   interference.  And this is a concession that they actually are

25   talking to our customers, which at other points they actually

 1    dispute or deny.  And this also is -- goes to the independent

 2    tort where they are making a material misrepresentation about

 3    whether -- or the impact of having an earlier patent what that

 4    actually does.

 5              THE COURT:  Who's the witness that this would be

 6    published through?

 7              MR. BERNSTEIN:  Doctor Hieber, Your Honor; one of

 8    the authors of this document.

 9              THE COURT:  All right.  Give me your position on

10    DTX 241.

11              MR. BERNSTEIN:  So DTX 241, Your Honor, I mean, it's

12    not actually being -- we're not using the document to show the

13    actual, you know, liability from that third party, CDL, or to

14    show the amount of liability for that third party, CDL; it's

15    being used to show the royalty rates that are -- that U.S.

16    Silica was asking for generally in the market as well as the

17    market's view as to the unreasonableness of those royalties.

18    Those are things that Mr. Napper talked about in his expert

19    report.

20              THE COURT:  Let me ask you this.  Is 308 a part of

21    Hieber's report, or is it outside of his report?

22              MR. BERNSTEIN:  So there's Doctor Haber, Your Honor.

23              THE COURT:  Haber.  I'm sorry.

24              MR. BERNSTEIN:  And this is going to be Doctor

25    Hieber, H-I-E-B-E-R.  He's a fact witness.  He's the retired

 1    boss of AKW.

 2         THE COURT:  Okay.  Thank you for the clarification.

 3    Obviously as a fact witness he hasn't generated a report.

 4    Okay.

 5         All right.  I think I've heard enough.  I'm going to

 6    admit DTX 308.  I don't see that it falls under the

 7    prohibitions of Rule 408.  And having seen the particular

 8    sections that Defendant seeks to use, I think they're

 9    probative of -- at least with regard to the assertions of

10    tortuous interference.

11         With regard to DTX 241, given that is included in the

12    expert's report, the expert may use it as a demonstrative when

13    he testifies but I see no reason to admit it as an exhibit in

14    the case.  So DTX 241 is not pre-admitted; DTX 308 is.

15         Okay.  That brings us to the next category.  These are

16    Plaintiff's proposed exhibits where Defendant objects, and

17    these relate to what's identified as third-party testing.

18         Let's follow the same protocols.  Let me hear from

19    Defendants as to the basis of their objection and then I'll

20    hear from Plaintiff in response.

21         MR. WIKBERG:  Your Honor, good afternoon again.

22    Terry Wikberg for the Defendant AKW.  And may it please the

23    Court.

24         There are -- I think it's important to understand what's

25    at issue here.  The asserted claims are directed to a roofing

1    system that includes some particulate embedded in asphalt, and

2    that is what is much like a shingle placed on a roof.  The

3    Defendant sells only the particulate; it does not assemble or

4    otherwise put the particulate in any substrate asphalt roofing

5    system.  It's not what they do.

6         There are a number of third-party communications and

7    documents that were in the production from potential

8    customers, actual customers, that purport to say they've

9    installed some granules in asphalt, they purport to

10   demonstrate some testing, but none of those third parties have

11   been deposed; none of those third parties have had discovery

12   taken from them.  There has been no -- there is no evidence as

13   to -- for particular documents --

14        If I could pull up PX 384, for example.

15        So here is an exemplary email.

16        If we go up a little bit to show that it's from U.S. Ply

17   company.

18        And it's an email from a gentleman by the name of Danny

19   Adair.  And the text of the email talks about, We've received

20   some granules, and they have installed them on a roll.  And

21   there's reference to, for example, an AK Cool 17 granule.

22   Now, Ms. Hullin, AKW's corporate witness, testified there is

23   no such thing; that's not our product.  But that goes to

24   demonstrate why documents from third parties that haven't been

25   authenticated, no foundation has been laid, are inadmissible

1    under various rules of evidence.

2        And it's fairly clear from the expert reports and the

3    briefing in this case that the Plaintiff would like to rely on

4    these documents to show that direct infringement has occurred

5    in some way when we -- no one has taken any deposition

6    testimony or gathered any evidence on who installed what, what

7    the products where, what it was.

8        Some of these documents, for example, PX 282, this is

9    from a company called BMI.  They're not even in the U.S.  This

10   is a European company.  So even if granules were installed on

11   a surface by BMI, that occurred in Europe and has no relevance

12   or bearing here in this case.

13       I mean, but the fundamental issue is no one has gathered

14   -- and some documents talk about potential reflectance values,

15   but there's no evidence on what was tested, who was tested, no

16   confirmation of whose granules were applied to these

17   documents.  They are the epitome of hearsay, hearsay within

18   hearsay, there's no foundation, no authenticity as to what was

19   done and who did it, and for that reason any of these

20   third-party communications and documents related to the

21   potential use of AKW's granules in any way, shape, or form

22   should be excluded.

23           THE COURT:  And you anticipate that these, if

24   permitted, would come in through Plaintiff's technical expert?

25   Or what's your anticipation?

1          MR. WIKBERG:  Absolutely; no doubt.  As a matter of

2    fact, the expert relies on them extensively in the report, but

3    it wouldn't surprise me if they would use some of these

4    documents with some of the witnesses who may come to trial.

5          For example, if I could have the elmo for just a second.

6          Here is an example of a document, the one email, PX 384,

7    that was used when Angela Hullin was deposed, and was asked

8    about it.  And here she explains, AK Cool 17 is a mistake, it

9    doesn't exist.  And then the follow-up question, "You have no

10   specific reason to doubt Mr. Adair's honesty?"

11         And she answers, "I don't know this gentleman."

12         So it wouldn't surprise me to see an attempt to put these

13   email communications from third parties in front of AKW fact

14   witnesses in an effort to try to validate in some way or lay a

15   foundation for the document from an evidentiary standpoint.

16   But for sure they will be used by the expert.

17         THE COURT:  All right.  Let me hear from the

18   Plaintiff in response.

19         MR. WHITLEY:  So, Your Honor, if -- let me first

20   frame this issue, because this is an important issue in what

21   AKW is trying to do here.

22         They have been arguing that we don't have evidence of

23   customers using their granules.  They sell granules to roofing

24   companies, but then they take the position that there's no

25   evidence that any of these customers actually used the

1    granules.  Well, they produced to us in discovery hundreds of

2    emails, if not more, between AKW and their own customers

3    making it clear they have a regular activity of talking to

4    customers, they send samples, the customers use the samples,

5    send back their report to AKW, some are detailed, some are

6    not, AKW -- there's emails where there's AKW going back and

7    forth, Oh, you want a different coating?  Sure, we'll put that

8    on.  You thought the particle size was off?  We'll change

9    that.  All kinds of evidence that shows they know exactly

10    what's going on.  And a case about induced infringement,

11    contributory infringement, and willfulness, we've got all

12    these documents showing that AKW is engaged in dialogue with

13    customers, showing -- giving the product and receiving

14    feedback from the customers on how the product is being used.

15    So that's what we're talking about.

16       This is not a discreet category of documents.  You'll

17    note that when I came up here it was a couple of documents in

18    each category.  That's all we talked about.  We pulled back

19    everything else.  There's about 50 documents in this category

20    and each one is different.

21       One thing that we pointed out in the briefing, AKW wants

22    you to make sweeping evidentiary rulings, when the case law

23    indicates things like hearsay are on a document-by-document

24    basis.  You have to look at each one to know what's going on.

25    And each of these is going to fall under a very obvious

1    grounds for admissibility.

2         If we can pull up 384.

3         This was the first document that was shown to you, and,

4    you know, the two arguments that I hear are authentication --

5    well, there's three.  I hear sponsoring witness,

6    authentication, and hearsay.  There's no rule for a sponsoring

7    witness.  When documents are in, they are in.  They are either

8    admissible or they're not.  That's not a rule of the Federal

9    Rules of Evidence.

10        Authenticity, as the Court well knows, is an incredibly

11   low standard, simply there to guarantee that the document is

12   what it purports to be.  These documents were produced by AKW,

13   which is itself proof of authenticity.  They contain signature

14   blocks, which we've cited the Court to case law, to

15   demonstrate authenticity.  That's not a barrier to

16   admissibility.  These documents are what they are.

17        They're also -- AKW lumps these altogether as, you know,

18   so-called testing documents, but what you actually see here,

19   if the Court looks to, you know, roughly in the middle,

20   there's the admission from U.S. Ply that they have put AK Cool

21   granules on rolled sheets.  That's one of the patent claims.

22        What's interesting is that when we cross examined

23   Ms. Hullin, who's the recipient of this email from AKW, and

24   she pointed out, Yeah, AK Cool 17, that's a mistake, he must

25   have meant AK Cool 21, so that's just a red herring.

1        Now, they say, Well, this is hearsay; it can't come in.

2   It comes in under multiple hearsay exceptions.  It is a

3   statement against interests because the statement is admitting

4   to patent infringement, admitting to copying one of the

5   claims -- one of the asserted claims.

6            THE COURT:  An admission has to come from the party,

7   counsel.  Third party can't make an admission on behalf of

8   the --

9            MR. WHITLEY:  Not an admission of a party opponent;

10  an admission against interests, which is Rule 804(b)(3), not

11  801(d)(2) --

12           THE COURT:  All right.

13           MR. WHITLEY:  -- which we'll talk about that in just

14  a moment, but an admission against interests.  This is a third

15  party putting in writing they are practicing one of the patent

16  claims.

17       But I think the one that just makes the most sense and it

18  will apply to all 50 documents in this category, it's the

19  residual exception, 807.  You know, the residual exception is

20  there to say even if things -- and we do argue they fit

21  neatly.  This is a regularly conducted activity as well as an

22  admission against interests.  But even if you went past those,

23  the residual exception says if there's no reason to doubt that

24  the author was telling the truth --

25           THE COURT:  I know what the residual exception is.

1        MR. WHITLEY:  And there's absolutely no reason why

2   U.S. Ply would not be telling the truth when they say to AKW,

3   We put your granules on, we like them, we want more.  I mean,

4   that's the substance of this agreement -- of this document.

5        This email is also a good example of another problem in

6   that AKW has a claim for tortuous interference.  They claim

7   that U.S. Silica interfered with U.S. Ply, and here you've got

8   U.S. Ply telling AKW after the date of the alleged tortuous

9   interference, We want more granules; give us more AK Cool.

10       So, you know, the bottom line here is that all of

11  these -- and again, I don't think the Court can categorically

12  exclude 50 documents without looking at them, but one theme

13  that the Court will see -- all of these you're going to see,

14  they are dialogues between AKW and customers where customers

15  are reporting back about their use of the product.

16       You're going to have embedded--not in this particular

17  example--you will see AKW responses to customer questions; you

18  know, customers reporting their test results and AK Cool

19  saying, Oh, that's great; we're happy to hear it; let's now do

20  X, Y, Z.  So, Your Honor, these are the classic documents that

21  come into evidence.

22       I mean, AKW is essentially trying to say that the jury

23  shouldn't even see AKW's own correspondence with customers who

24  are reporting back to AKW the way they're using the product

25  and, in some cases, the reflectance values for the product,

1    cause it to fall within the patent claims.

2        And so we would submit this category -- I mean, it ought

3    to be systematically denied.  Unfortunately, at a minimum, I

4    don't know how the Court could go through this without going

5    through all 50 documents.

6        And I -- just as a preview the next category that AKW

7    objects to has nearly 200 documents in it.  They've grouped --

8    they call it one bucket.  It's nearly 200 documents.  So

9    there's a big difference between what Defendants are

10   presenting you and what we're presenting.

11           THE COURT:  And at least with regard to this

12   category, tell me how these would be presented to the jury if

13   they were pre-admitted.  Who would be the sponsoring witness?

14   Who would discuss them?

15           MR. WHITLEY:  So the expert, obviously.  The expert

16   relies on them.  This would come in through AKW witnesses

17   primarily.  This would be cross examination of AKW witnesses;

18   the ones who, you know, received these reports, who had

19   knowledge of what customers were telling them about how the

20   products were being used.

21       And again, in a case where willfulness is at issue, when

22   inducement is at issue, when contribution or contributory

23   infringement is at issue, what AKW knew and what it was

24   communicating back to customers, that is -- I mean, that's the

25   heart of the case.

1          THE COURT:  Let's take the one that's on the screen.

2    It apparently is addressed to Doctor Hieber.  Now, I don't

3    know Doctor Hieber.  And apparently his email address says

4    quarzwerke.com.  Is Doctor Hieber going to be a witness at

5    trial to whom this would be presented, or is it going to be

6    some unknown participant who's not on this email chain that

7    works for the Defendant that you're going to lay this in front

8    of and ask them, Doesn't this admit you do X, Y, and Z?

9          MR. WHITLEY:  I don't know -- I don't believe -- we

10   were supposed to receive an updated witness list, and I don't

11   know if you sent us one or not.  We filed ours yesterday, but

12   it's my understanding that Doctor Hieber is coming live.

13        The Quarzwerke is the parent company, so-to-speak, of

14   AKW.

15        Hans-Jurgen Hofmann will -- I believe will be at trial.

16   Angela Hullin, may or may not be at trial.  Many of these

17   three, and I can't remember which combination -- this was used

18   in depositions.  So at least one of the three, and probably

19   more than one of the three, testified about this particular

20   document in depositions.

21        But there will be -- I mean, Angela Hullin and

22   Mr. Hofmann are in sales, and so they have a number of these

23   kinds of correspondence with customers.  Doctor Hieber is on a

24   smaller set, but he is on some of them as well.  So, I mean,

25   these will be AKW witnesses who were actively involved in

1     these communications.

2          And in some cases, Your Honor, what we will have -- and

3     this is not a good example, but many of these are email

4     strings, and so customers will say, you know, something about,

5     you know, We put your granules on and, you know, X, Y, and Z

6     happened; and there will be a response from Mr. Hofmann or

7     Ms. Hullin, you know, All right, we'll, you know, do X, Y, or

8     Z.  And all of -- those are clearly admissions of a party

9     opponent.  And our -- you know, in order for those to make any

10    sense, you have to see what they're responding to.  But all of

11    this --

12          THE COURT:  I assume that there's no dispute, given

13    the source of where these were produced from, that they came

14    out of the business records of AKW and that they're maintained

15    by AKW as a normal part of its business and were kept and

16    filed in the normal course of their business.

17          MR. WHITLEY:  I cannot imagine any dispute.  The

18    ones in this category were all produced by AKW and have AKW

19    Bates numbers.

20          THE COURT:  Let me say this, Mr. Whitley.  To the

21    extent these exhibits in this category are emails that have

22    been produced by AKW and they're going to be presented at

23    trial by the Plaintiff through an AKW employee who is a

24    participant in the email chain, then I'll pre-admit them.  All

25    right?  But you're not going to take some person in the

1    quality control department who's never seen one of these and

2    throw it in front of them and go over it with them.  They're

3    going to have to have been a participant in the email chain

4    and it's going to have to have been produced in the course of

5    discovery from the business records of AKW.

6        Now, if there are other items in this category that fall

7    outside that description, then I guess we need to talk about

8    them at some point, but that's -- what you've shown me so far

9    relative to this category have been emails that appear to

10   involve AKW personnel, and you've represented that they've

11   come to you from and as a part of the maintained business

12   records of AKW.  And if they're going to be presented through

13   AKW employees who are participants in that email chain, I find

14   that the evidentiary objections raised by the Defendant have

15   been overcome and I'll pre-admit them.  Okay?

16             MR. WHITLEY:  Understood, Your Honor.

17             THE COURT:  Now, you'll have to tell me.  Does that

18   cover this category or does it only partially cover this

19   category?  And if it only partially covers it, what's left?

20             MR. WIKBERG:  Your Honor, there's at least one

21   document that is not covered by what you just described.

22             THE COURT:  Well, that's why I asked the question.

23             MR. WIKBERG:  And that's going to be Exhibit PX 282.

24             THE COURT:  Somebody show me 282, please.

25             MR. WIKBERG:  PX 282 is a PowerPoint presentation

1    created by this company BMI, which is a European company.  It

2    is not -- it came in to AKW as -- from -- in an email from

3    this company BMI, but it is not an email and the Karen Ayme

4    and Dominique Haudebert are not AKW employees; they are

5    employees of BMI.  This was a presentation put together by BMI

6    and materials put together by BMI and sent to AKW.

7            THE COURT:  All right.  Let me hear from Plaintiff

8    on this particular exhibit.

9            MR. WHITLEY:  And I apologize I didn't address this

10   before.  No. 228 has a cover email.  I don't know why it's not

11   present on the slide you are seeing, but it was -- this

12   presentation was prepared by a third party, BMI.  It was

13   emailed to AKW to sort of summarize some of their experiences

14   with the AKW granules.

15       If we can go I think to the next slide.

16       The second bullet point in particular of this slide, you

17   know, BMI represents that the granules are composed of

18   calcined kaolin and other minerals.  This presentation was

19   sent to Angela Hullin.  She was deposed about this

20   presentation and, in particular, she took the position that

21   calling AKW calcined kaolin is erroneous.  So she was posed

22   the question, you know, When you received this presentation

23   and had a meeting with BMI, did you correct them?  Did you

24   tell them that their characterization in this document was, in

25   your view, wrong?

1    And she said no.

2    That is how the document has come into the case so far

3    through deposition.  But the important part is it's not just a

4    stand-alone document, it's really no different than if it had

5    all been in an email.  It is still something that a customer

6    sent to AKW, AKW received it and commented on it.

7              THE COURT:  Where's the email that this is attached

8    to?

9              MR. WHITLEY:  If that's going too fast, Your Honor,

10   let us know.

11             THE COURT:  It is.  Just hold it right there.

12   It looks like the only AKW employee in this email chain

13   is Ms. Hullin.

14             MR. WHITLEY:  Ms. Hullin and also Hans-Jurgen

15   Hofmann.

16             THE COURT:  I see that.  Are either of these

17   individuals going to be witnesses at trial?

18             MR. WHITLEY:  It's my understanding they will be.

19   It's my understanding Mr. Hofmann, at least, is coming live.

20             THE COURT:  And this email with the PowerPoint

21   attached to it was produced by AKW in the same manner as the

22   other emails we've just gone through.

23             MR. WHITLEY:  That is correct, Your Honor.

24             THE COURT:  Then the same ruling applies.  I'll

25   pre-admit it as long as it's used by an AKW or presented to

1   and examined by an AKW employee who is a participant in the

2   email chain.

3         All right.  Is there anything else?

4               MR. WIKBERG:  Your Honor, as a point of

5   clarification, we're not sure that the email actually is on

6   the exhibit list?  It is?  No. 284 is?  Okay.

7               THE COURT:  All right.

8               MR. WHITLEY:  And to the -- those should have been

9   combined.  To the extent they're separate, it's a mistake.

10              THE COURT:  The email and the attached PowerPoint

11  are to be considered as one exhibit and to be treated as such.

12              MR. WHITLEY:  We will correct that, Your Honor.

13              THE COURT:  All right.  What about this remaining

14  category 36 that has, as counsel indicated, 200 documents in

15  it, give or take?

16              MS. GREB:  Your Honor, Emily Greb on behalf of AKW.

17         In light of Your Honor's ruling and guidance on the prior

18  documents, we withdraw our objections to this group.

19              THE COURT:  Then I'll pre-admit them --

20              MS. GREB:  Thank you.

21              THE COURT:  -- without objection.

22         Are there other exhibit disputes that we haven't taken up

23  and need to turn our attention to?

24              MR. WHITLEY:  I don't believe so, from the

25  Plaintiff's perspective.

1        THE COURT:  What's Defendant's view?

2        MR. BERNSTEIN:  We agree with Mr. Whitley.

3        THE COURT:  All right.  Then we'll consider that the

4   exhibits to be pre-admitted for use during this trial have

5   been covered, and I'll direct you to the Court's order

6   regarding emails and any instructions you may receive about

7   physical production of the same, et cetera, from the Courtroom

8   Deputy.

9        Now, having dealt with the dispositive motions, the

10  motions in limine, and the exhibits, are there other matters

11  outstanding and in dispute that the parties are aware of with

12  regard to pretrial that have not been taken up and need to be

13  addressed by the Court?

14       MR. BERNSTEIN:  Not anything in dispute, but some

15  questions or things that Defendant would like to raise with

16  Your Honor.

17       THE COURT:  All right.  That's why I asked.

18       If you will, go to the podium, Mr. Bernstein, and tell me

19  what's on your mind.

20       MR. BERNSTEIN:  So, Your Honor, you heard a little

21  bit about Doctor -- Professor Mirke today.  He is a third

22  party.  He's our inventorship witness.  He is a professor at

23  the University of Nuremberg.  It's the middle of school there.

24  He's teaching.  He has gotten leave to basically travel on

25  Tuesday of trial and be here on the 23rd, and then needs to I

1    think leave that night.  And so in the pretrial order we

2    identified that his availability was on the 23rd.  There was

3    no objection that I saw in the pretrial order, but I just

4    wanted to notify Your Honor of that.

5              THE COURT:  Where does that fall in the trial week?

6              MR. BERNSTEIN:  That's Wednesday, Your Honor.

7              THE COURT:  All right.  Well, whether or not the

8    Plaintiff's rested their case in chief or not, if necessary,

9    to accommodate his schedule, we'll take him out of order.  And

10   I assume we won't have any problem with the Plaintiff with

11   that?

12             MR. WHITLEY:  Of course not, Your Honor.  Thank you.

13             THE COURT:  Thank you.

14             MR. BERNSTEIN:  So second, Your Honor, our tortuous

15   interference claim, that's an affirmative offensive claim that

16   we have, and I wanted to ask Your Honor how we would deal with

17   that as far as kind of the order of the trial goes.

18   Specifically, it's our view that we should have an opportunity

19   to put on rebuttal related to that case, and that I think

20   would be at the end of the case.  And also it's our view that

21   we should get at least a little bit more time for closing

22   rebuttal argument on that since, again, that's our burden of

23   proof.  That's our offensive claim.

24             THE COURT:  I'll take your request under advisement.

25   I have not given defendants with an affirmative counterclaim

1    the right to present rebuttal evidence in the past.  It is a

2    counterclaim.  I understand you have the burden and it's an

3    offensive weapon, if you will, on your side of the case, but I

4    am very reluctant to get into rebuttals to rebuttals to

5    rebuttals, and I want to keep the structure of the trial clear

6    and delineated for the jury.  I'm not going to tell you no as

7    I sit here; I will tell you I haven't done that before, but --

8    you can raise it again as we get closer.

9            MR. BERNSTEIN:  Can I just raise one point, an

10    example of an issue I think that --

11            THE COURT:  I'm not going to expand the closing

12    argument time.

13            MR. BERNSTEIN:  Okay.  So, Your Honor, with respect

14    to, for example, Mr. Napper our damages expert, he's going to

15    first opine on patent damages.  And, you know, I think the

16    disputed patents damages are between like 10,000 and they say

17    75,000.  It's not a lot.  But then he would have to come on

18    and right after, you know, provide an opinion on tortuous

19    interference damages.  And I guess it can be done; obviously

20    you said that that's how it's done usually.  Just, to me, I

21    thought maybe there's going to be some confusion with him

22    opining on two different issues when he's up there that one

23    time.

24            THE COURT:  He's your damages expert?

25            MR. BERNSTEIN:  He is, yes; yes, Your Honor.

1    THE COURT:  Well, I don't see a real problem with

2  him testifying to tell the jury why the Plaintiff's damages

3  expert is all wet and they shouldn't consider what he said and

4  here's a much better, more reliable opinion about the

5  underlying infringement damages; and then once that's

6  testified to and complete, then transitioning to, And also,

7  ladies and gentlemen, AKW has an affirmative claim against

8  U.S. Silica for, as the Court has told you, tortuous business

9  interference, and here's my opinion on what the damages, if

10  you find that is the case, would be.  I don't see that that's

11  problematic.

12    MR. BERNSTEIN:  Okay.  Thank you, Your Honor.

13    And then the last issue is we are now a little -- we --

14  two weeks, a few days.  There are a couple of third parties,

15  Rick Sexauer and Matt Kolb, they are the inventors on the two

16  patents-in-suit.  They were deposed.  They are in a common

17  interest agreement with the Plaintiff in this case.  We've

18  asked them for some clarification as to whether they are going

19  to be coming live to trial.  We haven't gotten that, and

20  obviously that impacts our preparation, our whole trial

21  strategy, and we'd like to know sooner rather than later as

22  to --

23    THE COURT:  What can you tell us about that,

24  Mr. Whitley?  This is not the time to drag your feet on

25  disclosing things to the other side.

 1          MR. WHITLEY:  Well, so two things, Your Honor, as

 2   far as that's concerned.

 3       The answer is I honestly don't know.  They are outside

 4   subpoena range.  And we are preparing for both contingencies.

 5   As they well know, I took a trial deposition of both of those

 6   gentlemen for the very reason that they are in their 70s and

 7   live in California and Idaho.  I will be asking them to come

 8   to trial.  I don't have an answer today.  We obviously will

 9   need -- we have to get an answer to that ourselves.

10          THE COURT:  Everybody needs an answer to that.

11          MR. WHITLEY:  Very soon.

12       The corollary to that, again, these rules have to work

13   both ways.  They've got witnesses from Germany on their

14   exhibit -- we were supposed to turn in updated witness lists

15   according to our joint pretrial order, which we have, they

16   have not.  They've got witnesses in Germany who they are

17   saying might come live, might testify by deposition.  So

18   everybody needs to be playing by the same rules here.

19          MR. BERNSTEIN:  Your Honor, I can clarify right now.

20          THE COURT:  No doubt about that.

21          MR. BERNSTEIN:  I mean, so as we said on our witness

22   list, Doctor Otto Hieber will be coming live, Hans-Jurgen

23   Hofmann will be coming live, Professor Michael Mirke will be

24   coming live, and Angela Hullin will be coming live in light of

25   the ruling on the summary judgment on tortuous interference.

1          THE COURT:  Let me just say this, counsel.  I'm

2    selecting a jury and starting a jury trial Monday.  I don't

3    have time to babysit this process between now and the 21st.

4    Everybody needs to know who's coming, who's not coming, if

5    you've got a trial deposition if you're going to use that

6    because the witnesses won't be here live.  All that needs to

7    be known.

8          MR. WHITLEY:  Agreed.

9          THE COURT:  Today is the 3rd.  I think, Mr. Whitley,

10   you need an answer from those folks in California and Idaho by

11   next Tuesday.

12         MR. WHITLEY:  I agree.

13         THE COURT:  And if they don't give you an

14   affirmative 'yes' or 'no', then you need to assume they are

15   not going to be here, you are going to use their trial

16   depositions, and you need to inform opposing counsel so

17   everybody can be playing by the same rules and preparing with

18   the same amount of time before we pick the jury on the 21st.

19         MR. WHITLEY:  We will do it.

20         THE COURT:  Okay.

21         MR. BERNSTEIN:  Thank you, Your Honor.

22         THE COURT:  Do we have other housekeeping matters we

23   need to take up?

24         MR. BERNSTEIN:  That's all for the Defendant.

25         THE COURT:  Nobody's planning to bring a front-end

1    loader in here with a bucket full of granules of some kind and

2    use it as a demonstrative?

3              MR. BERNSTEIN:  Just in our slides, Your Honor.

4    Just in our slides.

5              THE COURT:  Well, I found out today that the trial

6    I'm going to start Monday that involves overhead doors, they

7    told me today they wanted to bring an overhead door in the

8    courtroom and wanted to know where my loading dock was so that

9    they could get it up here and run it up and down in front of

10   the jury.  If you've got any surprises like that up your

11   sleeves for me, tell me now, not three or four days before

12   jury selection.

13        All right, counsel.  Thank you for your presence and your

14   hard work today.  To the Court's knowledge, this will complete

15   the pretrial process and, barring any unforeseen problems, I

16   will see you on the 21st of March for jury selection and

17   trial.

18        You are excused.

19        And the Court stands in recess.

20                        (End of hearing.)

21

22

23

24

25

1          I HEREBY CERTIFY THAT THE FOREGOING IS A

2     CORRECT TRANSCRIPT FROM THE RECORD OF

3     PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

4          I FURTHER CERTIFY THAT THE TRANSCRIPT FEES

5     FORMAT COMPLY WITH THOSE PRESCRIBED BY THE

6     COURT AND THE JUDICIAL CONFERENCE OF THE

7     UNITED STATES.

8

9     S/Shawn McRoberts                03/05/2022

10    _____DATE_____
      SHAWN McROBERTS, RMR, CRR
11    FEDERAL OFFICIAL COURT REPORTER

12

13

14

15

16

17

18

19

20

21

22

23

24

25